UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                          ORLANDO DIVISION

                    CASE NO.:  6:23-CV-0230-RBD-LHP


FREDERICK SAUNDERS, individually,

     Plaintiff,

v.

SIGNATURE FLIGHT SUPPORT, LLC,
a Delaware limited company,

     Defendant.
_____/


DEPOSITION OF:        FREDERICK SAUNDERS

DATE:                 NOVEMBER 30, 2023

TIME:                 9:37 A.M. – 6:36 P.M.

TAKEN BY:             DEFENDANT

PLACE:                JACKSON LEWIS, P.C.
                      390 NORTH ORANGE AVENUE, SUITE 1285
                      ORLANDO, FLORIDA  32801

REPORTED BY:          DAYNA JONES, FPR, NOTARY PUBLIC,
                      STATE OF FLORIDA



```
 1   A P P E A R A N C E S:

 2

     MICHAEL G. MANN, ESQUIRE
 3   OF:   The Cochran Firm
           605 East Robinson Street, Suite 140
 4         Orlando, Florida  32801
           mmann@cochranfirm.com
 5
           Counsel for the Plaintiff
 6

 7   AMANDA A. SIMPSON, ESQUIRE
     LIN J. WAGNER, ESQUIRE
 8   OF:   Jackson Lewis P.C.
           390 North Orange Avenue, Suite 1285
 9         Orlando, Florida  32801
           amanda.simpson@jacksonlewis.com
10         lin.wagner@jacksonlewis.com

11         Counsel for the Defendant

12

13

14

15   ALSO PRESENT:

16   Matthew Klein, Signature Aviation

17

18

19

20

21

22

23

24

25
```



                         I N D E X

TESTIMONY OF FREDERICK SAUNDERS

        Direct Examination by Ms. Simpson...............6

        Cross-Examination by Mr. Mann..................248

        Redirect Examination by Ms. Simpson...........271

CERTIFICATE OF OATH..................................274

CERTIFICATE OF REPORTER.............................275

ERRATA SHEET.......................................276

                        *  *  *  *  *  *

                     E X H I B I T S

DEFENDANT'S EXHIBIT 1................................13
     (Plaintiff's Answers to Defendant's First Set of
     Interrogatories to Plaintiff)

DEFENDANT'S EXHIBIT 2................................17
     (Florida Commerce Wage Information)

DEFENDANT'S EXHIBIT 3................................36
     (Conexus Engagement Letter)

DEFENDANT'S EXHIBIT 4................................43
     (BBA Aviation Application)

DEFENDANT'S EXHIBIT 5................................43
     (Signature Offer Letter)

DEFENDANT'S EXHIBIT 6................................46
     (2019-2021 W-2 and Earnings Summary)

DEFENDANT'S EXHIBIT 7................................59
     (Gallup Employee Engagement Report)

DEFENDANT'S EXHIBIT 8................................67
     (E-mail String)

DEFENDANT'S EXHIBIT 9................................83
     (E-mail String)



1          E X H I B I T S   C O N T I N U E D

2   DEFENDANT'S EXHIBIT 10.................................89
         (E-mail String)
3
    DEFENDANT'S EXHIBIT 11.................................94
4        (E-mail String)

5   DEFENDANT'S EXHIBIT 12.................................97
         (E-mail String)
6
    DEFENDANT'S EXHIBIT 13................................108
7        (Text Messages)

8   DEFENDANT'S EXHIBIT 14................................114
         (E-mail String)
9
    DEFENDANT'S EXHIBIT 15................................117
10       (E-mail String)

11  DEFENDANT'S EXHIBIT 16................................124
         (E-mail String)
12
    DEFENDANT'S EXHIBIT 17................................130
13       (E-mail String)

14  DEFENDANT'S EXHIBIT 18................................132
         (E-mail String)
15
    DEFENDANT'S EXHIBIT 19................................135
16       (E-mail String)

17  DEFENDANT'S EXHIBIT 20................................148
         (E-mail from Jan Chalk dated 9/14/21)
18
    DEFENDANT'S EXHIBIT 21................................152
19       (E-mail String)

20  DEFENDANT'S EXHIBIT 22................................153
         (Global Compliance Alertline System Report)
21
    DEFENDANT'S EXHIBIT 23................................155
22       (E-mail from Frederick Saunders dated 9/30/21)

23  DEFENDANT'S EXHIBIT 24................................161
         (Ethics Concern Notes)
24
    DEFENDANT'S EXHIBIT 25................................169
25       (E-mail String)



1                      E X H I B I T S    C O N T I N U E D

2

  DEFENDANT'S EXHIBIT 26...............................171
3            (E-mail String)

4     DEFENDANT'S EXHIBIT 27...............................177
             (E-mail String)
5
      DEFENDANT'S EXHIBIT 28...............................178
6            (E-mail String)

7     DEFENDANT'S EXHIBIT 29...............................182
             (Notice of Termination)
8
      DEFENDANT'S EXHIBIT 30...............................197
9            (Written Statement of Danielle Morales)

10    DEFENDANT'S EXHIBIT 31...............................225
             (Department of Veterans Affairs Medical Records)
11
      DEFENDANT'S EXHIBIT 32...............................226
12           (Charge of Discrimination)

13

14

15

16                          *  *  *  *  *  *

17                       S T I P U L A T I O N S

18          It is hereby stipulated and agreed by and

19    between counsel present for the respective parties, and

20    the deponent, that the reading and signing of the

21    deposition are hereby RESERVED.

22

23

24

25



```
 1                   P R O C E E D I N G S

 2                          * * * *

 3              THE COURT REPORTER:  Do you solemnly swear

 4         that the testimony you are about to give will be

 5         the truth, the whole truth and nothing but the

 6         truth?

 7              THE WITNESS:  Yes.

 8                         FREDERICK SAUNDERS,

 9         having first been duly sworn, was examined and

10    testified as follows:

11                     DIRECT EXAMINATION

12    BY MS. SIMPSON:

13         Q.   Good morning.  We've met, but my name is

14    Amanda Simpson.  I'm an attorney with the law firm of

15    Jackson Lewis and I represent Signature Flight Support

16    in connection with the claims you've brought against it.

17              We're here today for purposes of taking your

18    deposition.  Have you had your deposition taken before?

19         A.   I have not had my deposition taken before.

20         Q.   Okay.  So I'll just go through a few

21    guidelines to make it go as smoothly as possible today.

22              So obviously, first, remember you're under

23    oath and have sworn to tell the truth.  Do you

24    understand that?

25         A.   I do understand, yes.
```



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                7

1      Q.   If you do not hear or understand a question,
2  say so and I'll repeat it or rephrase it.  If you answer
3  the question, I'll assume you've heard it, understood it
4  and have given it your best answer; is that fair?
5      A.   That is fair.
6      Q.   And so as you can see we have a court reporter
7  here today who's taking down everything that we say, so
8  please be sure to answer all questions audibly.  The
9  court reporter can't take down a head nod or an
10  "uh-huh."  Do you understand?
11     A.   I do understand.
12     Q.   Okay.  And also, we're doing well so far.  But
13  sometimes we'll start talking over each other and if you
14  could just try to allow me to finish my question so the
15  court reporter can take down both the question and the
16  answer, okay?
17     A.   I understand.
18     Q.   And obviously, we're scheduled for all day
19  today.  But this is not a marathon.  If you need to take
20  a break, so long as a question isn't pending, we can
21  take a break at an appropriate time.  So just let me
22  know, okay?
23     A.   I will.
24     Q.   Are you taking any drugs or other medication
25  or are you under the effect of alcohol or any other



1  substance which might affect your ability to recall past

2  events or answer my questions today?

3      A.   I've never taken any drugs.  I am not on

4  alcohol.  Or not drinking, I will say.  I can understand

5  your questions.  Yes.

6      Q.   Are you suffering from any illness that would

7  affect your ability to testify today?

8      A.   Classify "illness."  When you say "illness" --

9      Q.   Are you suffering from any mental illness that

10  would affect your ability to testify today?

11      A.   Not that at this point in time.

12      Q.   Okay.  Are you suffering from any physical

13  illness that would affect your ability to testify today?

14      A.   I'm not suffering any physical illnesses, no.

15      Q.   Okay.  And are you taking any medication today

16  with respect to any illness that would affect your

17  ability to testify today?

18      A.   I'm not taking any medication, no.

19      Q.   Okay.  Did you prepare for today's deposition?

20      A.   Prepare for -- please explain prepare for the

21  deposition.

22      Q.   Did you speak to anyone to prepare for today's

23  deposition?

24      A.   Besides my lawyer, that's it.

25      Q.   Okay.  How long did you speak with your



1  attorney?

2      A.    Two hours yesterday during our prep call.

3      Q.    Okay.  Did you review any documents?

4      A.    I want to say yes, we reviewed the pending

5  claim as well as my termination letter and my -- I think

6  that's -- I want to say the claim and termination

7  letter, yes.

8      Q.    And when you say "claim," are you referencing

9  the complaint that is the subject of the case?

10     A.    Correct, yes.

11     Q.    Okay.

12     A.    The complaint, yes.

13     Q.    And just so I'm clear, you didn't speak with

14  anyone else besides your attorney to prepare for your

15  deposition today?

16     A.    I did not speak with anyone else besides my

17  attorney.

18     Q.    And what is your full name?

19     A.    Frederick Lee Saunders.

20     Q.    And your date of birth?

21     A.    ███████████████

22     Q.    And what is the address of where you reside?

23     A.    My address is ███████████████████

24  ████████████  Orlando, Florida 32822.

25     Q.    And how long have you lived there?



1      A.    I have lived at that address for about five

2  years, October 2018 to be exact, roughly.

3      Q.    Do you rent or own?

4      A.    I own.  A mortgage, but yes.

5      Q.    Does anyone live with you?

6      A.    No.

7      Q.    Where did you live before?

8      A.    I lived at ███████████████████████,

9  Orlando, Florida.  Zip Code same, 32822.  And I lived

10  there from 2015 to 2018, so three years.

11     Q.    What is your marital status?

12     A.    I am single.

13     Q.    Do you have any children?

14     A.    I do not have any children.

15     Q.    Have you ever been arrested or convicted of a

16  crime?

17     A.    I've never been arrested and never been

18  convicted of any crimes.

19     Q.    Did you complete high school?

20     A.    I did complete high school.

21     Q.    And did you complete undergraduate college?

22     A.    I did complete undergraduate college.

23     Q.    Where did you go to college?

24     A.    I started my college career at Hillsborough

25  Community College in Tampa.  I did two years there.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              11

1  Received my associate's degree, which automatically

2  transferred me or granted me admission to Florida State,

3  where I completed two years of undergraduate in

4  accounting.  And then after -- well, that's undergrad.

5  So yes.

6       Q.   So did you get a BS in accounting?

7       A.   Yes, I did.

8       Q.   And after undergrad, did you attend graduate

9  school?

10      A.   I did.  I attended the University of South

11 Florida for one year, which is basically to obtain my

12 master's of accounting/accountancy degree, which allowed

13 me to take the CPA exam.

14      Q.   Okay.  Do you have any other education besides

15 that?

16      A.   That's the only education.

17      Q.   And when did you get your master's in

18 accounting?

19      A.   2003; I want to say.

20      Q.   And did you end up getting a CPA licensure?

21      A.   I did, yes.

22      Q.   When was that?

23      A.   August of 2020 -- I think it was '20.  2020, I

24 want to say.  Yeah, 2020.

25      Q.   Is your licensure still current?



1      A.   It is still current, yes.

2      Q.   When did you begin your employment with

3   Signature?

4      A.   I began my employment with Signature

5   September 2007.

6      Q.   And I'm not trying to trick you, but was that

7   with BBA Aviation?

8      A.   Yes, initially.  Yes.

9      Q.   Okay.

10      A.   Before Signature Aviation and ASIG split from

11   each other.

12      Q.   Got it.

13      A.   Initially it was BBA Aviation.  You're

14   correct.

15      Q.   Okay.  And do you recall when you started

16   working for Signature?

17      A.   Actually, yes, October of 2017.

18      Q.   Great.  Thank you.

19      A.   You're welcome.

20      Q.   Where were you employed directly before

21   Signature?

22      A.   You mean before BBA Aviation?

23      Q.   Yes.

24      A.   No worries.

25           I was -- directly before that employment, I



FREDERICK SAUNDERS                              November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                          13

 1  was employed with a mid-size accounting firm, or CPA

 2  firm, LarsonAllen for approximately six months.

 3      Q.   So throughout the deposition I'm going to be

 4  handing you some exhibits that I'll mark and we can go

 5  through together.  Take your time and review them and

 6  just let me know if you need additional time before we

 7  move on with the questions, okay?

 8      A.   I understand.

 9           (Defendant's Exhibit 1 was marked for

10      identification.)

11  BY MS. SIMPSON:

12      Q.   So, Mr. Saunders, I provided you with what has

13  been marked as Exhibit 1.  Do you recognize this?

14      A.   I believe this is my claim against Signature

15  Flight Support.

16      Q.   Are you referencing --

17           MR. MANN:  Make sure you look at it.

18  BY MS. SIMPSON:

19      Q.   Yeah.

20           Are you referencing the top of that, the

21  caption?

22      A.   Exhibit 1?

23      Q.   Yeah, so at the top of the first page of

24  Exhibit 1, you see that it's your case reference at the

25  top, right?



1      A.   Yes, that is my case.

2      Q.   And then below that, do you see that the title

3  of the document is Plaintiff's Answers to Defendant's

4  First Set of Interrogatories to Plaintiff?

5      A.   Yes.

6      Q.   Okay.  And do you recall receiving some

7  questions -- we call them interrogatories, but they're

8  questions -- as part of this lawsuit that you signed off

9  on?

10      A.   Was that a question?

11      Q.   Yes.

12      A.   Could you repeat that, please?

13      Q.   Absolutely.

14           Do you recall receiving some questions as part

15  of this lawsuit that you signed off on?

16      A.   I do recall, yes.

17      Q.   Okay.  And just so we make sure we're on the

18  same page, if you flip to the second-to-last page,

19  page 24, it says "verification" on the top.  Right there

20  (indicating).

21           Do you see that it says, "I have reviewed the

22  above answers to interrogatories and verify that they

23  are true and correct"?

24      A.   I do see that.

25      Q.   And is that your signature underneath?



 1      A.   That is my signature.

 2      Q.   And did you sign these on July 13, 2023?

 3      A.   I did sign these on July 13, 2023.

 4      Q.   Okay.  And did you review the answers to

 5  interrogatories for their truth and accuracy before

 6  signing them?

 7      A.   I did.

 8      Q.   So we were talking about your prior employer,

 9  so I thought it would be helpful to just flip to

10  Interrogatory No. 4.

11           And do you see that this asks you for the 10

12  years preceding your employment with defendant, to

13  identify every employer for whom you've worked?

14      A.   I do see that.

15      Q.   And then there are two employers listed.

16  Employer number two, is that the LarsonAllen you were

17  just referencing?

18      A.   Yes, that is correct.

19      Q.   Okay.  So what is LarsonAllen?

20      A.   They are a regional CPA firm.

21      Q.   And what were your dates of employment there?

22           Again, I'm not trying to trick you.  If you

23  flip to the next page, it looks like dates employed are

24  indicated there.

25      A.   I would say December 2006 to March 2007.



FREDERICK SAUNDERS                              November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                           16

1        Q.    Okay.  And what was your position there?

2        A.    Audit senior.

3        Q.    And what were your job duties?

4        A.    Auditing clients in the banking industry as

5    well as either manufacturing and/or health care.

6        Q.    Do you recall what your pay was?

7        A.    I do not recall what my pay was.

8        Q.    Were you paid hourly or salary?

9        A.    Salary.

10       Q.    Who was your supervisor at LarsonAllen?

11       A.    I do not recall.

12       Q.    Do you recall if it was a man or woman?

13       A.    It was a man.

14       Q.    Did you end up resigning or were you

15   terminated from LarsonAllen?

16       A.    The contract had ended, the six-month

17   contract.

18       Q.    So explain that to me.  You were on a

19   six-month contract with LarsonAllen?

20       A.    That is correct.

21       Q.    And did you ask for it to be renewed?

22       A.    I did not.

23       Q.    Why not?

24       A.    I wanted to be more in the private sector to

25   be more part of a true company because at that point in



FREDERICK SAUNDERS                                        November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                  17

1  my career I had been with the CPA firm for about three

2  and a half, four years.  And again, I wanted to be more

3  in the accounting spectrum or world, if you will.

4      Q.   And so is that what you're referencing on the

5  second page of the response to the Interrogatory

6  No. 4 -- you were on it.

7      A.   A pursuit, yes.

8      Q.   -- it says, reason left, pursue another

9  opportunity?

10      A.   In summation, yes.

11      Q.   Okay.  How was your performance at

12  LarsonAllen?

13      A.   It was short-term, so I would say pretty good.

14  I did not receive a performance review.

15          (Defendant's Exhibit 2 was marked for

16      identification.)

17  BY MS. SIMPSON:

18      Q.   Mr. Saunders, I've handed you what's been

19  marked as Exhibit 2.  These are records that the Florida

20  Department of Commerce produced in response to our

21  request for records related to your unemployment claims.

22  I know it's a big file.  If you look at the bottom,

23  right-hand corner, we call them Bates labels --

24      A.   Excuse me.

25      Q.   Yes?



1        A.    Is it Amanda?

2        Q.    Yes.

3        A.    This is missing a sticker compared to this

4    one.

5              MR. MANN:   It's on the left.

6              THE WITNESS:   Oh, I was looking to the right.

7        I apologize.

8    BY MS. SIMPSON:

9        Q.    No problem.

10             If you look at the bottom, right-hand corner

11   of the exhibit, we call them Bates labels.   That's just

12   a fancy legal word for page numbers.   Okay?

13       A.    Okay.

14       Q.    So I'm going to be referring to Bates labels

15   throughout the deposition to help make sure we're on the

16   same page.

17             So if you flip to Bates label 030026, do you

18   see that this is a General Information section that it

19   appears you filled out online in order to apply for

20   benefits?

21       A.    I do see this.

22       Q.    And at the bottom of that page, do you see it

23   says, Personal Information, and says your name?

24       A.    Correct.   Yes.

25       Q.    And do you see that the street address is 2029



 1  North Rome Terrace, Tampa, Florida?

 2       A.   Yes.

 3       Q.   So approximately what time would this have

 4  been that you were residing at that address?

 5       A.   If I recall correctly, 199- -- if I may back

 6  date because this is so long ago.  But I got out of the

 7  Army in March of '97.  So that would be from, I'll say,

 8  April 1997 to maybe June, July of 2001.  But that may

 9  not be correct because I was at Florida State for

10  awhile.  Bear with me.

11          I got out of the Army in March of '97.  Did

12  two years at ACC, so that would be August of 1999.  I

13  was living there at the time, so that's two years.  Then

14  I went to Florida State for two years, '99 to 2001 and

15  then came back in '01 to '07.  That's six years.  So

16  maybe eight years total, roughly, if that makes sense or

17  if that's clear.

18       Q.   And I just need approximates because I

19  understand it was a long time ago, but you think this

20  could have been your address somewhere near the end of

21  1990s to 2007?

22       A.   Yes.  Roughly, yes.

23       Q.   So let's flip two pages in to 030028.  And you

24  were just referencing it, but do you see the section

25  that says, Military Veteran Assistance?



FREDERICK SAUNDERS                              November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                            20

1        A.    Military Veteran Assistance?  Where exactly

2   are we?

3        Q.    (Indicating.)

4        A.    Oh, okay.  Yes.

5        Q.    Okay.  So it looks like your answering some

6   questions about when you served, right?

7        A.    Correct.

8        Q.    And by the way, thank you for your service.

9              Under that, do you see it looks like you're

10  listing some employers and LarsonAllen is listed as

11  12/12/2006 to 4/20/2007, right?

12       A.    Yes, that is correct.

13       Q.    Okay.  And then under that in bold, the topic

14  says, Civilian Employment Information, and it's talking

15  about LarsonAllen.

16             Do you see that?

17       A.    I do see that, yes.

18       Q.    And so that's in Tampa, so it seems like your

19  Tampa address that we just covered was probably where

20  you lived at the time you worked for LarsonAllen?

21       A.    That is correct.

22       Q.    Got it.

23             Okay.  If you flip to the next page, 030029,

24  do you see that a couple lines down it says, "Reason for

25  separation," and it says, "discharged/fired"?

1      A.   I do see that.

2      Q.   Okay.  Do you recall entering that in or was

3  that generated by something else?

4      A.   I do not recall.

5      Q.   Okay.  Let's flip to 030036.  And do you see

6  that this is a form filled out by an HR generalist at

7  LarsonAllen named Jolynn.  Do you know who that is?

8      A.   I do not know who that is.

9      Q.   Okay.  Do you see that about three lines under

10  the chart at the top it says, "The decision to discharge

11  the claimant was made by Jack Rybicki"?

12      A.   I do see that, yes.

13      Q.   Do you know who that is?

14      A.   The partner or principal at LarsonAllen at the

15  time.

16      Q.   Okay.  And under that, do you see

17  "unsatisfactory work performance" is checked?

18      A.   I do see that.

19      Q.   Okay.  And then under that, do you see it

20  says, "Job Duties," and it lists "senior auditor

21  position" as your job duties?

22      A.   I do see that, yes.

23      Q.   And then the next line says, "How did the

24  claimant fail to perform the job duty satisfactory?"

25  And it says, "Poor performance."



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              22

 1        A.    I do see that.

 2        Q.    And if we go down to No. 4, it says, "Final

 3   Incident, what was the final incident that caused the

 4   employer to discharge the claimant?"  And it says, "Job

 5   performance not good."

 6        A.    I do see that.

 7        Q.    Okay.  And so does this refresh your

 8   recollection on how your job performance was while at

 9   LarsonAllen?

10        A.    I will say this is not true.

11        Q.    What about it is not true?

12        A.    My job performance not being good.

13        Q.    Okay.  So are you contending that LarsonAllen

14   is lying in this piece of paper?

15        A.    I do.

16        Q.    Okay.  And what motivation would they have to

17   lie?

18             MR. MANN:  Objection.

19             You can answer.

20             THE WITNESS:  Yes, sir.

21             I have no idea why they would lie.

22   BY MS. SIMPSON:

23        Q.    Okay.  Did you ever contact them and say, hey,

24   I think this is incorrect?

25        A.    I did not contact them.



1    Q.    Okay.  Did you ever have any communications

2  with Jack during your employment with LarsonAllen?

3    A.    Maybe once or twice about a pending assignment

4  I was going to.

5    Q.    Okay.  Did you have any communications with

6  your supervisor during your time at LarsonAllen about

7  your performance?

8    A.    Exactly not.  And that's why I believe this is

9  a lie.

10    Q.    Okay.  So just because nobody talked to you

11  about your performance, it's your contention that your

12  job performance was good?

13    A.    Yes.

14        MR. MANN:  Objection.

15  BY MS. SIMPSON:

16    Q.    Okay.  Did anybody ever tell you your job

17  performance was good?

18    A.    They never said it was not good until...

19    Q.    Understood.

20        My question was:  Did anyone ever tell you

21  your job performance was good?

22    A.    I do not recall.

23    Q.    You would recall if somebody told you you

24  weren't performing well, though, right?

25        MR. MANN:  Objection.

```
 1              You can answer.
 2              THE WITNESS:  I'd recall that.
 3  BY MS. SIMPSON:
 4       Q.   Okay.  Let's flip back to Exhibit 1, the
 5  answers to interrogatories.  We're just going to stay on
 6  that same page, which was Interrogatory No. 4.
 7              Do you see there's some information there
 8  about a company called Ernst & Young?
 9       A.   Yes, I do see that.
10       Q.   And chronologically, how did that employer
11  fall into place?  Was that before or after LarsonAllen?
12       A.   Before.
13       Q.   Okay.  And what's Ernst & Young?
14       A.   A national CPA firm.
15       Q.   And how long did you work there?
16       A.   From January 2004 to July 2006.
17       Q.   And what was your position?
18       A.   Assurance audit staff and assurance audit
19  senior.
20       Q.   And what were your job duties?
21       A.   Same as LarsonAllen.
22       Q.   Who was your supervisor?
23       A.   I do not recall.  Actually, I take it -- Brian
24  Pintacuda at one point.  And he's the only senior that I
25  recall during my time.
```



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              25

1      Q.    And why did you leave Ernst & Young?

2      A.    To pursue other opportunities.

3      Q.    Okay.  And referring to the answers to

4   interrogatories, reason left says, pursue private sector

5   opportunity, right?

6      A.    That's correct.

7      Q.    And just so I'm clear, was LarsonAllen a

8   private sector opportunity?

9      A.    They were not.

10     Q.    Okay.  So did you have a gap in your

11  employment from July 2006 to December 2006?

12     A.    That is correct.

13     Q.    Okay.  What were you doing during that time?

14     A.    Healing.

15     Q.    What do you mean by "healing"?

16     A.    Trying to find what track I wanted to be on in

17  my professional career because of not the partner track.

18  And then that's why I shifted to accounting, more so

19  internal audit.

20     Q.    Were you trying to be on the partner track at

21  Ernst & Young?

22     A.    I was just trying to do my job the best I

23  could.

24     Q.    How was your job performance?

25     A.    I believe it was pretty good.



1      Q.   Did something happen at Ernst & Young that

2  made you have to heal for several months after?

3      A.   I can remember one incident where we were

4  working until about midnight around Christmastime.  And

5  it was myself, Brian Pintacuda and other staffer senior

6  trying to get out reports and filings.  And I remember

7  hearing the sounds of the building empty and the vents

8  cranking, the AC cranking.  And I asked myself, what am

9  I doing here?  We all said that, what are we doing here?

10     Q.   And you had to heal from that?

11     A.   Yes.  Because on top of the 70-hour workweeks

12 that we were doing for the past two-and-a-half years, to

13 know CPA firms, it's a grind.  You go through this

14 gauntlet of working long hours, intense clients, no

15 life.

16     Q.   Did you sue Ernst & Young?

17     A.   Did I sue -- no, I did not sue Ernst & Young.

18     Q.   So was this more healing based on your own

19 decisions in your career path or was it something Ernst

20 & Young did to you?

21          MR. MANN:  Objection.

22          You can answer.

23          THE WITNESS:  It was more, again, wanting to

24     find what I wanted to do with the rest of my

25     career.  And I felt I needed to find something to



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              27

1      do with my career, something different.
2   BY MS. SIMPSON:
3      Q.    Was LarsonAllen different?
4      A.    Not at the time.
5      Q.    Why did you end up taking that job then?
6      A.    Because I needed employment.
7      Q.    So you quit Ernst & Young with no job
8   opportunity?
9      A.    No job opportunity.
10     Q.    How did you live for those couple of months?
11  What was your source of income?
12     A.    I lived with my parents at the time, so it
13  wasn't a huge financial strife or challenge.  And I
14  received unemployment.  And I just cut or reduced my
15  costs, my expenses, my life expenses.
16     Q.    Let's flip back to Exhibit 2.  And let's flip
17  to 030029.
18          Do you see the bottom of the page, it says in
19  bold, No. 2, Civilian Employment Information?
20     A.    Yes, I do see that.
21     Q.    And this is where Ernst & Young is listed.  Do
22  you see that?
23     A.    I do see that.
24     Q.    Okay.  And down for the reason for separation,
25  do you see it says, discharged or fired?



1      A.   I do see that.

2      Q.   And do you recall inputting that into the

3 system?

4      A.   I do not.

5      Q.   Okay.  Let's flip to 030049.  So do you see

6 that this is the document regarding the discharge from

7 Ernst & Young.  It looks like, in the middle, rate of

8 pay is $47,900.  Does that sound about right?

9      A.   I do not recall.

10     Q.   Okay.  If you flip to the next page, 030050,

11 in Section 4, do you see it says, "Claimant Rebuttal,"

12 and says, "I was laid off.  I was told on 6/8/06 that I

13 would be laid off and needed to look for other work.  I

14 was never told of any misconduct with my job and I'm

15 currently looking for work."

16     A.   I do see that.

17     Q.   Does that refresh your recollection on the

18 reason why you left Ernst & Young?

19     A.   I was pursuing other opportunities.

20     Q.   But you were laid off, right?

21     A.   According to their statement.

22     Q.   This is your statement though.

23     A.   That's not my handwriting.

24     Q.   It says, "Claimant's Rebuttal."

25     A.   That was not my handwriting.



1      Q.   So it's your testimony you never wrote this?

2      A.   I did not write this.

3      Q.   It's your testimony this is incorrect?

4      A.   It's not my handwriting.

5      Q.   Were you laid off?

6      A.   According to this?

7      Q.   According to you, under oath, were you laid

8   off?

9      A.   I was told by the partner, this may not be the

10  best fit for you.

11     Q.   So you were laid off, correct?

12     A.   According to this?

13     Q.   Yes.  So I understand that the document that

14  we're looking at, 030050, says that.  I'm asking you

15  under oath whether you were laid off from Ernst & Young?

16     A.   When they told me, yes.

17     Q.   Okay.  So why in answer to your

18  interrogatories did you say that the reason you left was

19  to pursue private sector opportunity?

20     A.   That's what I was doing.

21     Q.   After you were laid off, correct?

22     A.   I'll say correct.

23     Q.   Is there anything else in your answers to

24  interrogatories that you would like to revise before we

25  continue with questions?



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              30

1      A.   I'd have to go back and look at them.  I'm

2   unsure.

3      Q.   Okay.  So as we review them, take your time,

4   and let me know if there's any changes, okay?

5      A.   Will do.

6      Q.   Are you currently employed?

7      A.   I am, yes.

8      Q.   Where are you employed?

9      A.   GAF.

10     Q.   Does that stand for something?

11     A.   No, it's just GAF.

12     Q.   Okay.

13     A.   Materials company, basically.

14     Q.   What's your job there?

15     A.   Internal audit manager.

16     Q.   When did you begin employment with GAF?

17     A.   June 2022.

18     Q.   And have you been an internal audit manager

19   the entire time you've been employed by GAF?

20     A.   I have been an internal audit manager the

21   whole time.

22     Q.   And are you paid salary?

23     A.   I am paid salary.

24     Q.   Approximately, how much is your salary?

25     A.   At the time of hire or currently?



FREDERICK SAUNDERS                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                    31

1    Q.    Great point of clarification.   How about both?

2    A.    $145,000 or 145K.   And currently, 148K.

3    Q.    Are you eligible for any bonuses?

4    A.    I am eligible for bonuses.

5    Q.    Have you received any bonuses?

6    A.    I have received a bonus.

7    Q.    Approximately, how much?

8    A.    I do not recall.

9    Q.    When did you receive it?

10   A.    Possibly March of 2023, for the year 2022.

11   Q.    Do you receive any other sort of compensation

12   besides the salary and bonus we talked about?

13   A.    Besides unemployment?

14   Q.    Apologies.

15         When you're working at GAF, from GAF.

16   A.    No, that's the only compensation.

17   Q.    Okay.   And was your starting pay more than

18   what you made at Signature?

19   A.    My starting pay was more than what I made at

20   Signature.

21   Q.    Okay.   How did you find out about the position

22   at GAF?

23   A.    I believe a recruiter cold called me.   I'm

24   unsure.

25   Q.    Who's your supervisor at GAF?



1      A.    Ryan Flynn.

2      Q.    Do you enjoy your employment?

3      A.    Absolutely.

4      Q.    Do you have any intentions of looking for

5  other employment?

6      A.    According to Ryan, he says to always look for

7  other opportunities.

8      Q.    Have you looked for other employment while

9  you've been employed at GAF?

10     A.    I have looked for other employment

11 opportunities.

12     Q.    Have you interviewed anywhere else?

13     A.    Once or twice, I believe.

14     Q.    Did you get a job offer?

15     A.    I have not.

16     Q.    Have you been employed anywhere else since

17 your separation from Signature?

18     A.    With Ungaro Consulting.

19     Q.    You know what, going back to Exhibit 1.  If we

20 flip to Interrogatory No. 5, do you see this asks you to

21 state whether you've been employed by any person or

22 entity, other than defendant, since October 1, 2021 and

23 with respect to such employment identify -- and then it

24 lists some information.  And you list two employers,

25 Ungaro and GAF on the next page.



1      A.   I do see that.

2      Q.   So we already talked about GAF.  But Ungaro,

3  which is listed first.  It says it's in California.  Is

4  that just the principal place of business or did you

5  work remotely?

6      A.   The founder and owner of Ungaro Consulting is

7  based there and I worked remotely.

8      Q.   Got it.

9           And so what is Ungaro?

10     A.   Her name is Nicole Ungaro and that's her

11 company, basically.

12     Q.   And what type of company is it, I'm sorry?

13     A.   It's a consulting firm that does SOX audit

14 work for various companies.

15     Q.   How did you learn about this job?

16     A.   Through the recruiting company, Conexus, if I

17 recall correctly.

18     Q.   Is that the same recruiting company that let

19 you know about GAF?

20     A.   That is not the same company.

21     Q.   Okay.  And just take a second and look at your

22 answer to interrogatory.  Does everything look true and

23 accurate as to Ungaro?

24     A.   It looks correct.

25     Q.   And I saw you also looking at GAF.  Is



1  everything true and correct --

2       A.   No, no, I was just continuing from the

3  previous to the little piece there for Ungaro.

4       Q.   Got it.

5            While you're on that page, look at GAF and let

6  me know if everything looks true and accurate for them

7  as well.

8       A.   The information looks correct.

9       Q.   Okay.  So tell me about Ungaro.  How long did

10 you work there?

11      A.   From January 2020 to May 2022 -- sorry,

12 January of 2022 to May of 2022.

13      Q.   And what was your role?

14      A.   Audit, SOX consultant.

15      Q.   And how much did you make?

16      A.   $55 an hour.

17      Q.   I see next to that it says per time only.

18 What does that mean?

19      A.   It's basically contract work again.  Worked

20 about maybe four hours -- actually, probably two to

21 three hours a day, maybe two or three days a week

22 roughly.

23      Q.   Do you recall, approximately, what you made

24 during the time period that you worked at Ungaro?

25      A.   I do not recall.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              35

1    Q.   Does your pay rate ever change?

2    A.   I do not recall.

3    Q.   Were you eligible for benefits?

4    A.   I do not think so.

5    Q.   I should have asked that about GAF.  Are you

6    eligible for benefits?

7    A.   I am eligible for benefits at GAF, yes.

8    Q.   Have you elected benefits?

9    A.   Yes, I have.

10   Q.   What benefits have you elected?

11   A.   The first year, medical and vision, I believe.

12   And then the current year, medical and dental.

13   Q.   And not vision?

14   A.   Not vision this year.

15   Q.   Okay.  What about 401(k)?

16   A.   Yes, for both years.

17   Q.   Any life insurance?

18   A.   I do not think so.

19   Q.   Are you getting any benefits from being a

20   veteran?

21   A.   Besides using the VA hospital, but no

22   compensation, no disability benefits, nothing like that,

23   no.

24   Q.   Okay.  And no pension or anything?

25   A.   No pension.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              36

1    Q.   Got it.

2         Okay.  So at Ungaro, who is your supervisor?

3    A.   Nicole Ungaro.

4    Q.   And you worked remotely?

5    A.   Yes, I did work remotely.

6    Q.   And why did you leave Ungaro?

7    A.   Because of the opportunity for GAF.

8         (Defendant's Exhibit 3 was marked for

9    identification.)

10 BY MS. SIMPSON:

11   Q.   Okay.  Mr. Saunders, I've provided you what's

12 been marked as Exhibit 3, what are documents that

13 Conexus Recruiting produced in response to our subpoena.

14        And on the first page, do you see that it

15 appears to be something like an offer letter, that's

16 dated January 21, 2022, to report -- and they say client

17 information because it's recruiting -- to Nicole Ungaro

18 at Ungaro Consulting?

19   A.   I do see that.

20   Q.   And estimated start date was 1/24/2022, right?

21   A.   I do see that, yes.

22   Q.   And is that approximately when you started?

23   A.   I believe so.

24   Q.   And then under that do you see the

25 compensation says your hourly rate for this role would

1  be $65?

2       A.   I do see that.

3       Q.   So when we looked at your answers to

4  interrogatories it said $55 an hour, do you know which

5  one is right?

6       A.   I do not.  I'm unsure.  I thought it was $55,

7  but I guess it's $65.  I never looked at my paycheck

8  when I was getting paid.

9       Q.   You didn't look at your paycheck when you were

10  getting paid?

11       A.   No.  I rarely do, unless there's some concerns

12  or issues.

13       Q.   Okay.  How would you know if there's a concern

14  or issue if you don't look at your paycheck?

15       A.   If someone else is getting double paid or I

16  hear someone saying they got incorrect pay.  But other

17  than that, I don't look at my paychecks.

18       Q.   Okay.  Have you ever raised any concern about

19  your pay?

20       A.   At Ungaro Consulting?

21       Q.   At any of the employers you've worked for.

22       A.   No, I have not.

23       Q.   So if you flip to 030010, do you see that --

24       A.   Amanda, I apologize, 03-?

25       Q.   0010.  No problem.  I know there's a lot of



 1 | zeros in there.

 2 |         Do you know what these are?

 3 |     A.    It looks like pay stubs.

 4 |     Q.    Is it pay stubs or is it invoices to Ungaro?

 5 |     A.    Paychecks, pay stubs, invoices that, I

 6 | believe, Ungaro would pay Conexus and Conexus would pay

 7 | me.

 8 |     Q.    So when it's talking about a rate of 110, was

 9 | that a rate that you were paid?

10 |     A.    I do not believe so.

11 |     Q.    Okay.  Do you know what that rate stands for?

12 |     A.    I do not know what that rate stands for.

13 |     Q.    Besides Ungaro and GAF, did you work for any

14 | other company or person since your separation from

15 | Signature?

16 |     A.    I have not worked for any other company, other

17 | than Ungaro Consulting and GAF, since my separation from

18 | Signature.

19 |     Q.    Okay.  Did you apply for any employment

20 | anywhere else, either during your time with Signature or

21 | after your separation?

22 |     A.    None during Signature.  And after my

23 | separation, I searched for employment.

24 |     Q.    How did you search for employment?

25 |     A.    Through Glassdoor, Indeed and LinkedIn, their



 1  websites.

 2      Q.   Did you get any interviews besides Ungaro and

 3  GAF?

 4      A.   Yes, several interviews.

 5      Q.   Did you get any offers of employment besides

 6  Ungaro and GAF?

 7      A.   No, I did not receive any offers.

 8      Q.   Did you have any other sources of income after

 9  your employment with Signature, other than Ungaro and

10  GAF?

11      A.   Besides unemployment, no other compensation.

12      Q.   Okay.  Let's talk about unemployment.

13           Did you apply for unemployment from after

14  working for Ernst & Young?

15      A.   I believe so.

16      Q.   Do you recall if you received it?

17      A.   I believe so.

18      Q.   What about after LarsonAllen?

19      A.   I believe I received unemployment as well.

20      Q.   And then what about after Signature?

21      A.   I received unemployment as well.

22      Q.   Do you recall about how long you received

23  unemployment following your employment with Signature?

24      A.   If I may refer back to one of the exhibits

25  where I saw --



1      Q.    Yeah, absolutely.  Are you talking about

2  Exhibit 2?

3      A.    Yes.

4      Q.    Just point me to where you're looking.

5      A.    I would say 030020.

6      Q.    I'm there.

7      A.    And these 10 payments from unemployment.

8      Q.    The ten payments being from January 21st to

9  June 1st?

10     A.    You mean June 1, 2022.

11     Q.    Yes, I'm sorry.  I'm reading from the bottom

12  up --

13     A.    Oh.

14     Q.    -- because its chronology is reversed.  I

15  think we're saying the same thing, though.

16     A.    Actually, I just noticed that there's two

17  items from 2007, so then it would just be '8, from

18  January 21st to June 1st, correct.

19     Q.    Got it.

20           And then under that you see the dates

21  July 2007 and if we flip over to the next page, it looks

22  like it goes a couple months --

23     A.    I do see that.

24     Q.    -- before that, so it looks like June 2007 to

25  July 2007, so that's after LarsonAllen, right?



1      A.   I see one from July 2022 -- I'm sorry, 2002 --
2   I apologize -- on 030022.
3      Q.   Yeah, I'm still on 030020.
4      A.   Okay.  I apologize.
5      Q.   No problem.
6      A.   Okay.  Yes.
7      Q.   That's why we do these numbers.
8           Do you see, at the bottom, two entries from
9   July 2007?
10     A.   Yes.
11     Q.   And then if we flip over one page, it looks
12   like that unemployment section starts in June 6, 2007,
13   right?
14     A.   I do see that, yes.
15     Q.   So that would have been after your employment
16   with LarsonAllen, right?
17     A.   I believe so.  Yes.
18     Q.   And you'd agree you wouldn't have received
19   unemployment if you quit LarsonAllen, right?
20     A.   I'm not sure how that works.
21     Q.   You don't know the conditions for receiving
22   unemployment?
23     A.   As far as -- can you clarify that question?
24     Q.   Do you know the conditions upon which someone
25   can receive unemployment in the state of Florida?



1      A.    I do not recall.  I don't understand the
2    question.
3      Q.    Do you know if someone can receive
4    unemployment if they voluntarily quit from an employer?
5      A.    Can you?
6      Q.    I'm asking you if you know.
7      A.    I'm unsure.
8      Q.    Okay.  Do you know if somebody receives
9    unemployment if they're terminated from an employer?
10     A.    I'm unsure.
11     Q.    Okay.  That's all I want to know.
12     A.    Okay.
13     Q.    Have you ever filed for social security
14   benefits?
15     A.    I've never filed for social security benefits.
16     Q.    No sort of disability benefits either?
17     A.    I've never filed for any disability benefits.
18     Q.    Have you ever filed for workers' comp?
19     A.    I've never filed for workers' comp.
20     Q.    Have you ever filed or declared bankruptcy?
21     A.    I've never filed or declared bankruptcy.
22     Q.    Have you ever filed a charge of discrimination
23   against any other employer other than Signature?
24     A.    I've never filed for any form of
25   discrimination against any other employer other than



 1  Signature.

 2      Q.   Other than this lawsuit against Signature,

 3  have you ever been a party to any other lawsuit?

 4      A.   I've never been a party to any other lawsuits.

 5           (Defendant's Exhibit 4 was marked for

 6      identification.)

 7  BY MS. SIMPSON:

 8      Q.   So let's switch gears and talk about your

 9  employment at Signature.

10           I'm showing you what been marked as Exhibit 4.

11  Do you recognize this?

12      A.   I do recognize this document.

13      Q.   What is it?

14      A.   It appears to be my application for employment

15  with BBA Aviation.

16      Q.   What role were you applying for?

17      A.   The internal audit role.

18      Q.   And did you get that exact position with BBA?

19      A.   I did receive that exact positions.

20      Q.   And did you hold any other roles with BBA

21  before working for Signature?

22      A.   No, this was the only role I worked for

23  Signature -- or BBA, I apologize.

24           (Defendant's Exhibit 5 was marked for

25      identification.)



 1  BY MS. SIMPSON:

 2      Q.    Mr. Saunders, I'm showing you what I've marked

 3  as Exhibit 5.  Do you recognize this?

 4      A.    I do recognize this exhibit.

 5      Q.    What is it?

 6      A.    My offer letter for Signature Aviation.

 7      Q.    And does this accurately reflect the offer of

 8  employment to work as a regional accounting manager for

 9  Signature?

10      A.    I believe the document does.

11      Q.    Did you any other roles at Signature besides

12  the regional accounting manager?

13      A.    I have not held any other roles besides the

14  regional accounting manager for Signature.

15      Q.    If I refer to the role as RAM during the

16  deposition, will you understand that's --

17      A.    Oh, that's what we went by, so absolutely.

18      Q.    Perfect.

19            Okay.  So how did it work in terms of moving

20  from BBA to Signature, did you have to apply for this

21  specific role?

22      A.    I didn't have to apply.  Actually they wanted

23  me to be a RAM based on my vast experience with BBA as

24  an internal auditor.

25      Q.    And when you say "they," who wanted you to



FREDERICK SAUNDERS                                     November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                            45

 1  apply for the RAM role?

 2       A.   Ian Richardson and Peter Salling, the

 3  corporate controller and the, I would say, VP of

 4  accounting -- either director or VP of accounting, one

 5  of the two.

 6       Q.   So were there any interviews for this role?

 7       A.   I did interview with both Ian Richardson and

 8  Peter Salling.

 9       Q.   Okay.

10       A.   I believe so.  I'm pretty sure about Ian.  I'm

11  unsure about Peter, but I want to say both.  Don't quote

12  me, but...

13       Q.   And so the offer letter says that you were

14  offered $82,000 on an annual basis initially.  Do you

15  see that?

16       A.   That amount appears correct.  I do see that

17  amount, yes.

18       Q.   Did you receive raises throughout your

19  employment with Signature?

20       A.   I do believe I received raises, yes, I

21  believe.

22       Q.   I have a document that will help with us that.

23       A.   Okay.  I believe the merit increases, the

24  standard three percent or two percent, however they

25  deemed at the time each year.



1          (Defendant's Exhibit 6 was marked for

2      identification.)

3  BY MS. SIMPSON:

4      Q.   Got it.

5           Mr. Saunders, I'm showing you what's been

6  marked as Exhibit 6.  Do you recognize this?

7      A.   I do recognize the exhibit.

8      Q.   And are these your W-2s from Signature for the

9  years 2019 to 2021?

10     A.   These are my W-2s from Signature.

11     Q.   And do they accurately reflect your

12  compensation from Signature for the respective years?

13     A.   I believe so.

14     Q.   In addition to your salary, were you eligible

15  for any other compensation?

16     A.   Bonuses and 401K.

17     Q.   Did you actually receive bonuses during your

18  employment with Signature?

19     A.   I did receive bonuses for my employment with

20  Signature.

21     Q.   Do you recall, approximately, how much they

22  were?

23     A.   I do not recall.

24     Q.   Did you receive them each year that you were

25  employed by Signature?



1      A.    I did receive them each year, I believe.

2      Q.    Do you recall if they were more or less than

3  $10,000?

4      A.    I do not recall.

5      Q.    Besides 401(k), were you eligible for any

6  other benefits at Signature?

7      A.    I believe medical, dental and/or vision

8  depending on the year.

9      Q.    Did you actually elect those benefits?

10      A.    I believe so.

11      Q.    I actually have reviewed some documents that

12  was listing your benefits.  I saw beneficiaries listed

13  as Alice Saunders, who is that?

14      A.    That is my sister.

15      Q.    And Gwendolyn Saunders?

16      A.    That is my mother.

17      Q.    Got it.

18            So tell me about the reporting structure at

19  Signature.  In your role, what position would you report

20  up to?

21      A.    I'll call her the director of field

22  accounting.

23      Q.    And who is that?

24      A.    Sherri Miller.

25      Q.    Did you work with her at BBA as well?



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                          48

1       A.   Yes.   During audits, she would be the RAM at

2   the time and so when I would audit her particular bases,

3   we would interact and discuss the audit before, during

4   and after.

5       Q.   And what were your job duties as a RAM at

6   Signature?

7       A.   You say her job duties or my job duties?

8       Q.   Yours.

9       A.   Oh, sorry, mine?

10          So the main job duty was to -- one of the main

11  job duties was to make sure that fuel levels were

12  current each day.  I'll say current and appropriate,

13  adequate for each fuel day.  Because the business relied

14  on fuel -- having enough fuel to pump into the private

15  jets and charter planes for our customers.  And so

16  every -- every task revolved around fuel.

17      Q.   Did you have any direct reports?

18      A.   I did have six direct reports when I first

19  became a RAM.  And then five direct reports when I

20  transferred from the Northeast/Canadian Region to the

21  Atlantic/Southeast Region.

22      Q.   Okay.  I'm sorry, break that down for me.

23          So at first, as a RAM you had six direct

24  reports and you were in what region?

25      A.   It's Northeast and Canadian Region and that



1  was for about three years.  And then I transferred from

2  the Northeast/Canadian Region to the Atlantic/Southeast

3  Region, where I went from six direct reports to five

4  direct reports.

5        Q.    What was the title of the direct reports?

6        A.    Area accounting managers.

7        Q.    Are those the AAMs?

8        A.    AAM, yes.

9        Q.    And what their job duties?

10       A.    To make sure that the fuel was current and

11  adequate each day.

12       Q.    So in your role as a RAM, what were your

13  supervisory duties over the AAMs to make sure that the

14  fuel was current and appropriate each day?

15       A.    We had a fuel -- they have a fuel management

16  system that track the ins and outs of fuel, the issues,

17  the fills.  And so we had to make sure that any balance

18  of those transactions were current and adequate for each

19  close of the fuel day.

20       Q.    And so with respect to the AAMs, would you

21  coach them on their performance with respect to the

22  fuel?

23       A.    Yes, as far as making sure that they timely

24  reviewed their fuel days every day and closed the fuel

25  day every day.



1      Q.   And if they didn't, was your role responsible

2  for working with them on performance deficiencies?

3      A.   It was more to understand why they were unable

4  to close the fuel days.

5      Q.   Okay.  So if you had an AAM that wasn't

6  performing, who would handle the performance issues?

7      A.   I would as the RAM.

8      Q.   Okay.  Got it.

9           Let's focus on the five direct reports for the

10  Atlantic/Southeast time period.

11          First of all, let's take a step back.  Where

12  were you working during that time period?

13          MR. MANN:  Objection.

14          You can answer.

15          THE WITNESS:  The whole four years?

16  BY MS. SIMPSON:

17      Q.   If it's different, let me know.

18      A.   Sorry, for the Atlantic/Southeast Region --

19      Q.   Yes.

20      A.   -- I was at the 1345 Veterans Way location

21  before we went remote due to COVID.

22      Q.   Okay.  So during the time that you were at the

23  Veterans Way location, did any of your AAMs also work at

24  your location with you?

25      A.   They were all remote.



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                      51

1      Q.   So they were all remote even before COVID?

2      A.   Correct, stationed at their particular bases.

3      Q.   When you say "stationed at their particular

4  bases," would they go into the base sometimes?

5      A.   They primarily worked at a base.

6      Q.   Okay.  So they worked remotely from you, but

7  not remotely from the company?

8      A.   Correct.  They were at a base within the

9  company.

10     Q.   Got it.

11          And after COVID, did they also go remote?

12     A.   I want to say some went remote, some stayed at

13  the base, depending on their comfortability with COVID.

14     Q.   Got it.

15          Did you ever meet any of the AAMs in person?

16     A.   I did meet them in person.

17     Q.   And when would you meet them in person?

18     A.   The meetings varied because whether it was

19  during -- to support AAMs during audit, if it was to

20  address a concern from the general manager at a

21  particular base that the AAMs were sitting at or working

22  from.  That's about it.  Just a quarterly

23  meet-and-greet, if you will, the AAMs, just to have some

24  face-to-face time.

25     Q.   So is it safe to say you met all of the five



1  direct reports that were your AAMs from the

2  Atlantic/Southeast at some point?

3        A.    If I may name names.

4        Q.    Absolutely.

5        A.    Lisa Hay, met her in person.  Jan Chalk, of

6  course met her in person.  Greg Gunter, met him in

7  person.  David Jordan, actually I only met him once and

8  that was -- that meeting was at an AAM/RAM conference

9  when he came in to Orlando, so I only met him that one.

10 I'm sorry, I take that back.  I met him twice because I

11 went to support him during an audit in Atlanta.  And who

12 am I missing?  Renee, I believe I met her -- not only at

13 that same conference, but also once or twice supporting

14 her when I went to visit Huntsville.  So I think that's

15 all five of them.  It was all in person, yes.

16       Q.    So you said "of course" as to Jan Chalk.  Was

17 she local?

18       A.    No, Jan Chalk is based in Mobile, Alabama.

19       Q.    Why did you say "of course" as to her?

20       A.    The primary focus of all of this, this claim,

21 litigation.

22       Q.    Got it.

23             So it's not because of geographical location

24 or job duties?

25       A.    No.



1     Q.   Okay.   Were you responsible for interviewing

2 and hiring AAMs?

3     A.   That was my role, but I never interviewed an

4 AAM during my time as a RAM.

5     Q.   Got it.

6          Were you responsible for assigning and

7 directing them work?

8     A.   I was responsible for directing to make sure

9 their work was done.

10    Q.   Were you responsible for appraising the

11 performance of AAMs?

12    A.   I was responsible for appraising the

13 performance of the AAMs.

14    Q.   Were you responsible for addressing complaints

15 and conflict resolution with respect to the AAMs?

16    A.   I was responsible for addressing complaints

17 and resolutions for the AAMs.

18    Q.   Were you responsible for allocating raises for

19 the AAMs?

20    A.   I was responsible for allocating raises for

21 the AAMs within the constraints of a budget amount.

22    Q.   Did you understand that you were an at-will

23 employee during your time at Signature?

24    A.   I believe that's a Florida statute or that's

25 a --



1           MR. MANN:  Just answer the best you can.

2           THE WITNESS:  I want to say that I do

3     understand Florida is an at-will to work state.

4  BY MS. SIMPSON:

5      Q.   Got it.

6           And so as an employee in Florida for

7  Signature, was it your understanding you were an at-will

8  employee?

9      A.   I do understand that I was an at-will

10 employee.

11     Q.   Did you understand that Signature was an equal

12 opportunity employer?

13          MR. MANN:  Objection.

14          You can answer.

15          THE WITNESS:  I do not recall understanding

16     that part of this.

17 BY MS. SIMPSON:

18     Q.   Did you receive any EEO training during your

19 employment with Signature?

20     A.   I do not recall.

21     Q.   Do you recall seeing any policies on Signature

22 being an EEO employer?

23     A.   I do not recall.

24     Q.   Did you understand that Signature had

25 anti-discrimination policies in place?



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                            55

1        A.    I do recall that vaguely.

2        Q.    Did you understand that if an employee

3   experienced or witnessed any sort of discriminatory

4   behavior that there were procedures in place for

5   reporting that concern?

6        A.    I believe that was to be through the ethics

7   hotline.

8        Q.    And what's the ethics hotline?

9        A.    Where -- from my understanding, is where you

10  report an unfair or unethical behavior or action from

11  another employee.

12       Q.    And how did you know of the existence of the

13  ethics hotline?

14       A.    Because 10 years as an internal auditor within

15  Signature Aviation or BBA in total, one of the main

16  tasks of internal audit, when we're on-site, is to make

17  sure that each location has an ethics hotline poster

18  posted in the break room for the employees to report

19  unethical or unfair or biased behavior acted upon them.

20       Q.    Got it.

21             Okay.  So I know there's a bunch of posters in

22  most companies.  In your role, were you responsible for

23  just posting the ethics hotline or also some of the

24  other workers' comp, minimum wage, EEO posters?

25       A.    To clarify, I wasn't responsible for posting



1  any --

2      Q.    Okay.

3      A.    -- just to make sure the poster was there.

4      Q.    Got it.

5            So besides the ethics hotline poster, were you

6  responsible for ensuring any other posters were up?

7      A.    We were responsible for making sure, at a

8  certain point in time, that either the federal and --

9  either the federal and state minimum wage posters are

10 posted in the break room as well.

11     Q.    How would you describe your work performance

12 while employed at Signature?

13     A.    Excellent, advanced, skilled.  I believe at

14 the time, I was the best RAM in the four years that I

15 was a RAM and the second best RAM they ever had within

16 the company.

17     Q.    And what are you basing your belief that you

18 were the best RAM in the four years and best RAM in the

19 company on?

20     A.    My performance, my reviews, my lack of

21 performance improvement plans, my -- maxed out my

22 bonuses each year, the accolades that I received from my

23 peers and my direct reports, general managers, other

24 AAMs outside my team, within my team come to me for

25 support throughout my tenure.  I worked well with senior



1  management, with internal auditors when I left the group

2  to come to the RAM side.  I was put on special projects.

3  I led monthly meetings with different department heads,

4  whether it was finance, obviously accounting, HSE,

5  health, safety, and environment, maintenance, payroll

6  and HR, training, had monthly meetings for those, so I

7  was well revered within the company.

8      Q.   Okay.  So we reviewed your pay before and I

9  asked you about your bonuses.  So is it your testimony

10  now that you always maxed out your bonuses?

11      A.   I believe I did max out my bonuses.  As far

12  as -- I don't recall the numbers, but I believe I maxed

13  them out based on my percentage that is allowed to be

14  given, if I recall correctly.

15      Q.   Okay.  Do you know what other RAM's

16  performance ratings were?

17      A.   I did not know their performance rating, but I

18  do know that other RAMs were put on performance

19  improvement plans, PIPs.  I also know that other AAMs

20  under other RAMs would come to me for support and/or

21  address concerns about other RAMs.  And even Sherri

22  Miller said that I was the best RAM at the time.  When I

23  transferred from the Northeast/Canadian locations to

24  Atlantic/Southeast Region -- because when she told the

25  receiving AAMs that I was coming to be their RAM, she



1  said to them, you're getting the best RAM.

2      Q.   When other AAMs would come to you about their

3  concerns regarding their RAMs, what would you do with

4  those concerns?

5      A.   I told Sherri Miller twice about the concerns.

6      Q.   And what did she do with them?

7      A.   She said she would address the issue with that

8  particular RAM.

9      Q.   Any other factual basis for contending that

10 you were the best RAM in four years and the best RAM in

11 the company?

12     A.   For the last year I was a RAM, I received an

13 additional three percent merit increase on top of the

14 standard 2.5 increase that only the other RAMs received.

15 I'm the only RAM that received an additional three

16 percent on my merit increase.

17     Q.   How do you know that you were the only RAM who

18 got that?

19     A.   Because Sherri Miller told me so.

20     Q.   And what was that based off of?

21          MR. MANN:  Objection.

22          THE WITNESS:  My performance.

23 BY MS. SIMPSON:

24     Q.   And how do you know that?

25     A.   She told me.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              59

1      Q.   So were you ever coached at any time during

2   your employment with Signature?

3      A.   I was never coached during my employment about

4   my performance with Signature.

5      Q.   Were you aware that the company performs

6   Gallup surveys on leaders?

7      A.   I do -- I'm aware of that, yes.

8      Q.   Were you ever talked to about your Gallup Poll

9   Employee Engagement Reports?

10     A.   I was not because I was told they were

11  anonymous.

12     Q.   I understand they're anonymous.  I'm just

13  asking you if you were ever talked to about the surveys

14  generally?

15     A.   I was not.

16          MR. MANN:  You want to take a break after?

17          MS. SIMPSON:  After this, yeah, that would be

18      great.

19          (Defendant's Exhibit 7 was marked for

20      identification.)

21  BY MS. SIMPSON:

22     Q.   So, Mr. Saunders, I'm showing you what's been

23  marked as Exhibit 7, which are the results of the Gallup

24  Poll Employee Engagement Report for you from your team

25  for the end of 2020.



1          I'm looking at the first page, which is

2   Bates-labeled 010458.  I know this is in black and

3   white.  I can represent to you that this is the showing

4   the color red when it is talking about the numbers.  But

5   let's just talk about the numbers for a second.

6          Do you see that it says the last mean is 3.85

7   and that the change is .2 down to 3.65 and that you were

8   in the 22nd percentile?

9      A.   I do see that.

10     Q.   Okay.  And so in the footnote at the bottom,

11  second-to-last line, do you see that it says,

12  "Percentile Rank in Gallup Overall Database," and it

13  says different percentiles.  And it shows the first one

14  being lowest of -- of less than 25 percent?

15         MR. MANN:  Objection.

16         You can answer.

17         THE WITNESS:  I do see that percentage.

18  BY MS. SIMPSON:

19     Q.   Okay.  Was this ever discussed with you?

20     A.   I do not believe so.

21     Q.   Is this the first time that you're hearing

22  that your Gallup Employee Engagement Report showed you

23  in the lowest percentile?

24     A.   I believe this is the first time I'm seeing

25  this.



1        Q.   Is it your first time understanding that your

2   engagement scores were in the lowest percentile?

3        A.   I do see that it's saying that I'm below the

4   25 percent percentile.

5        Q.   So I'm not talking about the document.  I'm

6   just trying to understand, is this your first time

7   hearing this?

8        A.   Yes.

9        Q.   Got it.

10            Was Jan Chalk already employed with Signature

11   when you were hired as the RAM?

12       A.   In 2017, she was already employed.

13       Q.   Okay.  And did you not become her supervisor

14   until you switched to the Atlantic Region?

15       A.   That is correct.

16       Q.   Approximately, what year was that?

17       A.   October of 2020, roughly.

18       Q.   And she was an AAM, right?

19       A.   She was an AAM.

20       Q.   And I think you mentioned she lived in Mobile?

21       A.   She lived in Mobile.

22       Q.   Okay.  Did she manage a certain base?

23       A.   She managed four locations at the time when I

24   became the RAM in October of 2020.

25       Q.   And what were those four locations?



1      A.   Mobile, MOB; Mobile Executive, BFM; Baton

2  Rouge, BTR; and Lafayette, LFT.

3      Q.   At some point did her locations change or did

4  she maintain the four throughout the time that you were

5  her supervisor as a RAM?

6      A.   Her locations changed officially June of 2021

7  where she -- and this was before previously mentioned

8  locations, she obtained New Orleans, MSY, and New

9  Orleans Executive, NEW.

10          MS. SIMPSON:  Want to take a break?

11          MR. MANN:  Yeah.

12          THE WITNESS:  Well, actually --

13          MR. MANN:  You've got to finish your answer

14      before we take a break.

15          THE WITNESS:  I do not believe this is a fair

16      assessment of my engagement nor my performance.

17  BY MS. SIMPSON:

18      Q.   So just for purposes of the record, you're

19  going back to Exhibit 7?

20      A.   Correct.  And also I would like to ask, where

21  are the three years I was a RAM?

22          MR. MANN:  What did you say?

23          THE WITNESS:  The other three years I was a

24      RAM.  This is only for 2020.

25



FREDERICK SAUNDERS                           November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                          63

1  BY MS. SIMPSON:

2     Q.   What is your contention that -- what's the

3  factual basis for your contention that this is not a

4  fair assessment?

5     A.   Because, for example, there's a question that

6  says I have a best friend at work.  How does that really

7  purport my engagement?

8     Q.   So you're taking issue with the questions that

9  Gallup uses for its Employee Engagement Report?

10     A.   Correct.

11     Q.   Okay.  Any other factual basis for which you

12  contend that this is not accurate of your engagement?

13     A.   At my work, my opinion seems to count is a

14  question.

15     Q.   Okay.  You understand that this is compiled

16  from Gallup, right?

17     A.   I do understand.

18     Q.   Okay.  It's not like Signature came up with

19  this Employee Engagement Report.  Do you understand

20  that?

21     A.   I do understand that.

22     Q.   And you understand that your team members, who

23  anonymously, provide answers to this report, right?

24     A.   Anonymously, yes.

25     Q.   Okay.  Anything else?



1        A.    Not at the moment.

2             MS. SIMPSON:  Okay.  We can go off the record

3        for a break.

4             (Brief recess.)

5    BY MS. SIMPSON:

6        Q.    So, Mr. Saunders, we previously talked about

7    Jan Chalk and you had mentioned that she's somewhat at

8    the center of your claims, right?

9        A.    Jan Chalk is the center of the claim.

10       Q.    And is it with respect to her pay?

11       A.    With respect to her unfair pay and retaliation

12   for trying to have her pay be fair.  I'm an advocate for

13   equitable pay.

14       Q.    Okay.  So how does the issue of Jan's pay

15   first come to you?

16       A.    In March or April of 2021, I realized that Jan

17   had four locations that she did accounting management

18   for and my other AAMs had roughly five or six locations.

19   And so to, say, even the responsibilities or the

20   workload, if you will, I decided to have Jan take on two

21   additional locations, which were the MSY and NEW.  And

22   during that assessment decision discussion with Jan, one

23   of her responses was, if I take on two more locations,

24   justly I should be compensated for that additional work.

25   And I said to her, let me talk to Sherri Miller about



 1  this and see what we can do.  Is that enough?  I'm not

 2  sure that's --

 3      Q.   Yeah, that's great.  I appreciate that

 4  information.

 5           So was this an oral conversation?

 6      A.   Oral, yes.  Yes, it was an oral conversation.

 7      Q.   Okay.  Was anyone else present for the

 8  conversation?

 9      A.   No one was present during the conversation.

10      Q.   Did you take any notes from that initial

11  conversation?

12      A.   I did not take any notes from the

13  conversation.

14      Q.   So what happens next?

15      A.   That conversation took place actually in

16  Mobile, Alabama.  And driving back from Mobile to

17  Pennsylvania, I called Sherri Miller to explain to her

18  that Jan was going to take the two new locations, as

19  well as Jan wanted to be compensated for additional

20  work.  Sherri Miller, at the time, said no, initially

21  her reaction.  And to -- from what I know of Sherri

22  Miller, from my experience with Sherri Miller, her

23  reactions are more -- mostly knee jerk reactions, so I

24  told myself, I'll circle back with her in two days, let

25  her digest information and we'll go from there.



1          So in two days I circled back with her and

2     brought up the situation again.  And she said then, let

3     me talk to Chris de Jongh about the situation and see

4     what we can do.

5          Q.   Okay.  So when you say you circled back with

6     Sherri Miller, was that oral or in writing?

7          A.   I want to say initially oral, but I -- at some

8     point I may have sent an e-mail as well.

9          Q.   Okay.  And for that conversation was anyone

10    present?

11         A.   No, it was on the phone and I was in the car.

12         Q.   I'm sorry, say that again.

13         A.   Oh, sorry.  I was on the phone, but I think I

14    was in my office or at home working remotely.

15         Q.   Okay.  I think we were both distinguishing the

16    two, right?  So you had one conversation where you were

17    in the car driving back from Mobile to the panhandle?

18         A.   Initial conversation, yes.

19         Q.   And then two days later you called her from

20    your office?

21         A.   I want to say I called her from my office --

22    or home office, yes.

23         Q.   And you think there might have been an e-mail?

24         A.   Possibly, like a follow-up e-mail or the

25    initial, based on our discussion, we wanted to make this



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              67

1  a formal request.

2       Q.   When you say "we," what do you mean by that?

3       A.   Jan Chalk and myself.

4       Q.   So between the initial conversation when Jan

5  says, I want to get compensated for the two additional

6  locations and you speaking to Sherri, do you have any

7  additional conversations with Jan?

8       A.   After that fact, I want to say yes, but I'm

9  unsure.  Because it was two to three days and I may or

10 may not have called Jan to let her know Sherri's initial

11 reaction.  I may be not -- I'm unsure.  I know I spoke

12 to her subsequently, but I'm unsure within those two

13 days of getting back to Sherri that I spoke to Jan.

14      Q.   Okay.  And are we still in March or are we in

15 April at this time?

16      A.   March, April, roughly.

17           (Defendant's Composite Exhibit 8 was marked

18      for identification.)

19           MR. MANN:  What's the Bates numbers?

20           MS. SIMPSON:  Let me just give it for the

21      record.  So we are on Exhibit 8, which is Bates No.

22      010224 to 225.  And then picks up again at 347, 349

23      and that's going to be marked a composite.

24           MR. MANN:  Do you want me to mark them A and

25      B?



1          MS. SIMPSON:  I think I'm going to get a clip
2      and clip them together because I'm afraid they're
3      going to get lost.
4          MR. MANN:  Okay.
5  BY MS. SIMPSON:
6      Q.    All right.  So, Mr. Saunders, I'm showing you
7  Composite Exhibit 8, which are some e-mail
8  correspondence and a letter.  And if you turn to Bates
9  label 010347, do you see that that's an e-mail from Jan
10 Chalk to you on April 19, 2021 with a subject, salary
11 review letter?
12     A.    Yes, I do see that.
13     Q.    Okay.  I'm just trying to get the chronology
14 down.  So the conversations that you've just talked
15 about, is that before or after this e-mail?
16     A.    Before.  So probably late March, early April
17 Jan and I talked and then after that with Sherri, yes.
18     Q.    Okay.  So when does Jan send you this e-mail?
19 Is it after your second conversation with Sherri?
20     A.    I believe so, yes.
21     Q.    Okay.  And I know you had mentioned that
22 Sherri said she was going to talk to Chris, was this
23 before Sherri had talked to Chris?
24     A.    I'm unsure when Sherri talked to Chris.
25     Q.    Okay.  So continue on with your chronology of



 1  what happens next.  I just wanted to look at Exhibit 8

 2  to try to put this in the mix.

 3      A.   What happens next as far as after this e-mail

 4  was sent or?

 5      Q.   So did something occur between your follow-up

 6  call with Sherri and this e-mail?

 7      A.   I do not recall anything happening.  I don't

 8  know.

 9      Q.   Okay.  Do you and Jan talk before she sends

10  you this e-mail?

11      A.   We did talk because I instructed her to put

12  the request in -- not only in a formal document, but to

13  substantiate her request for a pay increase.

14      Q.   Okay.  And so why did you instruct her to put

15  it into a formal document?

16      A.   Because a formal document holds weight.  So

17  instead of someone saying, I want a raise, I deserve a

18  raise, you want to put it in a formal document so it's

19  in writing and substantiate your ask with your

20  performance, your accomplishments, your years of

21  service, the responsibilities you're taking on, that way

22  the formal request has more merit, if you will.

23      Q.   Okay.  And so Jan sends you this

24  correspondence and asks you to review it.  Do you see

25  that?




1        A.   I do see that.

2        Q.   Do you review it?

3        A.   I did review this document.

4        Q.   Okay.  Did you help her prepare this initial

5   one or just make revisions to it?

6        A.   Just make revisions.

7        Q.   So before we get to your revisions, let's look

8   at this.  I'm just going to look at the bigger version,

9   which is 010224.

10            What is this graph that's in the middle of it?

11       A.   I'm unsure.  All I understand is that Jan

12   obtained this from a third-party website.

13       Q.   Okay.  Do you know what it's showing?

14       A.   I believe it's showing the compa-ratio based

15   on this third-party's website experience assessment.  I

16   really -- I honestly have no idea.

17       Q.   Okay.  What's compa-ratio?

18       A.   Basically, from my understanding, compa-ratio

19   is when you use that percentage instead of comparing

20   people's salaries because, like for example, Jan in

21   Mobile that makes $60,000 let's say, is different from

22   someone in California that makes $60,000 because I

23   believe the cost of living, all of those factors that

24   weigh into the compa-ratio.  So you are less likely to

25   compare a salary to salary, but compa-ratio to



1  compa-ratio for fairness, from my understanding.

2      Q.   Did Signature use a compa-ratio for salaries

3  for AAMs?

4      A.   They did use compa-ratios for salaries for

5  AAMs, yes.

6      Q.   Do you know if Signature used a third-party

7  compa-ratio that Jan's putting in her correspondence for

8  salaries for AAMs?

9      A.   I have no idea what Signature used for

10  compa-ratio.

11      Q.   I see that the chart that Jan is referring to

12  says, accounting manager in it.  Do you see that?

13      A.   I do see that.

14      Q.   Do you know what sort of job duties fed into

15  this chart for an accounting manager in Mobile, Alabama

16  that she's using for the representation?

17      A.   I have no idea.

18      Q.   You'd agree if this compa-ratio chart used job

19  duties that Jan didn't perform, that it wouldn't be a

20  fair comparison to her job duties as a county manager

21  for Signature, right?

22      A.   Repeat that question, please.

23      Q.   You'd agree that if Jan didn't perform some of

24  the job duties that are being taken into account for the

25  accounting manager role and the compa-ratio, she's



1  putting in her note that it wouldn't be a fair

2  comparison to her job duties at Signature, correct?

3          MR. MANN:  Objection.

4          THE WITNESS:  I'm unable to answer that fully

5       because I don't know what the accounting manager

6       here's job duties versus an AAM's job duties at

7       Signature Aviation.

8  BY MS. SIMPSON:

9       Q.   So fair, I'm not asking you that because

10  you've already said you don't know.

11          But to the extent that this accounting manager

12  chart has different job duties than the accounting

13  manager role at Signature, you'd agree that it wouldn't

14  be a fair comparison, right?

15       A.   I don't know if those roles are different.  I

16  don't know if those job duties are different.

17       Q.   I'm not asking you whether or not they're

18  different.  I'm asking you --

19          MR. MANN:  It's a hypothetical.

20  BY MS. SIMPSON:

21       Q.   -- that if they're different --

22       A.   If they're different, yes, sorry.

23       Q.   -- you'd agree that it wouldn't be a fair

24  comparison, right?

25       A.   I would not agree with that.



1    Q.   Why not?

2    A.   Because you have to establish fair.  For

3  example, if there's eight job duties in this title

4  versus eight in Jan's job title and they're similar,

5  then that's a fair comparison.  It depends on what the

6  job duties are.

7    Q.   So what if the job duties are completely

8  different and one has 20 and the other has five?

9    A.   But as an accounting manager, they're pretty

10  much going to be similar.

11    Q.   Okay.  So you're telling me it doesn't matter

12  what the job duties are, that any compa-ratio for an

13  accounting manager would be a fair comparison to her job

14  duties at Signature in Mobile, Alabama?

15        MR. MANN:  Objection.

16        THE WITNESS:  Please repeat the question,

17    maybe a different way.

18  BY MS. SIMPSON:

19    Q.   I'm trying to understand your contention that

20  an accounting manager compa-ratio would be fair to

21  compare to hers regardless of what's specifically

22  included because they generally have the same job

23  duties.

24        MR. MANN:  There's no question.  Is there a

25    question?



1           MS. SIMPSON:  That's a question.

2           THE WITNESS:  I still don't understand the

3      question.  Because again, I don't know what's fair

4      based on this accounting manager's title and job

5      duties responsibilities afterwards.  I don't know

6      what -- I can't see what this is, so I can't attest

7      to it.

8  BY MS. SIMPSON:

9      Q.   Right.

10          And I'm asking you a hypothetical question, if

11 this is completely different and includes more complex

12 job duties, more of them and they're completely

13 different than her job duties as accounting manager at

14 Signature, you'd agree that it's not a fair comparison,

15 right?

16     A.   I would not agree because I still don't -- I

17 don't --

18     Q.   You're never going to agree no matter what I

19 say, right?

20     A.   No, I'm not being hostile.  I don't understand

21 how you -- unless you put apples to apples, I can't just

22 agree to a hypothetical.

23     Q.   Do you know what is utilized as part of

24 Signature's compa-ratio to determine salaries for AAMs?

25     A.   I do not know that.  So I have a blind apple



1  and a blind apple.

2      Q.   Based on Jan's correspondence to you, what was

3  she looking for?

4      A.   To be compensated fairly for additional job

5  responsibilities as well as to be at a certain

6  compa-ratio rate based on Signature Aviation's

7  guidelines.

8      Q.   What do you mean "compensated fairly"?

9      A.   If someone takes on additional

10 responsibilities, I think it's fair that they get paid

11 for that additional work.

12     Q.   And what is your factual basis for that?

13     A.   Why would -- ask the question again.  Explain

14 the question, sorry.  What is my factual basis?

15     Q.   What is your factual basis for contending that

16 if someone takes on any additional responsibilities that

17 their compensation should be increased to be fair?

18     A.   I still don't understand the question.  Sorry.

19     Q.   What don't you understand about it?

20     A.   The whole question.

21     Q.   You just testified that if someone gets

22 additional job duties, they should receive additional

23 compensation to be fair, correct?

24     A.   That is correct.

25     Q.   I'm trying to understand what your factual



 1  basis for that is.  You just think anytime anyone gets

 2  any additional job duties that their compensation should

 3  go up?

 4       A.   It depends on the situation.

 5       Q.   Okay.

 6       A.   In this situation, taking on two additional

 7  bases to manage the accounting, should warrant

 8  additional compensation.

 9       Q.   Didn't you testify that the other AAMs had

10  five to six sites that they were responsible for.

11       A.   That is correct.

12       Q.   Okay.  So wasn't the two additional bases just

13  bringing Jan up to the same level as the other AAMs?

14       A.   The level -- it does level Jan up to the same

15  level; however, the compa-ratio was lower.

16       Q.   I thought those were two separate things.

17            MR. MANN:  Objection.

18  BY MS. SIMPSON:

19       Q.   Am I not correct --

20       A.   They're usually exclusive.

21       Q.   Okay.  So I just want to be completely

22  clear --

23       A.   Yes.

24       Q.   -- when I asked you when you're talking about

25  fair compensation, you said for additional job duties



1  and for the compa-ratio to be increased.  Are those two

2  different buckets or all one?

3     A.   Repeat the question, sorry, to make sure I

4  understand.

5     Q.   When I asked you how you're defining fair

6  compensation you indicated that it was for additional

7  job duties and for the compa-ratio to be increased.

8          Are those two different buckets or all one?

9     A.   I want to say two different buckets.

10    Q.   Okay.  So what we've been talking about is the

11 additional job duties, right?

12    A.   The two bases additional, yes.

13    Q.   Okay.  So you thought that she should receive

14 more compensation for getting two additional sites,

15 right?

16    A.   I'd say fair compensation for two additional

17 sites.

18    Q.   Well, how are you defining "fair

19 compensation"?

20    A.   Because based on the other AAMs on my team, if

21 their compa-ratio is 68 percent and the two next people

22 are 78 percent and the next person, the fourth person is

23 83 percent and the fifth person is 90 percent, that's

24 unfair.  Especially to your point if they now all have

25 five to six locations.



FREDERICK SAUNDERS                              November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                        78

1      Q.    So what you're saying is the additional

2   responsibilities on compa-ratio are intertwined?

3      A.    They could be, but again you'd have to look at

4   the fairness and the equity of compa-ratio based on the

5   number of locations one has.

6      Q.    So --

7      A.    In addition to other factors, but we'll get to

8   that later.

9      Q.    Okay.  But how are you defining whether or not

10  a compa-ratio is fair?  That's what I'm trying to

11  understand.

12     A.    I would say fair.  I would say equitable to

13  the other team members' compa-ratio.

14     Q.    Whatever word you want to use, fair,

15  equitable --

16     A.    Yeah.

17     Q.    -- I'm just trying to understand what that is.

18     A.    When you say "what that is," what --

19          MR. MANN:  Fair, is that what you're saying?

20          MS. SIMPSON:  Yes.

21  BY MS. SIMPSON:

22     Q.    So you said fair, you said equitable.  But

23  when you're talking about compa-ratio, like what about

24  it is the issue?

25     A.    That she was at 68 percent and everyone else



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              79

 1  was 70 percent or higher doing the same job.

 2      Q.   Everyone was doing the same job?

 3      A.   Had the same job responsibilities, yes.

 4      Q.   Okay.  So let's break that down.  You

 5  testified you don't know what goes into the compa-ratio

 6  that Signature uses, correct?

 7      A.   That is correct.

 8      Q.   Do you know if the number of states goes into

 9  it?

10      A.   I'm unsure.

11      Q.   Do you know if the locations go into it?

12      A.   I'm unsure.

13      Q.   Do you know if the complexity of the sites

14  goes into it?

15      A.   I'm unsure.

16      Q.   Do you know if years of service goes into it?

17      A.   I'm unsure.

18      Q.   Do you know if experience goes into it?

19      A.   I'm unsure.

20      Q.   Do you know of any variable that's utilized to

21  figure out the compa-ratio at Signature?

22      A.   I'm unsure.  I have no idea what Signature

23  uses.

24      Q.   Then how can you say whether or not it's fair?

25      A.   Then "equitable" should be the choice word.



FREDERICK SAUNDERS                      November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                      80

1      Q.    How can you say whether or not it's equitable?

2      A.    Based on if we all have five locations or six

3  locations and my compa-ratio is what everyone else is,

4  why -- how is that fair or equitable?

5      Q.    But you don't know how Signature comes up with

6  its compa-ratio, right?

7      A.    I don't, but based on what I do know -- from

8  what I know, that's the only thing I can go off of.

9      Q.    What do you know that you were thinking was

10  not equitable?

11      A.    That they all have five locations.  At that

12  point Jan took on two locations and the compa-ratios

13  were not equitable.  They're not close to the same.

14      Q.    The compa-ratios were different, right?

15      A.    Very different, yes.

16      Q.    You'd agree that the types of sites that the

17  AAMs had were different, too, right?

18      A.    The sites are different and it's in more size

19  versus complexity.

20      Q.    What do you mean by that?

21      A.    Because at the end of the day each location

22  fuels private jets.  There may be a location that fuels

23  a thousand flights a day -- not a thousand, but let's

24  say a thousand a month versus a hundred a month.  So it

25  depends on the size, less complexity.  And I'll expand



 1  because those bases that are larger will have one to two

 2  additional AAs to support the volume of fuel transaction

 3  data to process to get the fuel day closed as I

 4  mentioned before.  So it's not really complexity, it's

 5  more volume based.

 6      Q.   Okay.  So you'd agree that a site that has a

 7  higher volume is different than a site that has a

 8  smaller volume, right?

 9           MR. MANN:  Objection.

10           THE WITNESS:  Different, but not more complex.

11      And only different by size and volume, not by

12      complexity.

13  BY MS. SIMPSON:

14      Q.   But you don't know whether or not this was

15  taken into account when determining compa-ratio, right?

16      A.   I do not know.

17      Q.   Who sets compa-ratio at Signature?

18      A.   I have no idea.

19      Q.   Were you part of the decision-making on a

20  compa-ratio for Signature?

21      A.   Not the base compa-ratio, no.

22      Q.   You said that in a way that makes me ask, were

23  you involved in something else?

24      A.   No.  Only -- only -- wait, when you say

25  "something else," explain.  I apologize.



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                        82

1    Q.   No, it's okay.  And maybe you just paused to

2    pause.

3         But you said, I was not involved in the base

4    compa-ratio, so it made me ask:  Were you involved in

5    any other compa-ratio with Signature?

6    A.   No, just my -- no.

7    Q.   Okay.  You had testified earlier that in your

8    role as a RAM that you would have the initial

9    decision-making as to the raises subject to a budget,

10   right?

11   A.   Repeat the question.  Make sure I understand.

12   Q.   You testified previously that as a RAM at

13   Signature you had the initial decision-making with

14   respect to raises subject to a budget, correct?

15        MR. MANN:  Objection.

16        THE WITNESS:  I have influence on raises

17    within the constraint of the allotted budget

18    amount.

19   BY MS. SIMPSON:

20   Q.   Did you set the initial raises for your AAMs?

21   A.   When you say "initial raises"?

22   Q.   If it's not initial, do you set raises for

23   AAMs?

24   A.   You mean, the base of when they were -- became

25   AAMs?



 1      Q.   Or at any time during their employment?

 2      A.   For the year 2021, I allocated percentages of

 3   increases to the AAMs.

 4      Q.   Did you do that for 2020?

 5      A.   I do not recall.  Because of the four years I

 6   was a RAM, I do not recall getting involved with

 7   compa-ratios except for the last year for sure, 2021,

 8   and I'm unsure about 2020.  But for say the years '17,

 9   '18, '19, I did not -- I don't believe I affected

10   compa-ratios in those years.

11           (Defendant's Exhibit 9 was marked for

12       identification.)

13           MR. MANN:  Are these redactions on 72?

14           MS. SIMPSON:  No, it's just the way they

15       printed.  So if you see at the bottom 71, it's Jan

16       writing Frederick and then the subject line just

17       starts in the middle of next page.

18           MR. MANN:  Yeah.

19   BY MS. SIMPSON:

20      Q.   Mr. Saunders, I see you've completed your

21   review of Exhibit 9.  Do you recognize this e-mail

22   exchange?

23      A.   The majority of the e-mail.  The one page I do

24   not recognize is -- is it Bates?

25      Q.   Yes.

1    A.    -- 010267, that square.  I do not recall

2  seeing that ever.  Other than that page, the rest of the

3  document appears reasonable.

4         Or actually, except for everything from 2016,

5  which I was not the RAM, I do not recall ever seeing --

6  like I said, Bates 010277, I do not recall ever seeing

7  that.  01276, I do not recall seeing that.  Like this

8  square (indicating), never.  010275, I do not recall

9  ever seeing that page or this square.  010724, do not

10  recall ever seeing a break out of area accounting

11  managers, AAMs.  For 010273, I do not recall the start

12  of the memorandum and the breakout of the regional

13  accounting managers.  I do not recall seeing that at

14  all.  And the screenshot on Bates 010271, I do not

15  recall this square.  I do not that square.  It was

16  e-mailed to me, but I do not recall that square.

17    Q.    Okay.  So let's just focus on the first two

18  pages --

19    A.    Okay.

20    Q.    -- because it sounds like you do recall 010271

21  to 272, right?

22    A.    Except for the square within 010271, I don't

23  recall seeing that square.

24    Q.    Okay.  But you'd agree that's an e-mail from

25  Jan Chalk to you on April 27, 2021, correct?



1      A.   I do recall the e-mail -- well, I see the

2  e-mail from Jan to myself, yes.

3      Q.   Okay.  And you just don't recall the square in

4  that, right?

5      A.   The square.  And as I look at the first

6  paragraph, I vaguely recall that comment or that

7  paragraph.

8      Q.   What do you mean -- what do you recall about

9  that comment?

10      A.   It may be just hearsay when her and I talked.

11  But she never replied to me, which is something Jan's

12  constantly said throughout this whole ordeal.  In the

13  second sentence, "I am not sure if Sherri was unaware of

14  the effective date."

15          I do recall Jan saying something to the effect

16  that she was -- Jan was unsure of when she became an

17  AAM, so she had to consult with Sherri and I believe the

18  statement is saying Sherri may not be aware as well when

19  Jan became an AAM off the top of her memory, so I

20  believe -- well, I'll pause.  That's what I understand

21  that statement to say.

22      Q.   And what is that referring to?

23      A.   I'm unsure -- besides her becoming an AAM, I'm

24  unsure what else that statement refers to.

25      Q.   So do you know the context of this e-mail from



1  Jan to you, like what is she trying to get across to
2  you?
3       A.    About when she became an AAM, when Jan became
4  an AAM.
5       Q.    And why was she trying to convey that to you?
6       A.    To Jan, it was the -- the understanding of
7  when she became an AAM shows the fact that before her
8  becoming an AAM she managed the responsibilities --
9  accounting responsibilities of her two bases of Mobile
10 and -- or MOB and BFM.
11      Q.    And why is that important?
12      A.    Because when Jan became an AAM, and in essence
13 the AAM core basically centralized five locations
14 accounting responsibilities into one person doing those
15 accounting responsibilities.  So basically before the
16 AAM position was created, each base had their own base
17 accountant, and that would include Jan when she at that
18 point had two, everybody else had one, maybe two as
19 well.  So when they all became AAMs, they went from one
20 to two location to four or five, six locations.
21            And also within that transformation, the AAM's
22 jobs -- the base accountant's jobs were centralized into
23 what's called shared services, I believe now currently.
24 And so with that said, Jan Chalk still kept a lot of the
25 responsibilities that were centralized and shared



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                      87

1  services.  Basically she did more work than most AAMs at

2  that time.

3       Q.   So she believed she was doing more work than

4  most AAMs at that time?

5       A.   Yes.  That's -- for example, I'll give you an

6  example.  So in Signature Aviation, they -- the bases

7  have to pay a concession fee to the airport to operate

8  at the FBO or the base.  And when the base accountants

9  became AAMs, that responsibility that work went to a

10  centralized team at corporate.  But in Jan's case, she

11  kept doing concession reporting for her two locations

12  when everyone else did not do that reporting anymore

13  when they became AAMs, if that makes sense.

14       Q.   Did you tell anyone about this new concern

15  that she sends you?

16       A.   I think this concern was embedded in her

17  letter to myself, which I forwarded on to Sherri.

18       Q.   Did you revise her letter that she sent to you

19  that you forwarded on to Sherri?

20       A.   I made some grammatical changes.  As I think

21  you'll see here, the 58 percent, I think I changed that,

22  and I'm unsure now where that number came from.  And I'm

23  looking at the diagram -- maybe it was another

24  attachment that we don't see that because I don't see

25  the 58 percent here.  But I remember changing that and



FREDERICK SAUNDERS                                      November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                    88

 1  then -- to make the sentence make more sense

 2  grammatically more so.  But no other revisions besides

 3  those two, I believe.

 4      Q.   I'm sorry, Mr. Saunders, just for purposes of

 5  the record --

 6      A.   That's fine.

 7      Q.   -- I see you're pointing to a page.  Can you

 8  just say what page number that is?

 9      A.   Bates 010269, I made two revisions that are

10  highlighted in red.

11      Q.   Did you and Jan otherwise talk about the

12  letter besides the two revisions that you made before

13  you sent it to Sherri?

14      A.   I would think we talked about the letter,

15  either before, during or after sending the letter to

16  Sherri.

17      Q.   What did you discuss with Jan about the

18  letter?

19      A.   That more support that this formal written

20  request substantiates her asking for fair equitable pay.

21      Q.   So you told Jan that you thought her letter

22  substantiated her request for different pay?

23      A.   More so a good start to the process.

24      Q.   Did you tell her to do anything else to help

25  with the process?



1      A.   I do not believe so.

2           (Defendant's Exhibit 10 was marked for

3      identification.)

4  BY MS. SIMPSON:

5      Q.   Mr. Saunders I'm showing you what's been

6  marked as Exhibit 10.  Chronologically, it starts at the

7  bottom of the page and goes up.

8           Do you see at the bottom of the page

9  Bates-labeled 010338, that this is an e-mail from you to

10  Sherri on May 6, 2021?

11      A.   I do see that.

12      Q.   And is this the e-mail that you were

13  referencing where you send Sherri Jan's correspondence

14  that you revised regarding her concerns with her pay?

15      A.   This is the e-mail.

16      Q.   Okay.  And do you see that Sherri's response

17  that same day, an hour and a half later says, "Thank

18  you, Frederick.  I'll go over it and let you know the

19  outcome"?

20      A.   I do see that.

21      Q.   And do you see you then write another e-mail

22  to Sherri on May 19th?

23      A.   I do see that.

24      Q.   Is Jan copied on these -- blind copied on

25  these e-mails to Sherri?



1    A.    She is.

2    Q.    Did I talk to Jan between the May 6th e-mail

3 and the May 19th follow up e-mail to Sherri about the

4 status?

5    A.    I believe so.

6    Q.    Do you recall what you discussed?

7    A.    The discussion was more to calm Jan because

8 from beginning of this process, she was upset with her

9 treatment because of the -- not being compensated for

10 additional work.  So it was more to support her in

11 saying that it's a process, we'll get through it, I'll

12 follow up with Sherri and I'll let you know.

13    Q.    And you had told her you thought her letter

14 justified her request, right?

15    A.    Substantiated her request.

16    Q.    Did you ever tell Jan that you thought she

17 deserved more money?

18    A.    I told Jan it would be fair to be compensated

19 for additional work, especially 50 percent increase -- a

20 50 percent increase would be a fair number to have

21 adjusted compensation.

22    Q.    And I'm sorry, what percentage do you --

23    A.    A 50 percent increase in her job --

24    Q.    Fifty?

25    A.    Fifty.  From four locations to six locations,



 1  50 percent increase in work.

 2      Q.   You told Jan Chalk that a 50 percent increase

 3  in her compensation would be fair?

 4      A.   It would be just.

 5      Q.   And what was your factual basis for contending

 6  that?

 7      A.   That -- I guess from my experience, my

 8  understanding of fairness, being in Corporate America,

 9  that if someone take on not five or 10 or 15, but

10  50 percent more responsibilities, that should warrant

11  justly an increase in pay.

12      Q.   Had you witnessed any other AAMs receive a

13  50 percent increase when they took on additional sites

14  that doubled their work?

15      A.   I don't recall anyone taking on -- at that

16  site, that doubled their work.

17      Q.   Did you believe that -- I'm sorry, I'm just

18  struggling with where you're getting that a 50 percent

19  increase would be fair.  Was there some historical

20  precedent that you saw that happen?

21          MR. MANN:  Objection.

22          THE WITNESS:  I do not believe a precedent was

23      seen or known.  But again, I believe in fairness.

24      And to me, fairness would be if she received

25      50 percent more additional work that her



1      compensation be adjusted fairly for that.

2   BY MS. SIMPSON:

3      Q.   And you're judging that just based on the

4   number of sites that she had?

5      A.   The additional work, additional sites that she

6   had to now manage at the time.

7      Q.   Okay.  And just so I understand, she went from

8   how many sites to what?

9      A.   Four to six.

10     Q.   And you thought that justified a 50 percent

11  compensation increase?

12     A.   Yes.  Not 50 percent compensation increase,

13  just -- not 50 percent increase in pay.  Just a more

14  fair equitable pay based on additional work that she

15  took on.

16     Q.   I thought you just testified that you thought

17  it was fair for her to get a 50 percent compensation

18  increase?

19     A.   You misheard me.

20     Q.   Okay.

21     A.   Her work went up 50 percent, right, from four

22  to six.  That's two additional.  Two divided by four is

23  50 percent, right?  And then her pay should be adjusted

24  fairly to that.

25     Q.   Okay.  So what did you think her pay should be



 1 | adjusted to?

 2 |         MR. MANN:  Objection.

 3 |         THE WITNESS:  I have -- I don't have -- I

 4 |    don't know what that number should be, right?  I

 5 |    don't know what Signature considered when someone

 6 |    goes from four to six, what that number should be,

 7 |    but in my opinion it should not be zero.

 8 | BY MS. SIMPSON:

 9 |    Q.   And you didn't know because you didn't know

10 | what went into Signature's decision on how they set the

11 | salaries, right?

12 |    A.   I did not know --

13 |         MR. MANN:  Objection.

14 |         THE WITNESS:  I did not know what -- how

15 |    Signature did their compa-ratios, the factors that

16 |    went into that compa-ratio.

17 | BY MS. SIMPSON:

18 |    Q.   Did you ever articulate to Jan what you

19 | thought would be fair compensation?

20 |    A.   I did not.

21 |    Q.   What prompted you to follow up with Sherri on

22 | May 19th?

23 |    A.   Because I have this standard rule week, two

24 | weeks follow-up with any inaction, just from my career

25 | mindset, how I do my work.  Oh, and on top of Jan

1  persisting what -- you know, throughout this process she

2  would constantly ask me, what have you heard, what have

3  they said and that also kept prompting me as well to

4  follow up with the individuals that I e-mailed.

5      Q.   What would you tell Jan when she would follow

6  up with you?

7      A.   That I'm supporting you, it will take time,

8  we'll get through this.

9      Q.   Did you ever tell her, I don't know how

10  Signature sets salaries?

11      A.   I don't recall saying that to her, no.  But I

12  do know that I don't know how to do compa-ratios.  I may

13  have said that.  But how they set salaries, which I

14  guess is one and the same, I don't know how they do

15  that.

16          (Defendant's Exhibit 11 was marked for

17      identification.)

18  BY MS. SIMPSON:

19      Q.   So I'm showing you what's been marked as

20  Exhibit 11.  Do you recognize this?

21      A.   I do recognize the e-mail.

22      Q.   And what e-mail is this?

23      A.   This is my e-mail to Dan Cunico and Allyson

24  Snell to follow up with the salary adjustment letter

25  that we sent to Sherri.



1                    MR. MANN:  Is this a redaction?

2                    MS. SIMPSON:  Uh-uh.

3                    MR. MANN:  Just making sure.

4                    MS. SIMPSON:  It's just the way they're placed

5          on --

6                    MR. MANN:  In my last discovery, it was white,

7          but it was redacted.

8                    MS. SIMPSON:  We'll put redacted on, if it is.

9                    MR. MANN:  It did it online, but it didn't

10          print that way.

11                    MS. SIMPSON:  That's weird.

12                    MR. MANN:  That doesn't happen on your print?

13                    MS. SIMPSON:  No.

14                    MR. MANN:  Okay.

15   BY MS. SIMPSON:

16        Q.    Who is Dan and Allyson?

17        A.    Dan Cunico was the director of HR and Allyson,

18   I want to say, was the HR generalist.

19        Q.    Why are you sending them this letter?

20        A.    Because we received no traction from Sherri.

21        Q.    Did you let Sherri know that you were going to

22   reach out to HR?

23        A.    I believe I did.

24        Q.    What was her response?

25        A.    I'm unsure.



1      Q.   Is it possible you didn't let Sherri know that

2  you were reaching out to HR?

3      A.   Yeah, I believe I did at some point.

4      Q.   Do you know positively sitting here today if

5  you let her know before you sent this e-mail to HR?

6      A.   I'm unsure of the timing.

7      Q.   Do you know what Sherri was doing in the

8  background with respect to the salary adjustment letter?

9      A.   From my understanding, Sherri Miller was in

10 agreement that the AAMs' pay raise or salary and

11 compa-ratios were low and that she was working to have

12 them increased.

13     Q.   How did you become aware that you thought

14 Sherri was in agreement that the AAMs' compa-ratio was

15 low?

16     A.   She told me that.

17     Q.   When did she tell you that?

18     A.   I'm unsure of that timing.  I recall because I

19 was at my brother's house -- actually, I want to say it

20 was -- I'm unsure.  I know we talked about it.

21     Q.   What year?

22     A.   2021.

23     Q.   What month?

24     A.   I'm unsure.

25     Q.   Is it before or after you send Sherri the



1  salary adjustment letter?

2       A.   I'm unsure.

3       Q.   Was it on the phone or in person?

4       A.   On the phone.

5       Q.   Was anyone else on the phone?

6       A.   No.

7       Q.   And Sherri said she was looking into it?

8       A.   She was looking into it, yes, she said that.

9            (Defendant's Composite Exhibit 12 was marked

10      for identification.)

11 BY MS. SIMPSON:

12      Q.   Mr. Saunders, I'm showing you what's been

13 marked as Exhibit --

14      A.   Amanda, may I --

15      Q.   Yes.

16      A.   -- finish going through the documents?

17      Q.   Oh, yes, absolutely.  I thought you were done.

18 I'm sorry.

19      A.   Okay.

20      Q.   So I'm showing you what's been marked as

21 Composite Exhibit No. 12, which are several e-mails

22 between you and Jan.  Do you recognize these?

23      A.   I do recognize the e-mail less the attachments

24 because I think this is the first I'm seeing Jan's

25 increases over the years.  That's why I had to take a



1  little more time because I don't recall seeing these.

2       Q.   Okay.  So are you referring to --

3       A.   Oh, sorry, Bates --

4       Q.   And they're on the side.

5       A.   Yeah, 010328, 010329 and 010300, I do not

6  recall seeing these documents.

7       Q.   Okay.  And so if we flip to 010327 you see

8  this is an e-mail from Jan to you on June 1, 2021,

9  correct?

10      A.   I do see that, correct.

11      Q.   And do you see that it says there's some

12 attachments, there's a number referenced through the PDF

13 and then a merit letter and a PDF mailer?

14      A.   I do see that.

15      Q.   And you don't recall seeing the attachments to

16 the e-mail?

17      A.   No, because my focus wasn't -- was not on the

18 past, but what should happen going forward.

19      Q.   Okay.  And so do you see in this e-mail from

20 Jan to you she's referencing that in 2017, 2018, and

21 2019, she only had four bases and still received the

22 standard 2.5 percent merit increase?

23      A.   I do see that statement.

24      Q.   And then in the next paragraph, do you see

25 that it says, "I believe the 1.5 percent is a direct



1  result of trying to get my salary adjusted to a fair

2  amount"?

3       A.   I do see that.

4       Q.   You were responsible for the 1.5 percent

5  increase, correct?

6       A.   I'm unsure.  I'd need to look back and see the

7  entries that were made in the system at that time.

8       Q.   Did you look back at the time that Jan's

9  complaining about it?

10      A.   I believe they closed the system at that time.

11      Q.   Okay.  And you don't have any personal

12  recollection of what you set for Jan's raise?

13      A.   That is correct.

14      Q.   Did you go and ask anybody about the

15  1.5 percent raise when she sends this to you?

16      A.   I didn't ask anyone and no one asked me.

17      Q.   And if we flip to 010278, do you see -- and

18  again, it starts at the bottom that initial e-mail is

19  from Jan to you on June 1st at 2:32 p.m.  Do you see

20  that?

21      A.   I do see that.

22      Q.   And do you see in the second sentence she

23  says, so based on what Chris and Sherri are saying, do

24  you see that?

25      A.   I do see that, yes.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              100

1    Q.   At this point, had you two talked to Chris or

2 Sherri?

3    A.   We talked to Sherri and we had yet talked to

4 Chris because we didn't talk to Chris until September of

5 that year.

6    Q.   I also want to make sure because you said, we

7 talked to Sherri.  Was there a time that both you and

8 Jan spoke to Sherri about Jan's pay?

9    A.   On a call, yes, at least once, if not twice.

10   Q.   Okay.  When did that call occur?

11   A.   I do not recall.

12   Q.   Was it more towards the beginning of the

13 conversations regarding her pay in April or closer to

14 June?

15   A.   I do not recall.

16   Q.   What was said during that call?

17   A.   I do not recall.

18   Q.   But you know it was with respect to Jan's pay?

19   A.   Correct.

20   Q.   Do you see that she continues, "I have only

21 four bases.  I am guessing these 11 people were

22 discriminated against because they had four or less

23 bases when others had five, six and seven."

24   A.   I do see that comment or statement, yes.

25   Q.   Did she explain to you what she meant by that?



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                101

1      A.    Yes, that statement was sarcastically put.

2  Sarcastically put in a sense that they too -- these 11

3  people must be okay -- they must be unaware that they're

4  being discriminated against.

5      Q.    And how do you know that she meant it in a

6  sarcastic way?

7      A.    Based on discussions with her during the time

8  that she sent this e-mail.

9      Q.    And what does "discriminated against" mean?

10      A.    That part I'm unsure of.

11      Q.    Did you ever talk to her about what she meant

12  when she said "discriminated against"?

13      A.    The only thing I can think of is her

14  assumption where they're being treated unfairly.

15      Q.    Did she ever articulate what the unfairness

16  was with respect to?

17      A.    Actually I think it was more her being treated

18  unfairly than the 11 people.  Again, two years ago,

19  honestly, I...

20      Q.    Did she ever explain how she felt like she was

21  being treated unfairly?

22      A.    She explained that the whole time through this

23  entire process.

24      Q.    So it's just based on the difference in the

25  compa-ratio pay that we've been talking about?



1      A.   In addition to the additional work,

2  50 percent, and receiving no compensation for that.

3      Q.   Do you see in the next e-mail you write her at

4  4:30 p.m. and you say, I agree?

5      A.   I do see that.

6      Q.   So you're agreeing with a subordinate that

7  these people are being discriminated against because

8  they had four less bases?

9      A.   No, I was being supportive and agreeing with

10  her frustration.

11     Q.   Do you think that was wise as a manager to be

12  agreeing with a subordinate saying that people are

13  getting discriminated against when you don't know what

14  she's talking about and it's sarcastic?

15     A.   Again, I wasn't agreeing to her claim that

16  people were being discriminated against.  It was

17  supportive in nature.

18     Q.   Do you see in the same e-mail you say, "The

19  issue should only be about how one is significantly

20  below the minimum of the 90 percent compa-ratio based on

21  which source they use"?

22     A.   I do see that statement.

23     Q.   So was that the focus of the questions about

24  her pay?

25     A.   Again, the focus was both not receiving fair



1  compensation for additional work, 50 percent, and her

2  being below the compa-ratio the company set.

3      Q.   And the additional work is referenced in the

4  line before that she goes from four bases and say six

5  bases and you say that's a non-argument, right?

6      A.   Non-argument in the sense that that's what

7  happened in the past.  Going forward the issue, again,

8  taking on more responsibility and the compa-ratio below

9  the 90 percent.

10     Q.   So you are saying that going forward if

11 someone receives additional bases, then they should be

12 compensated more and not worrying about the past?

13     A.   Repeat the question.

14     Q.   So are you saying that you were looking

15 forward and saying, if someone gets additional bases,

16 then they should be compensated more?

17     A.   Depends on the situation.

18     Q.   And you weren't concerned with the past,

19 right?

20     A.   When you say "not concerned with the past" --

21     Q.   That's what you just said --

22     A.   Right.

23     Q.   -- so I'm trying to understand.

24     A.   Right.  Right.  I guess what I should say is

25 that I think, from my understanding, during this time



1  the focus was, in my opinion, incorrectly on how many

2  bases she had before versus after.  To me, the focus

3  should be on if you now have five or six, like everyone

4  else on the team, why -- one, why didn't you get

5  additional compensation for additional work, as well as

6  a compa-ratio below 90 percent.

7      Q.   How is that your understanding from before?

8  Did someone tell you that?

9         MR. MANN:  Objection.

10        THE WITNESS:  Re-ask the question, I

11    apologize.

12  BY MS. SIMPSON:

13      Q.   You had said my understanding was before it

14  was this and I'm trying to understand how you learned of

15  that.

16        MR. MANN:  Objection.

17        THE WITNESS:  How I learned of what?

18        MR. MANN:  That wasn't a question.

19        THE WITNESS:  Okay.

20  BY MS. SIMPSON:

21      Q.   Well, let me ask you, you're talking about you

22  had an understanding before the number of bases and an

23  understanding that you wanted going forward.  What were

24  those?

25      A.   One question at a time, please.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              105

1        Q.    What was your understanding of the

2   compensation with respect to the number of bases in the

3   past?

4        A.    I have no understanding because I didn't -- I

5   wasn't involved with compa-ratios in the past.

6        Q.    And what was your desire for compensation with

7   respect to bases going forward?

8        A.    My perspective was if you're below the

9   company's guideline for beginners at 90 percent, you

10  should be adjusted to 90 percent, if you're not a

11  beginner.

12       Q.    Okay.  This is the first time you've mentioned

13  a guideline for beginners.  What are you referencing?

14       A.    The company's guidelines on setting

15  compa-ratio.

16       Q.    Is that on a document somewhere?

17       A.    A document somewhere?  What do you mean

18  document somewhere?

19       Q.    Where are you getting a guideline for

20  beginners for compa-ratio?

21       A.    That was the understanding at the time.

22       Q.    How did you get that understanding?

23       A.    Talking to different AAMs.

24       Q.    Did you talk to any managers or HR about this

25  understanding?



1    A.    I believe I did.  I'm unsure what timing of

2    when we talked about it.

3    Q.    Who did you talk to?

4    A.    Sherri Miller, when she said that the pay

5    rate/compa-ratios are low.

6    Q.    My question is specific to the guidelines for

7    beginners.  Who in management or HR did you talk to, if

8    anyone, about your understanding of that?

9    A.    I don't think I talked to anyone in HR.  I'm

10   unsure.  I'm unsure.

11   Q.    Did you talk to anyone in management?

12   A.    Management like Sherry or Chris, Christy

13   Pavel, like, who are you referring to when you say

14   management?

15   Q.    Anyone who is not an AAM.  You had mentioned

16   AAMs and I'm trying to understand RAMs and above.  Did

17   you talk to someone to gain an understanding of

18   guidelines for beginners?

19   A.    I had to to understand that number, but I

20   don't know for sure.

21   Q.    You don't know who you talked to?

22   A.    I do not recall.  And again, it may not have

23   been management.  It may have been AAMs or someone that

24   an AAM talked to from HR, told them, and they told me.

25   Q.    Okay.  So just so I'm clear, sitting here



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                        107

1  today, you don't recall having a conversation with

2  anyone in HR or management about your understanding of

3  the guidelines for beginners based on compa-ratio,

4  correct?

5       A.    I do not recall.

6            THE WITNESS:  Can we take a break before the

7       next document?

8            MR. MANN:  Yeah.

9            THE WITNESS:  Is that possible?

10           MS. SIMPSON:  Absolutely.

11           (Brief recess.)

12           MS. SIMPSON:  So we took a quick break and

13      just for purposes of the record, I was talking to

14      plaintiff's counsel and we had an agreement to keep

15      this deposition open currently for the limited

16      purpose of exploring further the damages analysis

17      as plaintiff's counsel plans to supplement or amend

18      the answer to the interrogatory with respect to

19      damages and is going to supplement the production

20      of documents as to the several hundred possible

21      text messages between Mr. Saunders and Jan Chalk

22      that might be more limited after your review.

23           Did I represent that correctly?

24           MR. MANN:  Yeah, so the text messages, for the

25      record, go back to, I think, 2020.  And plaintiff's



1        counsel will review them and then produce probably

2        all of them, but yeah.

3            MS. SIMPSON:  And understood if there's

4        smaller ones you'll review them for relevancy.

5            MR. MANN:  Yeah.

6            MS. SIMPSON:  And to the extent we need to

7        leave it open for any other purpose, we'll note

8        that at the end of the deposition.

9            MR. MANN:  Yeah.

10            MS. SIMPSON:  Thank you.

11            (Defendant's Exhibit 13 was marked for

12        identification.)

13    BY MS. SIMPSON:

14        Q.   Okay.  So, Mr. Saunders, you've been provided

15    what's been marked as Exhibit 13.  Do you recognize

16    this?

17        A.   I do recognize the text messages.

18        Q.   And are these your text messages with Sherri

19    Miller from around June 1st?

20        A.   These are those text messages, yes.

21        Q.   Okay.  Just so I'm clear, there's text

22    messages on the left and there's text messages on the

23    right, which ones are your text messages?

24        A.   My text messages are on the left.

25        Q.   Okay.  So in the first text message from you,



 1  when you say, "Jan was extremely upset when Chris wanted

 2  to wait two to three months for her fair compensation,"

 3  what did you mean by that?

 4       A.   She was upset that she took on two additional

 5  locations, 50 percent more responsibility and her pay

 6  stayed the same.

 7       Q.   But what's the wait two to three months

 8  referring to you?

 9       A.   That's where Chris told us in response to Jan

10  asking for additional compensation for two additional

11  bases.

12       Q.   What did Chris say in that regard?

13       A.   This is what Sherri told us that Chris said.

14  So I'm not sure all that he said, but that's what Sherri

15  told us that he told us to wait two to three months and

16  he'll get back to us.

17       Q.   So Sherri tells you and Jan that Chris wants

18  to wait two to three months for what?

19       A.   To reevaluate compensation, her compensation.

20  But again, Sherri told Chris -- I'm sorry, Chris told

21  Sherri, Sherri told me, I told Jan.

22       Q.   You told Jan that Chris wanted to wait several

23  months to reevaluate her compensation?

24       A.   Based on what Sherri told me that Chris said,

25  yes.



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.   Did Sherri tell you she told Jan?

2    A.   I'm unsure.  I believe so, yes.  Yes, she did.

3    She said to let her know that Chris said we'll circle

4    back to that in two, three months.

5    Q.   Okay.  So then going down to your second text

6    which is at the bottom, left-hand corner, do you see

7    that you say, "I gave Jan 1.5 percent"?

8    A.   For the record, the gave is in quotes because

9    I wasn't sure what percentage I gave her at that time.

10    Q.   So at this time of June 1st, you don't know

11    what percentage raise you gave her?

12    A.   I'm unsure if it was one percent, two percent,

13    1.5 percent, I'm unsure.

14    Q.   Then why would you say for the next part that

15    the budget was constricted to a certain amount for my

16    team?

17    A.   That's just a fact.  It was.

18    Q.   Okay.  And you continue by saying, "so I gave

19    the best performers, in my opinion, more of the lion's

20    share," right?

21    A.   Correct.

22    Q.   So you're saying Jan's not one of your best

23    performers, right?

24    A.   Jan is a good performer.  She was probably my

25    number three out of the five at the time.



1       Q.    So Jan wasn't one of your best performers,
2   correct?
3       A.    I'm not saying that's correct.  And maybe I
4   used the wrong choice of words in that text.
5       Q.    Well, if you flip to the next page, it's the
6   text in more full fashion.
7       A.    Yes.
8       Q.    And you see after that, you say, "However, can
9   Jan receive one point percent portion of my increase"?
10      A.    I do see that.
11      Q.    And you were saying that because you gave her
12  1.5 percent, correct?
13      A.    I'm not saying that either though.  I'm unsure
14  what I gave her.  But I do know I felt bad for her
15  having, you know, not enough pay for taking on two
16  additional bases.
17      Q.    So I'm talking about the increase and we've
18  reviewed Jan's letter that said she routinely got
19  2.5 percent in raises, right?
20      A.    I do recall that letter.  I think that was the
21  previous e-mail, yes.
22      Q.    Yes.
23            And she then gets 1.5 percent?
24      A.    According to Jan, yes.
25      Q.    And that seems to start her complaints about



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                          112

1  her pay, right?

2       A.   No, the complaints started when she got two

3  additional bases and was not compensated for the

4  additional work.

5       Q.   But you'd agree that her raise of 1.5 percent

6  was part of her concerns as well, correct?

7            MR. MANN:  Objection.

8            THE WITNESS:  That was a separate issue.  It

9       was not part of the overall concern of her

10      receiving two additional bases and having zero

11      compensation for the additional 50 percent more

12      work.

13  BY MS. SIMPSON:

14      Q.   And I understand you don't recall what you

15  gave her for a raise, but you were responsible for

16  giving her the raise, correct, subject to budget

17  constrictions?

18      A.   Subject to budget restrictions.

19      Q.   Correct?

20      A.   Correct.

21      Q.   Did Jan know that you were responsible for

22  setting her raise?

23            MR. MANN:  Objection.

24            THE WITNESS:  All AAMs know that their RAMs

25      gives them their merit increase.

 1  BY MS. SIMPSON:

 2      Q.   Did she ever ask you why did you give me a

 3  smaller merit increase?

 4      A.   No, she didn't ask me that question.

 5      Q.   Did you ever explain to her why she got the

 6  merit increase she got?

 7      A.   I was unsure what I gave her.  I need to go

 8  back to the actual entry of the percentage.

 9      Q.   But if you have a subordinate who's

10  complaining about her pay, inclusive of her rate,

11  wouldn't you as a manager go and look and see what her

12  raise was?

13      A.   The main concern was about her, again, getting

14  50 percent more work and not being paid for that

15  50 percent compensation.  It stayed zero.

16      Q.   But you never went and saw what you gave her

17  for a raise?

18      A.   I never went back -- I think when I tried to

19  go back, it was closed.  Not go back for this

20  percentage, but just overall, you know, understanding of

21  the compa-ratios.

22      Q.   Did you say to anyone in HR or in higher level

23  management, hey, it's closed, can you let me know what

24  she was given for the merit increase because I don't

25  recall?



1      A.   I did not go back to anyone in HR to open up

2  that.

3           MR. MANN:  Are there more of these?

4           MS. SIMPSON:  Not that I'm using today.

5           MR. MANN:  Because I'd like to know what the

6      date is of that one.

7           THE WITNESS:  There are a couple of more.

8           MS. SIMPSON:  We can look into that.

9           MS. WAGNER:  I don't specifically recall.

10          MR. MANN:  He might even have them, so yeah.

11          MS. SIMPSON:  Well, that's why I asked if he

12     had text messages with Sherri, too, but you think

13     it's just on your company phone?

14          THE WITNESS:  Exactly, yes.

15          MS. SIMPSON:  Okay.  So we can look into that

16     if he doesn't have them.

17          (Defendant's Exhibit 14 was marked for

18     identification.)

19  BY MS. SIMPSON:

20     Q.   Are you still reviewing?

21     A.   No, I'm fine, Amanda.  Thank you.

22     Q.   So, Mr. Saunders, I've been -- I've given you

23  what's been marked as Exhibit 14.  Do you recognize

24  this?

25     A.   Vaguely.



1      Q.    So let's walk through it and flip to the

2   second page, which is Bates-labeled 010218.

3          Do you see at the bottom of that page it's an

4   e-mail from you to Dan and Allyson from May 24th.  And

5   we reviewed this e-mail previously where you're sending

6   them the salary adjustment letter, right?

7      A.    Correct.

8      Q.    And so then going up from there, it looks like

9   Jan follows up on that correspondence May 28th.  Do you

10  see that?

11     A.    I do see that.

12     Q.    Okay.  And then it looks like Dan replies that

13  same day saying, "We're having discussions with Sherri

14  and Chris.  They will follow up as appropriate."

15          Do you see that?

16     A.    I do see that.

17     Q.    And then do you see at the top of the first

18  page, it's Jan's e-mail following up with Dan as to a

19  status of her salary adjustment and she says, "Please

20  see the attached follow-up letter"?

21     A.    I do see that.

22     Q.    Do you recall all those e-mails we just

23  reviewed?

24     A.    Vaguely, yes.

25     Q.    Okay.  Is there a reason why you only recall



1 these vaguely and the other ones you definitely recall?

2     A.   Because I do not recall receiving an e-mail

3 from Dan.  It's obviously clear that I did, but I don't

4 recall getting that e-mail from Dan.

5     Q.   Okay.  Fair enough.

6          Do you remember the e-mail from Jan with the

7 follow-up letter?

8     A.   I will say I received so many e-mails from Jan

9 during that time.  One specifically to remember, I think

10 that's why this thing is all vaguely.  I mean, the

11 content I remember, obviously.  But specific e-mails, I

12 do not remember specific e-mails each day and each

13 follow-up e-mail and each additional e-mail and each

14 reply e-mail.

15     Q.   And so, Mr. Saunders, if we flip to the last

16 page that's Bates-labeled 010219, do you see that this

17 is Jan's follow-up letter?

18     A.   I do see it as a follow-up letter, yes.

19     Q.   Had you reviewed this letter before she sent

20 it?

21     A.   This one is hard to say because I do not see

22 any revisions that I may have done.  And normally I --

23 nothing is ever perfect, so I would have marked or

24 edited this in some ways, so I don't recall seeing this

25 letter.



1    Q.   Do you recall talking to her about it before
2  she sends it?

3    A.   Not before, but in general because this is the
4  content of the whole entire situation.

5    Q.   And did you talk to her about the specific
6  timing of when she's sending this?

7    A.   No, I do not recall that.

8         (Defendant's Exhibit 15 was marked for
9    identification.)

10 BY MS. SIMPSON:

11   Q.   Why are you laughing, sir?

12   A.   Because now I realize my revisions was to --
13 although -- because the previous e-mail I would see
14 highlights in the red edits.  This one, when you compare
15 this letter or this -- yeah, this letter to this one,
16 this was, I believe, Jan's original -- or Bates 01025
17 was Jan's original letter to HR.  And Bates 010219 is my
18 revisions to have it be more formal, more presentable,
19 more substance behind the ask or the follow-up.  And I
20 love using bullet points, everything flows and
21 grammatically correct and concise and coherent, I always
22 say.  So that's why I laughed because I didn't recall
23 this being my final edit.  But based on the original
24 e-mail or letter that she put together, I believe this
25 is my edits.  But again, what exactly was said, it's two

 1 | years ago, I cannot recall fully.

 2 |     Q.    Completely understood.  That's why we use

 3 | documents to refresh recollections.  Let's just make the

 4 | record clear because we're pointing at two documents

 5 | here.

 6 |     A.    Yes.

 7 |     Q.    So I've handed you what's been marked as

 8 | Exhibit 15.  Do you see that's an e-mail from Jan to

 9 | yourself on July 6, 2021 where she has an attachment

10 | called letter-follow up.docx and she says, "Hello, I've

11 | attached the draft for my second letter.  Will you

12 | please look over?"

13 |     A.    I do see that.

14 |     Q.    Okay.  And then the second page is a letter

15 | that Jan Chalk appears to have put together and put her

16 | name at the bottom, right?

17 |     A.    Yes.

18 |     Q.    And so if I'm understanding your testimony,

19 | your recollection has been refreshed and you believe you

20 | revised the letter on Bates-labeled 010258 and that the

21 | revised letter is on Exhibit 14 at 010219?

22 |     A.    I do believe that's correct.

23 |     Q.    Okay.  And 010219 looks a lot different than

24 | 258, right?

25 |     A.    That is correct.



 1      Q.   And that's because that's more of your
 2   formatting and the way that you write?
 3      A.   That is correct.
 4      Q.   Okay.  But you don't recall having specific
 5   conversations with Jan about this because it's been a
 6   couple of years?
 7      A.   That is correct.
 8      Q.   And so when I'm looking at the differences
 9   between the two letters, in your version it looks like
10   you're clarifying what the 40 percent increase in salary
11   meant.  Do you see that, second paragraph?
12      A.   I see the statement underlined.  I do see
13   that.
14      Q.   And I'm not seeing that in her letter, do you
15   agree?
16      A.   I do not see 40 percent reference in the
17   original e-mail Bates 010258.
18      Q.   So did you revise this because you thought the
19   way she presented it previously was unclear as to what
20   she was asking with respect to her salary adjustment?
21      A.   I recall now that when we talked to Sherri
22   Miller, Sherri Miller's response was that Jan wanted a
23   40 percent increase and we were like, no, we want up to
24   a 40 percent increase basically leaving the range open
25   to whether it's 10, 20, 30, 40.  Sherri was saying, you



FREDERICK SAUNDERS                           November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                      120

1  guys want 40 percent and we're like, no, we're not

2  saying that.  We're saying up to 40 percent, if that

3  makes sense to clarify our position.

4          Again, Jan did not state in the original

5  letter, Bates 010258.  But now that I recall our

6  discussion, based on the call we had with Sherri Miller,

7  Sherri was saying -- kept saying, you want a 40 percent

8  increase.  And we were like, no, we want up to a

9  40 percent increase, to clarify that.  Not a flat

10 increase, but an up to.  Leaving the range open to

11 either 10, 20, 30, 40 percent whatever they deemed fair,

12 if that makes sense.

13     Q.   That makes sense.

14     A.   Okay.

15     Q.   And you keep using the "we."  At this point

16 did you believe that this is not just Jan's concern, but

17 it was your concern, too?

18     A.   My concern for Jan to get fair pay.

19     Q.   And when you say fair, that was with respect

20 to additional pay for two additional sites and the

21 compa-ratio, correct?

22     A.   That is correct.

23     Q.   After the four bullet points in the middle, do

24 you see that the letter -- and I'm referring to the one

25 that you revised on 010219 -- it says, "If there is a



1  valid reason why my compa-ratio percentage is well below
2  others who hold my same position as an AAM; why my June
3  2021 merit increase was only 1.5 percent; why I did not
4  a receive a salary increase when promoted from AA to AAM
5  and given multiple locations and why I was overlooked
6  for a cost of living salary adjustment, I'd appreciate
7  the opportunity to discuss the rationale for these
8  disconnects and shortcomings."
9       A.   I do see that paragraph.
10      Q.   And at this point you had not looked into what
11 you had given Jan as the merit increase for 2021,
12 correct?
13           MR. MANN:  Objection.
14           THE WITNESS:  That is correct.
15 BY MS. SIMPSON:
16      Q.   And at this point you didn't even know what
17 the reason was for the different compa-ratio
18 percentages, correct?
19           MR. MANN:  Objection.
20           THE WITNESS:  I did not know the reason for
21      the different compa-ratios.  I did not know the
22      difference between -- yes, I did not know.
23 BY MS. SIMPSON:
24      Q.   At this point, did you know why Jan did not
25 receive a salary increase when promoted from AA to AAM?



1       A.   I do not know that because that was before I

2   became a RAM in 2017.

3       Q.   In the last full paragraph, do you see that it

4   says, "To reiterate, I'm not asking to be paid an

5   outrageous salary or a salary that I do not deserve"?

6       A.   I'm sorry, Amanda, where do you see that, on

7   Bates 010219?  The last paragraph?

8       Q.   Yes, the last full paragraph, "To reiterate,

9   I'm not asking to be paid an outrageous salary or a

10  salary that I do not deserve."

11      A.   Yes, I see that statement or sentence.

12      Q.   Okay.  And so you thought that up to a

13  40 percent increase in salary was not an outrageous

14  request?

15          MR. MANN:  Objection.

16          THE WITNESS:  I believe they're mutually

17      exclusive because on the second paragraph, on Bates

18      010219, we're correcting Sherri's misunderstanding

19      of asking for a flat increase 40 percent versus our

20      asking up to 40 percent.  The last paragraph is

21      just clearly stating what we're asking for and

22      what's fair was not outrageous.

23  BY MS. SIMPSON:

24      Q.   My question was --

25      A.   I'm sorry.



1      Q.    -- is a salary adjustment up to 40 percent not

2   an outrageous request?

3      A.    I do not believe -- honestly, I'm unsure how

4   to answer that question.

5      Q.    Well, I mean, you revised this letter,

6   correct?

7      A.    Correct.  But when I revised the letter, I

8   wasn't looking at this paragraph to refer to the

9   paragraph above on Bates 010219.

10     Q.    Were you aware of anyone receiving a

11   40 percent salary increase?

12     A.    I was not aware of anyone receiving any

13   increases.

14     Q.    You're not aware of anyone ever receiving an

15   increase?

16          MR. MANN:  Objection.

17          THE WITNESS:  That I'm aware of.  I mean, I

18       was a RAM for four years and I -- within my first

19       region, my six AAMs did not take on any additional

20       responsibilities.  So again, I was unaware of any

21       increases to their pay.  And then when I became the

22       RAM of the Atlantic/Southeast Region, the only

23       person that received additional locations during

24       that time was Jan Chalk.

25



 1  BY MS. SIMPSON:

 2      Q.   But you'd agree that the AAMs received annual

 3  increases, right?

 4      A.   They received annual merit increases.  The

 5  standard increase, merit increase for the year.

 6      Q.   Okay.  I just wanted to be because you had

 7  said you weren't aware of anyone receiving an increase,

 8  but you're very aware of AAMs receiving merit increases

 9  each year, correct?

10      A.   I'm aware of them receiving merit increases,

11  but I'm not aware of anyone receiving increases for

12  additional compensation because during my 10 years of

13  RAM, only Jan received additional work during that

14  four-year time.

15      Q.   So you didn't actually know what the company's

16  practice was with respect to individuals getting

17  additional sites, right?

18      A.   I am not aware of how that works.

19           (Defendant's Exhibit 16 was marked for

20      identification.)

21  BY MS. SIMPSON:

22      Q.   So, Mr. Saunders, I have provided you with

23  what's been marked as Exhibit 16.  Do you recognize

24  this?

25      A.   Again, vaguely, I recognize this e-mail chain.



1      Q.   Okay.  And so on the first page, Bates-labeled

2   010313, do you see the second e-mail down, Sherri's

3   writing Jan, copying you, Dan and Allyson on July 12th

4   indicating that an additional one percent has been

5   approved and will retro back to June 1st?

6      A.   I do see that.

7      Q.   Why are you smiling, sir?

8      A.   Because smiling prevents me from crying.

9      Q.   Why would you cry over this exhibit?

10      A.   Not this exhibit, this entire process.

11      Q.   Explain that to me.

12      A.   This is very emotional.  This is very --

13   it's -- it's -- from the beginning -- from the beginning

14   of all this, my integrity was lied upon and it continues

15   to haunt me to this day.  In keeping it short, I just

16   have to laugh at this process.

17      Q.   The process that they actually increased Jan's

18   pay from the 1.5 percent that you gave her to

19   2.5 percent?

20      A.   No, not about the process of this e-mail chain

21   and the content of the e-mail, about this entire

22   process.

23      Q.   What do you mean by this?

24      A.   This deposition.

25      Q.   What about the deposition?



 1      A.   To go through all this.

 2      Q.   We have to.  You've brought claims against the

 3  company.

 4      A.   I understand that.  I do understand that,

 5  Amanda.

 6      Q.   If you want to drop your claims, we can stop

 7  the deposition.

 8      A.   I'm not saying that, Amanda, no.  Let's please

 9  continue.

10      Q.   Okay.  Do you need to take a break?

11           MR. MANN:  Let's take a break.  We've been

12      going for 45.  Take a break?

13           THE WITNESS:  All right.

14           (Brief recess.)

15  BY MS. SIMPSON:

16      Q.   Mr. Saunders, we took a quick break so that

17  you could compose yourself.  I understand you want to

18  make a statement with respect to what we were just

19  talking about.

20      A.   Yes, about the process.  I will respect the

21  process because I understand we all have jobs to do.  I

22  was frustrated because the points we've been discussing

23  I believe aren't the points that truly matter to the

24  claim of the termination, the whistleblowing, the

25  termination, retaliation, and so I'll continue to use my



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                           127

1  pin here to remain calm and speak slowly as much as

2  possible to help me get through this.

3       Q.   Okay.  So you've just said some legal words.

4       A.   Oh, legal words.

5       Q.   When you say "discrimination," what are you

6  talking about?

7       A.   Against me from Signature Aviation.

8       Q.   And what do you mean by that?

9       A.   How they fired me unjustly based on lies,

10 which I believe I said before the break, to put my

11 integrity in question and that has bothered me from

12 October 21st to now.

13      Q.   Okay.  And we're going to talk about your

14 termination.  When you're saying "retaliation," what do

15 you mean?

16      A.   For going to the hotline and mentioning that

17 the company at the time had a possible EEOC liability

18 exposure.

19      Q.   Okay.  We're going to get to that as well.  As

20 you can tell, I'm going chronologically.  So I know it

21 might be in the timeline that you want to go through,

22 but I have a lot of e-mails to go through and so we're

23 working up to the time period that you were terminated.

24 Do you understand that?

25      A.   I respect your process.  But for me, the point



1  where it gets egregious or being mistreated was the day

2  I was terminated unfairly, unjustly and that's why the

3  case needs to progress.  So I respect your timeline, you

4  can go through it.  But for me, the hurt, the mental

5  anguish didn't start until I was wrongfully terminated.

6      Q.   Okay.

7      A.   And read the lies in the term letter.  So if

8  you refer back to this e-mail or the e-mail before, it

9  doesn't begin to touch on that injustice.

10     Q.   No, I understand that.  We're going to talk

11 about that.  And I understand that this process is hard.

12 And it seems like the litigation has weighed on you

13 mentally as well.  And as part of the process, I have to

14 do my job.

15     A.   I respect that, Amanda.

16     Q.   Okay.  And we can talk about all that before

17 we go on with the e-mails and we're getting to an August

18 e-mail, okay, so we're moving forward.  There's just a

19 lot of e-mails that I have to, especially for purposes

20 of the record, get in.

21          You had mentioned whistleblowing as well, what

22 did you mean by that?

23     A.   Again, reporting a hotline claim and being

24 retaliated for it.

25     Q.   And when you say "retaliated for it," what do



 1  you mean?

 2       A.   Being fired.

 3       Q.   Okay.  So you can see I wrote down everything

 4  you just said and we're going to get to that and I

 5  promise we're going to spend some time on that.  And if

 6  it meets with your approval, we'll go through a couple

 7  e-mails first and then get to that.

 8       A.   Yeah, we can continue with your process.

 9  Again, I respect your process and we can go through

10  however many e-mails you need to go through to not jump

11  around, I'm totally fine with that.

12       Q.   And I know the deposition is trying on you.

13  Like we said at the beginning, if you need to take a

14  another break, just let me know.  Okay?

15       A.   I will.  Thank you.

16            MS. SIMPSON:  For purposes of the record,

17       before we took a break was there a question

18       pending, before I move on?

19            MR. MANN:  I think he had said it was a joke

20       and you asked about what was joking and that's when

21       we got sidetracked.  So I think there was a

22       question before that though.

23            MS. SIMPSON:  Can the court reporter look for

24       me?

25            THE COURT REPORTER:  Yeah.



1          MS. SIMPSON:   Thank you so much.

2          (The testimony was read back by the reporter.)

3    BY MS. SIMPSON:

4      Q.    Let me just quickly, to clarify the record,

5    Mr. Saunders, we were looking at Exhibit 16 before the

6    break and talking about that Sherri confirmed on

7    July 12th that Jan got an additional one percent

8    increase retro back to June 1st.  Do you see that?

9      A.    I do see that statement.

10     Q.    And was it your understanding that that salary

11   adjustment, in fact, occurred?

12     A.    I'm unsure if that actually occurred.

13     Q.    Okay.  Did you ask anybody whether or not it

14   actually occurred?

15     A.    I did not ask anyone.

16     Q.    Okay.  Did Jan ever tell you whether or not

17   she got the salary increase?

18     A.    I do not recall.  I don't want to speak for

19   her.  I don't recall her saying.

20     Q.    Okay.  Does this exhibit refresh your

21   recollection that you only gave Jan a 1.5 percent salary

22   increase?

23     A.    I do not recall what I gave Jan.

24          (Defendant's Exhibit 17 was marked for

25          identification.)

FREDERICK SAUNDERS                           November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                      131

1  BY MS. SIMPSON:

2      Q.   Okay.  So then I provided you what's been

3  marked as Exhibit 17.  Do you recognize this?

4      A.   I recognize all except for Bates 010288.  And

5  would this be another example of there's an original one

6  and then my revision or is this the only letter for this

7  document?

8      Q.   That was going to be I question I had for you.

9      A.   Honestly, Amanda, I'm unsure if I revised this

10  one previous to the other documents.  Unless you present

11  to me a different version and I can look at it and tell

12  if I revised it or not.  But just off this one

13  particular Bates 010288, I'm unsure if I revised this

14  document or not.

15      Q.   Okay.  So starting on the first page, do you

16  see that this is an e-mail from Jan to you on

17  August 14th and she's asking you to review an e-mail she

18  prepared to Jen Hudak saying she's still not happy with

19  her compensation and she has your support?

20      A.   I do see that statement.

21      Q.   Does that refresh your recollection on whether

22  or not you reviewed the e-mail to Jen?

23      A.   It does not.

24      Q.   Okay.  Do you recall talking to Jan about the

25  e-mail to Jen?



1      A.   I recall Jan talking to me about e-mailing Jen

2  Hudak because we had yet to hear any response from Dan

3  Cunico who was Jen Hudak's report.

4      Q.   Who's Jen?

5      A.   If Dan Cunico was the director of HR, I

6  believe Jen was the global -- not global, but maybe --

7  all I know is she reported -- Dan reported to her.  And

8  if Dan was director, I'm unsure, maybe senior VP of HR.

9      Q.   Okay.

10      A.   I'm unsure.  Maybe it's in one of her e-mail

11  responses, her title, but I'm not unsure what her title

12  was at the time.  But I know she -- I know Dan Cunico,

13  director of HR, reported to Jen Hudak.

14      Q.   Did you let anyone know that Jan was going to

15  be e-mailing Jen Hudak?

16      A.   I do not recall.

17      Q.   Do you recall if Jan actually sent the e-mail

18  to Jen Hudak?

19      A.   I do not recall.  Unless there's an e-mail

20  that I'm copied -- from Jan to Jen with me copied on it,

21  I don't recall if she sent an e-mail or not.

22           (Defendant's Exhibit 18 was marked for

23      identification.)

24  BY MS. SIMPSON:

25      Q.   And so, Mr. Saunders, I've provided you with



1   what has been marked as Exhibit 18.  Does this refresh

2   your recollection that Jan, in fact, sent Jen the e-mail

3   on August 16 and copied you?

4       A.   It does not.  But based on the exhibit, I do

5   see that Jan Chalk sent this e-mail to Jen Hudak and

6   copied me on it.

7            MR. MANN:  This e-mail doesn't have a date.

8       Am I missing something?

9            THE WITNESS:  Oh, correct.

10           MS. SIMPSON:  The bottom?

11           MR. MANN:  The first one --

12           MS. SIMPSON:  Yes.

13           MR. MANN:  -- at the top.

14           MS. SIMPSON:  I'm not referring to that.

15           MR. MANN:  Okay.

16           MS. SIMPSON:  I'm referring to the bottom of

17       010377.

18   BY MS. SIMPSON:

19       Q.   Mr. Saunders, I just want to make sure we were

20   on the same page.  When I was asking you questions, I

21   was referring to that e-mail that's dated August 16th

22   from Jan to Jen copying you.  Do you see that?

23       A.   At 4:41 p.m.?  Yes, I do see that.

24       Q.   Okay.  And then above that, do you see that

25   you send a follow-up e-mail to Jen?



1        A.    I do see that.

2        Q.    Okay.  And why did you send that follow-up

3   e-mail to Jen?

4        A.    Both because Jan asked me to or asked what was

5   the status and if I heard from anyone and I believe I

6   told her, no.  I told her no and it was a follow-up

7   reminder to Jen to get a response.

8        Q.    And do you recall Jen replying that she

9   forwarded this information to Dan?

10       A.    I don't recall that at all.

11       Q.    Do you recall any other response from Jen?

12       A.    Not at all.

13             But to Mike's point, why is the date missing?

14       Q.    That's how it came out, so I'm just asking you

15   about what I have in terms of the document that we

16   produced in discovery.

17       A.    It's weird because every other e-mail has

18   from, date, to.  That one is missing the date.

19       Q.    I understand that.  I can represent to you

20   that that's a corporate document that we have been

21   provided based on an e-mail pull.

22       A.    Can we understand why the date is missing?

23             MR. MANN:  Right.  But we don't know if it was

24       sent based off of this, right?

25             MS. SIMPSON:  So I need him to testify, not



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                            135

 1      you.

 2  BY MS. SIMPSON:

 3      Q.   But do you have any reason to believe that

 4  that e-mail is not accurate?

 5      A.   Without the date, I have no idea when this

 6  e-mail was sent or if it's accurate.

 7      Q.   Did you ever follow up with Jen again?

 8      A.   I do not recall.

 9      Q.   If you wouldn't have heard from her, would you

10  have followed up again?

11      A.   Absolutely.

12           (Defendant's Exhibit 19 was marked for

13           identification.)

14  BY MS. SIMPSON:

15      Q.   Okay.  So you've been provided what's been

16  marked as Exhibit 19.  Do you recognize this?

17      A.   Vaguely I recognize this e-mail chain.

18      Q.   Okay.  So starting from the bottom of the

19  first page, Bates-labeled 010336, and do you see that

20  Sherri's announcing that Enrique is moving from an AA to

21  an AAM?

22      A.   I do see that.

23      Q.   And then it appears that Jan is e-mailing you

24  on September 7th saying she bet he received a salary

25  adjustment for the promotion and believes this is

 1 | another example of how she was overlooked.

 2 |         Do you see that?

 3 |     A.   I do see that statement.

 4 |     Q.   And you respond that more than likely, yes,

 5 | since there was probably an offer letter because of the

 6 | promotion to a higher level, especially managerial.

 7 |         Do you see that?

 8 |     A.   I do see that, yes.

 9 |     Q.   Okay.  And so why are you saying that?

10 |     A.   Because that promotion was official and going

11 | from an area accountant to an area accounting manager,

12 | so different job responsibilities.  I would say in this

13 | point more complex job responsibilities.  If that

14 | answers -- I'm not sure if that answers your question or

15 | not.

16 |     Q.   Was there a point that Jan went from an AA to

17 | an AAM?

18 |     A.   She went from a basic accountant to an AAM,

19 | from my understanding.

20 |     Q.   Okay.  Do you know if she had an offer letter

21 | when she became an AAM?

22 |     A.   I do not.  Because again, that was in 2016 and

23 | I became a RAM in 2017.

24 |     Q.   Okay.  So do you think it was appropriate that

25 | you're commenting on someone getting an offer letter to



1  a subordinate when you don't know whether or not she

2  received an offer letter as part of her AAM promotion?

3      A.   I stated more than likely.  I wasn't sure.

4  But more than likely that -- I would come to believe

5  that going from an accountant to a manager was probably

6  more money involved, possibly.  Again, more than likely.

7  I don't know for sure, but more than likely.

8      Q.   When you say in the second sentence, "Please

9  remember there are at least eight to nine others in the

10 same situation as you, what do you mean by that?

11     A.   That's when Sherri, again, told us that -- on

12 a call with her that there are eight or nine other AAMs

13 in the same situation as Jan.

14     Q.   What does that mean, same situation?

15     A.   Below the compa-ratio.

16     Q.   But this is talking about a promotion from AA

17 to AAM, right?

18     A.   Two separate issues, correct.  Or topics,

19 we'll say.

20     Q.   Right.  So that's why I'm trying to understand

21 why you're talking about eight to nine others in the

22 same situation because it's different, right?

23     A.   Two separate topics, yes.  One about

24 receiving -- both about receiving more money, but the

25 reason why they receive more money, if that makes sense.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                            138

1      Q.   And then you instruct Jan to make note of all
2  your concerns in a summarized manner in order to present
3  to Chris on the call, right?
4      A.   Yes, to be more formal, more prepared, more
5  professional, to substantiate the ask.
6      Q.   Did Jan do that?
7      A.   I'm unsure.
8      Q.   Do you recall Jan asking you to review
9  anything before you met with Chris?
10     A.   I'm unsure.
11     Q.   Do you recall the meeting with Chris?
12     A.   I asked for the meeting with Chris or we asked
13  or Jan asked -- I'm not sure -- or Sherri may have even
14  asked, but someone asked for a meeting with Chris and he
15  finally gave us a meeting in September.
16     Q.   Okay.  So my question was:  Do you recall the
17  meeting with Chris?
18     A.   Oh, do I recall -- I thought you said, did I
19  call it.  Yes, I do recall the meeting with Chris, yes.
20     Q.   What did you discuss?
21     A.   Jan's unfair pay and not being -- her
22  compa-ratio being lower -- being low.
23     Q.   What was Chris's response?
24     A.   The main response I remember Chris saying is
25  that no one is leaving, so the pay must be fair.  And



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              139

1  also, Chris -- another response that Chris said was,

2  Signature is not the only place to work.

3       Q.   Do you recall Chris indicating that he

4  believed that the extra bases for Jan brought her more

5  in line with the average bases covered by other AAMs?

6       A.   I recall Chris saying what Sherri said about

7  that.

8       Q.   And what is that?

9       A.   That Sherri said that now that Jan has six

10  bases, she's more in line with everyone else, but her

11  compa-ratio is still low.

12       Q.   But you'd agree that additional basis did

13  bring her more in line with the number of bases the

14  other AAMs have, correct?

15       A.   More in line with number of bases, but not

16  more in line with her pay.

17       Q.   Do you recall Jan discussing her compa-ratio

18  during that meeting?

19       A.   I believe she did, yes.

20       Q.   Had you told Jan her compa-ratio?

21       A.   I had not.  I'm very proud of that.

22       Q.   How did she know what her compa-ratio was?

23       A.   She did not know her compa-ratio.

24       Q.   So you don't recall her saying 58 percent

25  compa-ratio?



1       A.   She said that compa-ratio, 58 percent, but

2   that was based on her independent research, not on her

3   actual compa-ratio.

4       Q.   What independent research?

5       A.   That chart on Bates 010224, Exhibit 8.

6       Q.   So she was referencing the chart?

7       A.   Yes, Amanda.  Because again, I prided myself

8   on not telling, not only her, her compa-ratio, but my

9   other four AAMs as well because I was told that you're

10  not to share that information with your AAMs.

11      Q.   And you understood why you shouldn't share it

12  with your AAMs, right?

13      A.   I understand because once people have a

14  benchmark -- because like, for example, if -- let's say

15  someone knows their compa-ratio is 70 percent and that

16  is all they know, they are unable to compare that number

17  to anything because it's all they know.  But if people

18  start to talk about their compa-ratio with others, then

19  they start to know where they sit as far as pay and

20  being compensated for doing the same job.  Since Jan did

21  not know her compa-ratio, she had no idea how to compare

22  herself to anyone else.

23      Q.   But you didn't actually know how to compare

24  her to anyone else because you didn't know what went

25  into the compa-ratio, right?



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                           141

1      A.   But I do know that compa-ratios were

2   inequitable.

3      Q.   You're using that word, but they were

4   different, right?

5      A.   Inequitable.

6      Q.   But what is your basis for contending that

7   they're inequitable when you don't know what goes into

8   them?

9      A.   Comparing them.

10      Q.   I understand they're different, no dispute.

11   But how are they inequitable?

12      A.   They're doing the same job and not equity in

13   pay.

14      Q.   And you're contending that based on the number

15   of cites they had solely, correct?

16          MR. MANN:  Objection.

17          THE WITNESS:  No, I'm not basing it solely on

18      number of bases.  It's performance as well, too.

19   BY MS. SIMPSON:

20      Q.   Okay.  Performance and number of bases,

21   anything else?

22      A.   Possibly.  But those two -- and even less

23   about number of bases, about performance.  Because in

24   the AAM world, it really revolves around timeliness and

25   having less discrepancies in your work.  I'm trying to

1  think of an example.  For example, one of the core

2  responsibilities for AAMs was to make sure that their

3  open ticket report was clean.  And by clean we mean no

4  open tickets dates more than seven days or a week old.

5  And Jan was adamant at making sure that her bases had

6  less open tickets that were more than a week old.

7          So again, less about number of bases, more

8  about performance and making sure that your work is done

9  timely and all the discrepancies are resolved timely, if

10 that all makes sense.

11     Q.   Any other reason you believe that the

12 difference in compa-ratio is inequitable?

13     A.   Any other reason?  Yes, because I think Sherri

14 held a grudge against Jan and did not want to increase

15 her pay.

16     Q.   What is your factual basis for contending that

17 Sherri held a grudge against Jan?

18     A.   Based on Sherri's comments that Jan did not

19 take Huntsville as a base.  She was mad at Jan for not

20 taking Huntsville as a base.

21     Q.   Any other reason?

22     A.   I know there's several, but off the top of my

23 head when they come I'll share it.

24     Q.   Well, I'll wait for you to think of them.

25     A.   At this point, that's the main reason, I



1  think, that Sherri held a grudge against -- that's the

2  main reason that Sherri held a grudge against Jan for

3  not taking Huntsville.

4      Q.   Did she ever say she held a grudge against

5  Jan?

6      A.   She was mad at Jan for not taking Huntsville.

7  She did say that to me, yes.

8      Q.   Okay.  Did she say, I'm not going to increase

9  her pay because of it?

10     A.   She said, Jan deserves nothing because she

11 didn't take Huntsville.

12     Q.   Because Jan didn't take an additional site

13 when asked to, correct?

14     A.   Huntsville, yes.

15     Q.   And, in fact, you were in charge of the merit

16 increase initially, correct?

17     A.   That's separate.  Not taking Huntsville was

18 prior to me being Jan's manager.

19     Q.   So you're saying this only has to do with the

20 pay in terms of taking additional bases?

21     A.   No, no, the grudge that Sherri held against

22 Jan for not taking Huntsville.

23     Q.   But what's the effect of the grudge?  I don't

24 understand.

25     A.   That whatever Jan asked for, Jan was not going



 1  to get.

 2       Q.    That's just your opinion, right?

 3       A.    That's my opinion.

 4       Q.    Do you recall in the meeting with Chris that

 5  Jan brought up issues with other AAMs?

 6       A.    I do recall that, yes.

 7       Q.    And is this because you told her that you

 8  believed other AAMs had similar issues?

 9       A.    No, Sherri Miller told us that on a call when

10  all three of us were together.

11       Q.    At this point, has any other AAM brought pay

12  issues to your attention?

13       A.    Yes, Greg Gunter.

14       Q.    When did he bring the concern to you?

15       A.    During this situation between April and

16  September.

17       Q.    Did you approach Greg first?

18       A.    No.

19       Q.    How did he come to you?

20       A.    Because Greg was -- he had just met with the

21  HR person and he was sharing with me the running concern

22  that one -- if one were to -- Signature Aviation's pay

23  rates were skewed because if one were to leave at a

24  certain rate and then come back and get rehired, they

25  would get a higher rate than what they left at.  And



1  actually he asked the HR person that -- you know, to

2  explain that situation and the HR person agreed with

3  them that that's how it works.

4        Q.   So I'm sorry, did Greg leave and come back?

5        A.   No, that was the presumption based on what

6  people understood the current market rate -- or what

7  Greg understood the rates to be based on a discussion

8  with an HR person.

9        Q.   Who was the HR person?

10       A.   I have no idea.

11       Q.   And so what did Greg come to you and say?

12       A.   That it's not fair.  It's not right.

13       Q.   And what was your response?

14       A.   It didn't make sense to me either.

15       Q.   Did you do anything with Greg's comment?

16       A.   It was all encompassed with trying to get, not

17  only Jan, but the entire team who was below the

18  compa-ratio of 80 percent to that level.

19       Q.   Did you ever bring Greg's name up during the

20  conversation with Chris?

21       A.   I do not believe so.

22       Q.   Did you ever bring Greg's name up to anyone in

23  HR or another higher-level manager?

24       A.   I do not believe so because of fear of

25  retaliation.



1     Q.    What do you mean by that?

2     A.    Because Greg shared with me that he was the

3  only breadwinner in his home and he did not want to rock

4  the boat for fear of losing his job.

5     Q.    What did you say to him when he said that?

6     A.    That I understood that.

7     Q.    Any other AAM bring any pay issues to your

8  attention at this point?

9     A.    I do not believe so.

10     Q.    Did you talk to Jan about the meeting after

11  you finished meeting with Chris?

12     A.    Jan was on that call.

13     Q.    I understand.  I'm asking you:  After the

14  meeting, did you two talk?

15     A.    I believe so, yes.

16     Q.    What did you talk about?

17     A.    We did not understand how Chris believes that

18  a measurement of fair pay is based on no one leaving.

19  We also talked about how Chris said on the call,

20  Signature is not the only place to work, which we both

21  understood that as if you're not happy here, leave.

22  We -- there was one more point.  I apologize.

23     Q.    Take your time.

24     A.    Chris also said that Jan was the on same level

25  or playing field as everyone else, which I was unsure of



FREDERICK SAUNDERS                              November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                        147

1  that statement for all the AAMs, which at the time were

2  like 20 to 25 AAMs.  I just knew from my team, she was

3  not on the same level as all the other AAMs, especially

4  with not having the same -- basically to your point

5  earlier.

6          THE COURT REPORTER:  The same what?

7          THE WITNESS:  Same level, same playing field.

8      Basically he was referring to the compa-ratio.

9  BY MS. SIMPSON:

10     Q.   So what do you do next?

11     A.   Well, actually there's one more -- one more

12 thing -- at least one more thing he said that -- it just

13 slipped my mind.  I apologize.

14         What happened next?

15     Q.   Yes.

16     A.   I'm unsure.  We talked about it.  Jan and I

17 talked about the call.  And I'm unsure what happened

18 next.  I mean, besides being frustrated.  I'm unsure

19 what happened next.

20     Q.   Who initiated preparing ethics hotline

21 complaints?

22     A.   I'm unsure.

23     Q.   Did you tell Jan about the ethics hotline?

24     A.   I'm unsure.

25     Q.   Did you two talk about submitting ethics



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                148

1  hotline complaints?

2      A.   We did talk about submitting hotline

3  complaints.

4      Q.   And what did you discuss?

5      A.   Why we were submitting the hotline claim.

6      Q.   When did you talk about that?

7      A.   After the call with Chris.

8      Q.   That same day or how long after?

9      A.   I do not recall.

10         MR. MANN:  Is this one a redaction for the

11     names on this e-mail?

12         THE WITNESS:  I believe so, the names.

13         MS. SIMPSON:  Yes, the black box.

14         MR. MANN:  And that's not in the original that

15     was sent to him?  In other words, was it

16     redacted --

17         MS. SIMPSON:  Yes.

18         MR. MANN:  -- when it was sent to him --

19         MS. SIMPSON:  Yes.

20         MR. MANN:  -- or when it was produced?

21         MS. SIMPSON:  Wait.

22         MR. MANN:  When it was sent to him or when it

23     was produced?

24         MS. SIMPSON:  When it was produced.

25         (Defendant's Exhibit 20 was marked for



 1      identification.)

 2  BY MS. SIMPSON:

 3      Q.    I'm showing you what's been marked as

 4  Exhibit 20.  Do you recognize this?

 5      A.    Vaguely.

 6      Q.    Do you see that this is an e-mail from Jan to

 7  you dated September 14th?

 8      A.    I do see that.

 9      Q.    Do you see that Jan mentions that she recorded

10  the meeting and sent it to you via text?

11      A.    I do see that.

12      Q.    Are you in possession of the recording of the

13  meeting?

14      A.    If it was in my work phone, no.  If in my cell

15  phone, possibly.

16      Q.    Did you direct her to record the meeting?

17      A.    I did not.

18      Q.    Did you know that she was going to being

19  recording the meeting?

20      A.    I'm unsure.

21      Q.    Did you notify Chris, after she told you that

22  she recorded the meeting, that it was recorded?

23      A.    I do not believe so.

24      Q.    Do you notify anyone else that Jan had

25  recorded the meeting with Chris?



1        A.    I do not believe so.

2        Q.    Why did Jan record the meeting?

3              MR. MANN:  Objection.

4              THE WITNESS:  I have no idea.  I think --

5        well, she wanted to have proof of what was said in

6        fear of retaliation.

7   BY MS. SIMPSON:

8        Q.    How do you know that?

9        A.    That's what she shared with me.

10       Q.    When did she share that with you?

11       A.    Around the time after the meeting.

12       Q.    Do you know whether she recorded any other

13  meetings?

14       A.    I do not recall.

15       Q.    So in the last paragraph of this e-mail, do

16  you see that Jan is saying, one thing I can say is that

17  I sleep well at night because I know when I lay my head

18  down, I say what I mean and I mean what I say and I tell

19  the truth.  I do not blow smoke up someone's ass to make

20  myself look good and I would never tell someone what

21  they want to hear rather than the truth.  I cannot say

22  the same for those two.

23       A.    I do see that paragraph.

24       Q.    Who is she referring to?

25       A.    Chris de Jongh and Sherri Miller.



1      Q.    Okay.  Did you-all talk about this at all?

2      A.    When you say did we talk about this, what do

3    you mean?

4      Q.    About Jan's feelings about Chris and Sherri.

5      A.    Jan has always been upset with her unfair pay

6    and that frustration only exacerbated when -- after we

7    had the call with Chris and Chris said what he said

8    about no one is leaving, so the pay must be fair.  Jan

9    you're in the same playing field as everyone else.  If

10   you're not happy with Signature, there's other places

11   you can work.

12     Q.    When you say that Jan's always been upset with

13   unfair pay, what do you mean by that?

14     A.    From the time that she agreed to take two

15   additional bases she was not compensated for it and

16   stayed at zero -- stayed the same rate.

17     Q.    And what's the date that that happened?

18     A.    It went effective June -- I want to say

19   July 1st.  I want to say July 1st or June 1st.  I think

20   July 1st, mid year.

21     Q.    July 1st of what year?

22     A.    2021.  I mean, we talked about it beforehand

23   obviously, from April -- March/April to then, but it was

24   official July 1st, I believe.

25     Q.    So in April when she initially raises



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              152

 1  concerns, does she know about the two additional bases

 2  at that point?

 3       A.   Yeah, that's why she was upset.

 4       Q.   But you're saying it didn't go into affect

 5  until July?

 6       A.   It wasn't official or -- because to know how

 7  the process works, you can announce like, Jan, would you

 8  take these two bases -- two additional bases on?  Jan

 9  says yes.  Now, we have to go through the process of

10  alerting all the general managers that were affected by

11  the transition, if you will.  We had to notify corporate

12  that Jan would not be covering these two additional

13  bases versus the former person, the former AAM.  We have

14  to acknowledge transfer.  We have to make sure all the

15  system access are updated.  So all that and more goes

16  into that transition.  So she agreed to take the two

17  additional bases in March/April, but it wasn't

18  officially handed over until July 1st, if that makes

19  sense.

20       Q.   It does.  Thank you.

21       A.   You're welcome.

22            (Defendant's Exhibit 21 was marked for

23       identification.)

24  BY MS. SIMPSON:

25       Q.   I'm showing you what's been marked as



 1  Exhibit 21.  Do you recognize this?

 2      A.   I do, yes.

 3      Q.   And what is this?

 4      A.   Correspondence between Jan and I to file our

 5  hotline claims.

 6      Q.   And so at the bottom of the first page Jan's

 7  writing you on September 27th sending you a draft of the

 8  hotline complaint that she plans to file?

 9      A.   I believe that is correct, yes.

10      Q.   Did you revise it at all?

11      A.   I do not recall.

12      Q.   Did you send her your draft hotline complaint?

13      A.   I do not recall.

14      Q.   And then further up it looks like you're

15  sending her a website.  What is that?

16      A.   That's the website to the hotline.

17      Q.   Okay.

18      A.   Because I thought it was an e-mail, but it was

19  actually a website.

20           (Defendant's Exhibit 22 was marked for

21      identification.)

22  BY MS. SIMPSON:

23      Q.   I'm showing you what's been marked as

24  Exhibit --

25      A.   I'm sorry, Amanda, may I?



1      Q.    Yes.

2      A.    Okay.

3      Q.    I'm showing you what's been marked as

4  Exhibit 22.  Do you recognize this?

5      A.    I do recognize this.

6      Q.    What is this?

7      A.    My hotline complaint.

8      Q.    Okay.  And on the top of the first page, do

9  you see that the date and time received, September 29,

10  2021 at 5:16 p.m. Eastern Time?

11      A.    I do see that, yes.

12      Q.    And then on the second page, it says, report

13  details.  Does this accurately capture what you reported

14  to the ethics hotline?

15      A.    I believe so, yes.

16      Q.    In the first line, it says, "I have a concern

17  about the AAMs' compensation throughout the network,

18  which I believe some are low and unfair."

19           Do you see that?

20      A.    I do see that.

21      Q.    Okay.  And what did you mean by that?

22      A.    Further down to the third paragraph, that the

23  minimum was 80 percent, yet Jan was at 68 percent.

24      Q.    I'm trying to understand what the concern was

25  with respect to AAMs' compensation generally.



1       A.   That any AAM that was below 80 percent
2  compa-ratio, I deemed unfair.
3       Q.   Okay.  So you didn't believe that the
4  compa-ratio was being applied fairly?
5       A.   I believe that if someone's compa- -- AAMs'
6  compa-ratio was below 80 percent, it was unfair.
7       Q.   And when you say "unfair," did you believe it
8  was a violation of some sort of law?
9       A.   I don't know the law, so I have no idea how to
10  answer that.
11       Q.   At this point had any other AAMs come to you
12  about concerns with their pay?
13       A.   Greg Gunter, as I mentioned earlier.
14       Q.   Right.
15            Besides Jan and Greg?
16       A.   I do not recall.
17       Q.   At this point had you proactively spoke with
18  any other AAMs about your concerns with their pay?
19       A.   At this point, I believe not.
20       Q.   After this you start reaching out to other
21  AAMs, though, right?
22       A.   Only once.
23       Q.   Who is that?
24       A.   That was the group call.
25            (Defendant's Exhibit 23 was marked for



 1        identification.)

 2   BY MS. SIMPSON:

 3        Q.   I'm showing you what's been marked as

 4   Exhibit 23.  Do you recognize this?

 5        A.   Vaguely.

 6        Q.   Do you see that this is an e-mail from you to

 7   Sandy Montalbano --

 8        A.   Montalbano, yes.

 9        Q.   -- on September 30th?

10        A.   Yes.

11        Q.   Who is Sandy?

12        A.   She was an AAM on my first team.

13        Q.   And why were you contacting her?

14        A.   I'm unsure actually.

15        Q.   Well, you see in the e-mail that you say, "I

16   have a concern about the AAMs' compensation throughout

17   the network, which I believe some are low and unfair."

18             The first line, right?

19        A.   Correct.

20        Q.   In fact, when I look at this, it appears to

21   be --

22        A.   Exactly the same as the claim.

23        Q.   -- the ethics hotline complaint that's

24   Exhibit 22 --

25        A.   Correct.



1        Q.    -- right?

2        A.    Yes.

3        Q.    So you copied and pasted your ethics hotline

4   complaint to an AAM from your prior team, right?

5        A.    That is correct.

6        Q.    But you don't recall why you did that?

7        A.    Exactly.

8        Q.    Did you ever talk to Sandy about that e-mail?

9        A.    I do not recall.

10       Q.    At this point you hadn't heard back on the

11  investigation into the ethics hotline complaint that you

12  submitted the day before, right?

13       A.    I do not recall.

14       Q.    So you think you might have heard back on it

15  in a day?

16       A.    I do not recall.

17       Q.    I'm looking at both this e-mail, Exhibit 23,

18  and the ethics hotline complaint, you say in the second

19  line, "Please note that I'm looking at this issue from

20  an unselfish nature with the respect and concern for the

21  AAMs who are adversely affected for being underpaid."

22            Do you see that?

23       A.    Which Bates are you on?

24       Q.    Either 22 or 23 because they're the exact same

25  thing --



1        A.    Actually --

2        Q.    -- first paragraph, second line.

3        A.    First paragraph, second line, okay.  Yes, I

4   see now.

5        Q.    Why would you say that you're looking at this

6   from an unselfish nature?

7        A.    I do not recall why I would say that.

8        Q.    At this point were you trying to get all the

9   AAMs' compensation increased?

10       A.    I was not trying to get all AAMs' compensation

11   increased.

12       Q.    Just the ones that you felt were below the

13   compa-ratio?

14       A.    Of 80 percent, that is correct.

15       Q.    Did you think if you got their compensation

16   increased that your compensation would also increase?

17       A.    Absolutely not.

18       Q.    But you point out that you're doing this in an

19   unselfish way and you don't recall why?

20       A.    I do not recall why.

21       Q.    So you mentioned the meeting with the AAMs.  I

22   have that occurred on October 4, 2021.  Does that sound

23   right?

24       A.    I believe so, yes.

25       Q.    How did that meeting come about?



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                          159

1      A.   I wanted to share with my current group and my
2  first group three points.  One, that I had filed a
3  hotline claim; two, the reason for the hotline claim;
4  and three, if you receive a call from HR or the ethics
5  hotline, this is the reason why.
6      Q.   And why did you want to do that?
7      A.   To make them aware of the situation and that I
8  filed a hotline claim.
9      Q.   Why did you include your former AAMs as part
10 of that meeting?
11     A.   Because I cared about them.
12     Q.   Did you believe that there were pay concerns
13 with some of those people?
14     A.   I had absolutely no idea.
15     Q.   So nobody from your former team complains to
16 you about their pay at this point, right?
17     A.   I believe that is correct, yes.
18     Q.   But you bring them into a meeting where you
19 shared that you have an ethics hotline complaint pending
20 with the company, correct?
21     A.   Correct.
22     Q.   Okay.  And what do you say during that
23 meeting?
24     A.   Those three points, that I filed a hotline
25 claim, the reason for the hotline claim, and if you get



1  a call from HR or the hotline, this is why.

2       Q.   Did anybody respond to that?

3       A.   I asked them not to because of fear of

4  retaliation.

5       Q.   I just want to make sure you understand my

6  question.  Did anybody respond to your points during

7  that meeting?

8       A.   Yes, actually at one point when -- when I

9  mentioned the goal was to have those who were below

10 80 percent compa-ratio to be there at compa-ratio, Greg

11 responded with, actually, Frederick, the compa-ratio is

12 actually 90 percent for beginners.  80 percent was for

13 last year, 2020.  And that, I believe, was the only

14 response that was said on the call, I believe.

15      Q.   This was a call?

16      A.   Call, yes, ma'am.

17      Q.   Was it where there was video or just phone?

18      A.   It was a Teams call and I don't believe

19 anyone -- I don't believe I was on video.  I don't

20 recall anyone else being on video.

21      Q.   What was your response to Greg?

22      A.   Thank you for enlightening me on the update.

23      Q.   Is this where you learned of the 90 percent

24 for beginners that we were talking about earlier?

25      A.   I believe so.



1    Q.   Where had you learned the 80 percent from?

2    A.   I'm unsure.

3        (Defendant's Exhibit 24 was marked for

4    identification.)

5  BY MS. SIMPSON:

6    Q.   So I've provided you what's been marked as

7  Exhibit 24.  On the first page, do you see that you're

8  sending an e-mail on October 4, 2021 to a Yahoo e-mail?

9  Do you know what Yahoo e-mail that is?

10   A.   That is my Yahoo e-mail.

11   Q.   So you're sending from your business e-mail to

12  your personal e-mail?

13   A.   That is correct.

14   Q.   Okay.  And then there's a couple documents

15  behind that.  What are these?

16   A.   Basically the first document on Bates 010297

17  is, I'll say, an ad hoc agenda for that call that I had

18  with my current team and my former team.

19   Q.   Okay.  And what's the next page?

20   A.   The next page is, I'll say, a summation of all

21  that Jan and I had been through at that point in time

22  based on conversations with either Sherri or Chris.  And

23  basically the statements in quotes are what Chris said

24  on that one call we had with him, Jan and myself.

25   Q.   And what's the next page?



 1     A.   On Bates 010484?

 2     Q.   Yes.

 3     A.   It looks like a screenshot of that.  I don't

 4  recall seeing this.  Maybe it was an early version of

 5  what's on Bates 010298, but similar.  I mean, the

 6  information on 010298 is expanded obviously, but in

 7  essence the same -- a similar document we'll say.

 8     Q.   Okay.  Got it.

 9          So let's start with 010297, this ad hoc

10  agenda.  Did you circulate this to any of the AAMs

11  before the meeting?

12     A.   I do not recall.

13     Q.   Did you circulate it to any of them during the

14  meeting?

15     A.   I do not believe so.  I think I just had it on

16  the screen.

17     Q.   Okay.  Did you read from this during the

18  meeting?

19     A.   For the most part, I believe so.

20     Q.   And do you recall if you circulated it to

21  anyone after the meeting?

22     A.   I do not recall.

23     Q.   So at the top, in italics, the second line

24  from the last italicized, "No other RAM, Sherri or

25  Chris, knows about this call."



1           Do you see that?

2      A.   I do see that.

3      Q.   Why did you say that?

4      A.   To let them know that -- to worry less about

5  retaliation.

6      Q.   Did you tell them that?

7      A.   No, I don't believe so.

8      Q.   And so you call a meeting with former AAMs and

9  current AAMs with explicitly not letting any other

10  managerial employee know about the call?

11      A.   I believe so.  Because of fear of retaliation.

12      Q.   Why did you think at this point there was some

13  sort of fear of retaliation?

14      A.   Because Sherri has always been adamant about

15  no one should talk about pay.

16      Q.   When has Sherri said that?

17      A.   To me, at least once or twice.

18      Q.   Was it after you got all of your AAMs

19  together?

20      A.   Before.

21      Q.   But Sherri before talked to you about the

22  AAMs' pay, correct?

23      A.   Being low.

24      Q.   And she talked about the AAMs' pay, correct?

25      A.   On a call, yes.  But she didn't tell anyone



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              164

 1 | the percentages.
 2 |     Q.    Because that's not appropriate to tell
 3 | subordinates, right?
 4 |     A.    I'm unsure about that.
 5 |     Q.    You don't know if in your managerial role
 6 | whether it was appropriate or not for you to share
 7 | compa-ratios with subordinates?
 8 |     A.    The differences -- well, I will say that
 9 | Corporate America prides themselves on people not
10 | knowing the salaries in order to keep them as low as
11 | possible.  Because once people know about their salaries
12 | or compare to other people's salaries, then questions
13 | and issues and concerns are raised.  But again, like I
14 | said before, if you don't know what a benchmark, what
15 | your compa-ratio salary is compared to, you have no idea
16 | if you're being under- or overpaid, more so underpaid.
17 |     Q.    That's your opinion, right?
18 |     A.    My understanding from being in Corporate
19 | America for 20-plus years, yes.
20 |     Q.    And you think that is for any company?
21 |     A.    It depends on the company.
22 |     Q.    Do you believe this for any company you've
23 | worked with?
24 |     A.    Signature Aviation, obviously.  And I'm unsure
25 | about GAF.  I've only been there for a year and a half,



1  so I'm unsure.

2      Q.   What about Ernst & Young?

3      A.   No idea.

4      Q.   Why did you believe this about Signature?

5      A.   Because you hear about -- you hear rumblings,

6  right, after 14 years of being there, that people are

7  underpaid, people leave to -- people leave and get not

8  only better jobs, but more pay.  And it was a running

9  joke within the company, going back to what Greg shared

10 with me that you can leave your position, come back and

11 rehire at a higher rate.

12     Q.   And you're hearing these rumors from AAMs?

13     A.   That particular one was from Greg, AAM, yes.

14 And then throughout my 14 years at Signature, it was a

15 running joke that people were underpaid.

16     Q.   Running joke with who?

17     A.   Just throughout the company.

18     Q.   Who besides AAMs joked about that?

19     A.   Line service technicians, who have worked at

20 the bases, they're the ones that put fuel in the planes,

21 all the way up to their supervisors, house managers,

22 general managers.  It was across the board.

23     Q.   What general managers joked with you about

24 this?

25     A.   I wouldn't say joked, but they expressed that



FREDERICK SAUNDERS                                        November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                  166

 1  they were underpaid.

 2       Q.    So you just heard from some people in the

 3  company that they felt like they were underpaid?

 4       A.    That is correct.

 5       Q.    Okay.  And it was your belief that some of the

 6  AAMs were underpaid because the compa-ratio was lower

 7  than others?

 8       A.    Compared -- based on what Sherri told us, yes.

 9       Q.    But I'm trying to understand, what exactly did

10  Sherri tell you?

11       A.    That there are eight or nine other people in

12  the same boat as Jan.

13       Q.    And what does that mean, same boat as Jan?

14       A.    That compa-ratio was low.

15       Q.    Okay.  But how -- how is that, using your

16  word, unfair?

17       A.    Low is unfair.

18       Q.    How do you know low is unfair when you don't

19  know what goes into compa-ratio?

20       A.    I can't answer that question that you're

21  asking, Amanda.  If Sherri said they were low, they were

22  low.

23       Q.    So whatever Sherri says is true?

24       A.    I'm not saying that.

25       Q.    Do you know if Sherri is part of setting



1 compa-ratio?

2      A.    I have no idea what her setting is.

3      Q.    So the second page of notes, 010298, did you
4 draft this?

5      A.    I did draft this.

6      Q.    And what was the purpose of this?

7      A.    To get my notes down based on the call with
8 Chris, as well as what we had endured from March, April
9 to that point in time.

10     Q.    We endured, you're talking about you and Jan?

11     A.    Yes, Amanda.

12     Q.    Who did you share this with?

13     A.    No one, I don't believe.

14     Q.    Did you share it with Jan?

15     A.    I believe -- I'm unsure.  I'm unsure.

16     Q.    What is the first line, subjective reasoning,
17 hearsay, instead of objective analysis, reevaluate the
18 compa-ratios and pay fairly based on the 90 to
19 110 percent scale noted by CHQ?

20     A.    Basically subjective is Chris saying that no
21 one is leaving, so the pay must be fair.

22     Q.    And what's the objective?

23     A.    To base people's pay on compa-ratio.

24     Q.    Do you know if anyone at Signature conducted
25 an analysis of the compa-ratio as part of an



1  investigation to determine whether or not it was fair?

2      A.   I'm unsure about the fair part.  But from what

3  I was told by, I believe, Sherri and Chris that the

4  compa-ratios had been evaluated, but they were

5  incorrect.

6      Q.   What did you mean "incorrect"?

7      A.   I have no idea.  Those were their words.

8      Q.   Did you ask them what they meant by that?

9      A.   I asked them to correct them.

10     Q.   When did this conversation take place?

11     A.   I'm unsure.

12     Q.   What year?

13     A.   2021.

14     Q.   What month?

15     A.   I have no idea.

16     Q.   And this is a conversation with who?

17     A.   Either Sherri -- I'm unsure about Chris.  It

18  was a conversation with Sherri, I believe.

19     Q.   Was anyone else present for the conversation?

20     A.   I do not recall.  If it was one with her one

21  on one or it was one with Sherri, Jan and I.

22     Q.   And what specifically did Sherri say about the

23  compa-ratios?

24     A.   That they were low.  That they weren't correct

25  and they needed to be revalued.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              169

1              MR. MANN:  Can we take a break for a second?

2              MS. SIMPSON:  Yeah.

3              (Brief recess.)

4              (Defendant's Exhibit 25 was marked for

5         identification.)

6    BY MS. SIMPSON:

7         Q.    So, Mr. Saunders, I've provided you what's

8    been marked as Exhibit 25.  Do you recognize this?

9         A.    Vaguely.

10        Q.    Okay.  So if we flip to the second page, which

11   is Bates-labeled 010290, do you see that you are sending

12   Jan an e-mail on October 4th and the subject line is

13   ethics concern?

14        A.    I do see that.

15        Q.    Does that refresh your recollection of you

16   sending Jan your notes on the ethics concerns?

17        A.    Based on the from and to, I sent this to her

18   on October 4th.

19        Q.    And then do you see Jan's response?

20        A.    Would that be on Bates 010289?

21        Q.    Yes.

22        A.    Yes.

23        Q.    And then you reply and state, "I will call you

24   after my call with Christy to talk more through your

25   e-mail below and our next steps."

```
 1              Do you see that?

 2       A.    I do see that.

 3       Q.    So at this time you had a call scheduled with

 4  someone named Christy?

 5       A.    Christy Pavel P-A-V-E-L.

 6       Q.    Who is that?

 7       A.    Honestly, I know she's HR.  And so if the

 8  reporting structure is Dan Cunico, Jen Hudak, then

 9  Christy Pavel was above them, so either HR, global

10  compensation, senior VP, VP, I'm unsure.

11       Q.    So when was that meeting scheduled for?

12       A.    With Christy Pavel?

13       Q.    Yes.

14       A.    I'm unsure.

15       Q.    How did that meeting come about?

16       A.    Christy Pavel called me after Jan and I filed

17  our hotline claim.

18       Q.    Was she the one investigating it?

19       A.    I'm unsure.

20       Q.    Had you spoke with her before?

21       A.    Never.

22       Q.    Did you know who she was generally at that

23  time?

24       A.    Never heard of her name until that day she

25  called me.
```



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                          171

1      Q.   And you were meeting with her one on one and

2   not with Jan?

3      A.   That is correct.

4      Q.   But you were going to go tell Jan afterwards

5   what you-all talk about?

6      A.   Not what Christy and I talked about, but Jan's

7   a e-mail below.

8      Q.   Okay.  I don't understand.  Why would you tell

9   her you're going to call her after your call with

10   Christy, unless you were talking to her about what you

11   and Christy discussed?

12      A.   No, Jan wanted to talk.  I had a call with

13   Christy.  So I went to put Jan on pause.  After I talk

14   with Christy, I'll call you back and talk about the

15   e-mail below and our next steps.

16      Q.   Okay.  So between her e-mail on October 4th

17   and the next morning, you don't talk to Jan?

18      A.   Repeat the question.

19      Q.   Between her e-mail on October 4th and your

20   response on October 5th in the morning, you don't talk

21   to her?

22      A.   To Jan?

23      Q.   Correct.

24      A.   I do not recall.

25           (Defendant's Exhibit 26 was marked for



1        identification.)

2    BY MS. SIMPSON:

3        Q.    I'm showing you what's been marked as

4    Exhibit 26.  Do you recognize this?

5        A.    Vaguely.

6        Q.    So at the top of the first page, do you see

7    that you're sending an e-mail again to Sandy --

8        A.    Montalbano.

9        Q.    -- on October 25, 2021?

10       A.    I do see that.

11       Q.    And so you're forwarding Sandy an e-mail you

12   sent Christy with the attachments of your ethics

13   concern.  Do you see that?

14       A.    I believe so.

15       Q.    And Sandy was a former AAM of yours, right?

16       A.    That is correct.

17       Q.    She was still with the company, but on a

18   different team, right?

19       A.    That is correct.

20       Q.    Who did she report to?

21       A.    Bobby Benziger, B-E-N-Z-I-G-E-R.

22       Q.    And why did you send her this e-mail?

23       A.    I do not recall.

24       Q.    You don't recall forwarding your e-mail to

25   Christy to another AAM?



1      A.   I do not recall.

2      Q.   Did Sandy come to you at this point with any

3  concerns regarding her pay?

4      A.   I do not recall.

5      Q.   I'm trying to understand why you recall very

6  specifically some things, but not others.

7      A.   Because certain things meant more to me than

8  others.

9      Q.   It didn't mean anything to you that you're

10 reaching out to AAMs that aren't on your team about your

11 concerns with pay?

12          MR. MANN:  Objection.

13          THE WITNESS:  I don't recall this particular

14      one, but like I said before -- and I said in my

15      statement or document, that I cared about them all.

16 BY MS. SIMPSON:

17      Q.   Okay.  Do you recall sending Christy your

18 ethics concerns?

19      A.   I believe she asked me to send them.

20      Q.   Was this before or after your meeting?

21      A.   I'm unsure because she called me and then we

22 had a meeting and I'm unsure how many days in between

23 her calling me and our meeting and when I sent this

24 e-mail to her.  I do not recall.

25      Q.   Okay.  So I mean, just between the last two



1 exhibits we have, from Exhibit 25, you're telling Jan on

2 October 5th you're going to call her after your call

3 with Christy, right?

4        A.    But not to talk to her about the call with

5 Christy.

6        Q.    That's not my question.

7        A.    Okay.

8        Q.    On October 5th you e-mail Jan saying you're

9 going to call her after your call with Christy, right?

10        A.    I believe so.

11        Q.    Okay.  So then Exhibit 26, at the bottom, is

12 you sending Christy on October 5th your ethics concerns?

13        A.    I believe so.

14        Q.    So was that before or after your meeting with

15 her?  Because it's the same day that you said to Jan --

16        A.    When was my meeting with Christy Pavel?

17        Q.    That's what I'm asking you.

18        A.    I don't recall.  Please tell me when that date

19 was.

20        Q.    I can't answer questions.

21              MR. MANN:  You don't get to ask questions.

22              THE WITNESS:  Well, I don't recall.  Until

23        someone shows me that date on an e-mail or a Teams

24        call or Teams chat, group meeting, I don't recall

25        what day that was.  Forgive me, it was two years.



 1  BY MS. SIMPSON:

 2      Q.   Yeah, I know, but you recall some things very

 3  specifically, so that's what I'm trying to figure out.

 4      A.   Exactly, yes.

 5      Q.   So Christy asked you to send these to her?

 6      A.   Yes.

 7      Q.   So what do you recall about your meeting with

 8  Christy?

 9      A.   The initial meeting was that she understood I

10  filed a hotline claim and she wanted to understand why

11  and she wanted to investigate the claim.

12      Q.   How long did that meeting last?

13      A.   If I had to estimate 20, 25 minutes at the

14  most, if I recall correctly.

15      Q.   Did you record that meeting?

16      A.   I did not.

17      Q.   Did you take notes?

18      A.   I'm unsure.

19      Q.   If you would have taken notes, you would have

20  provided them to your attorney, right?

21      A.   Yes.  Absolutely.

22      Q.   Okay.  I just want to make sure you're not in

23  possession of anything that hasn't been produced.

24      A.   Okay.

25           MR. MANN:  Text messages.



1  BY MS. SIMPSON:

2       Q.   So is anyone else on that initial meeting?

3       A.   With Christy Pavel and I?

4       Q.   Yes.

5       A.   No.

6       Q.   And you don't recall what day this is?

7       A.   Do not recall.

8       Q.   And then you have another meeting with her?

9       A.   Yes.

10      Q.   Are these on the phone or in person?

11      A.   They were on a Teams chat, video/audio.

12      Q.   Okay.  How long after the first meeting is the

13  second meeting?

14      A.   Within two weeks, approximately.

15      Q.   Okay.  What occurred during the second

16  meeting?

17      A.   She wanted to update me on the investigation,

18  but she said before she went into her findings that she

19  understood that I had a call with my current AAMs and my

20  former AAMs.  And she asked me how long was that call,

21  what was that call about, who was on the call, and I

22  answered all those questions.  And then she proceeded to

23  tell me that based on her investigation, Jan's pay is in

24  line with everyone else's and she's going to close the

25  investigation.



 1        Q.    About how long did that meeting occur?

 2        A.    Again, possibly 15, 20 minutes.

 3        Q.    What did you say in response?

 4        A.    Well, I answered her question about who was on

 5   the call, why we had the call, and about Jan's pay being

 6   in line with everyone else that I responded to Christy

 7   that we may have a possible EEOC liability exposure to

 8   the company, if this is not resolved.

 9        Q.    What did Christy say?

10        A.    I think she -- if I recall correctly, she

11   asked me to either repeat or explain why I believe that

12   there's a possible EEOC liability exposure.

13        Q.    And what did you say?

14        A.    I'm unsure what I said after that.

15              (Defendant's Exhibit 27 was marked for

16        identification.)

17   BY MS. SIMPSON:

18        Q.    I'm showing you what's been marked as

19   Exhibit 27.  Do you recognize this?

20        A.    Vaguely.

21        Q.    Do you see that at the top you're sending

22   David Jordan a forwarded e-mail of your ethics concern

23   that you sent to both Christy and Sandy?

24        A.    I do see that.

25        Q.    And it's dated October 7th, do you see that?



1      A.    I do see that.

2      Q.    Who's David Jordan?

3      A.    He was one of my current AAMs.

4      Q.    Why were you sending this to him?

5      A.    I do not recall.

6      Q.    Did you have a conversation with David Jordan

7   about it?

8      A.    I do not recall.

9      Q.    Had he brought any pay concerns to your

10  attention?

11      A.    I'm unsure.

12      Q.    Did he respond to you forwarding him your

13  ethics concerns?

14      A.    I do not recall.

15            (Defendant's Exhibit 28 was marked for

16      identification.)

17  BY MS. SIMPSON:

18      Q.    I'm showing you what's been marked as

19  Exhibit 28.  Do you recognize this?

20      A.    I do recognize this e-mail correspondence.

21      Q.    Is this e-mail correspondence in follow up to

22  the conversation with Christy you were just referring

23  to?

24      A.    I believe so.

25      Q.    And do you see that at the bottom Christy is



1  writing you saying, "Hi again, Frederick.  Thank you for

2  your time this morning.  To follow up on your comments

3  about an EEOC concern, I want to make sure I fully

4  investigate that.  To confirm your concern, you told me

5  that Lisa and Jan have a percentage gap in their

6  compa-ratio and that you believe it is based on their

7  age, race, gender and years of experience.  Would you

8  please take some time today to respond to this e-mail

9  and let me know why you believe each of those affected

10  Lisa and Jan's pay.  This would help my investigation

11  into your overall hotline complaint."

12       Do you see that?

13       A.   I do see that paragraph, yes.

14       Q.   And then can you read for me your response?

15       A.   "That is my concern because I do not know why

16  there is a significant percentage gap in the compa-ratio

17  when age, race, gender, years of accounting experience,

18  years of experience within the same position and

19  performance when all these factors are a part of each

20  other, to include my whole internal team, in addition to

21  Lisa and Jan.  Basically, I would like to see equity

22  amongst my internal team."

23       Q.   It seems like Christy is trying to better

24  understand your concern in order to further investigate

25  your hotline complaint, right?



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                           180

1       A.   I believe that was part of her intent.

2       Q.   And so what you're saying is that there's a

3  significant percentage gap in the compa-ratio, right?

4       A.   I did state that, yes.

5       Q.   And you didn't understand why there was a gap

6  in compa-ratio when things like age, race, gender, years

7  of accounting experience and years of experience within

8  the same position and performance are all on par with

9  each other?

10      A.   I guess you'd have to understand how I talk.

11 It was rhetorical in nature.  Basically I was saying,

12 help me understand why there is a gap when all these

13 things are equal.

14      Q.   Okay.  And so we're looking at Lisa and Jan,

15 right?

16      A.   My whole team.

17      Q.   Okay.  Then why are you referring to Lisa and

18 Jan specifically?

19      A.   Because Christy started that.

20      Q.   Well --

21      A.   That's why I clarified my whole team, not just

22 Lisa and Jan.

23      Q.   Okay.  I'm just trying to understand what

24 you're saying.  So with all those being the same, are

25 Lisa and Jan -- do they both have significant years of



1  experience in accounting?

2       A.   I want to say I believe so.  I believe so.

3       Q.   Okay.

4       A.   I'm not sure how equitable it is.  I'd have to

5  go back to the notes.  But I'm unsure of their profile,

6  if you will.

7       Q.   Were they both older?

8       A.   I'm unsure.  I know Jan at the time was 60.

9  And I'm unsure how old Lisa was at the time.

10      Q.   Was she over 40 years old?

11      A.   I have no idea.

12      Q.   And they're both women?

13      A.   They're both women.

14      Q.   Do you know their race?

15      A.   Both white.

16      Q.   Okay.  So you were looking at all of those

17 things and they were the same, but yet the compa-ratio

18 was different?

19      A.   I was looking at more so compa-ratio being

20 different.

21      Q.   Do you recall what Lisa's compa-ratio was?

22      A.   Ninety percent.

23      Q.   Okay.  And what was Jan's?

24      A.   Sixty-eight.

25      Q.   Did you have any follow-up conversations with



 1  Christy after this?

 2       A.   I did not.

 3            (Defendant's Exhibit 29 was marked for

 4       identification.)

 5  BY MS. SIMPSON:

 6       Q.   Do you need a tissue, Mr. Saunders?

 7            MR. MANN:  Let's take a break.

 8            (Brief recess.)

 9  BY MS. SIMPSON:

10       Q.   So, Mr. Saunders, before the break I handed

11  you what's been marked as Exhibit 29.  Do you recognize

12  this?

13       A.   I do recognize this document.

14       Q.   And what is it?

15       A.   My termination letter from Signature Aviation.

16       Q.   And were you provided a copy of this document?

17       A.   Yes, I was.

18       Q.   So how were you notified of your termination?

19       A.   A Teams call on Thursday, October 21st, with

20  Sherri Miller and Dan Cunico.

21       Q.   And were you on video during that call?

22       A.   Yes, I was.

23       Q.   Do you recall that you were driving at the

24  time of the call?

25       A.   Yes, I do recall driving.



1      Q.   Where were you going?

2      A.   To my girlfriend's place.

3      Q.   Are you still dating her?

4      A.   No.

5      Q.   What was your girlfriend's name?

6      A.   At that time?

7      Q.   Yes.

8      A.   Alison Hugo, H-U-G-O.

9      Q.   Were you supposed to be working at that time?

10     A.   I always work.

11     Q.   You had canceled several meetings that day,

12 right?

13     A.   I do not recall that.  Especially not several.

14     Q.   You canceled a couple meetings that day?

15     A.   I don't recall canceling meetings that day.

16     Q.   You didn't have permission to take time off

17 and go drive to your girlfriend's, did you?

18     A.   I did not take time off.  Salary employee, I

19 make up the hours.  I work different hours.  I work long

20 hours before, during, after.

21     Q.   So did you routinely go to your girlfriend's

22 in the middle of the workday?

23     A.   No.

24     Q.   So tell me what you recall about that call.

25     A.   What I recall about that call, Sherri Miller



 1  was on the call.  Well, I noticed her first -- well,

 2  actually I only noticed her and I could tell she had

 3  been crying and she was crying during the call.  And I

 4  was not on video because prior to that call I never was

 5  on video with her.  We always just talked, me not on

 6  video, her not on video, or if she was, I was not on

 7  video.  And she asked me, would you please turn your

 8  video on.  And I said yes, and I turned on my video.

 9       Q.   And so at this point had you pulled over from

10  driving?

11       A.   Yes.  That is correct.

12       Q.   And where were you driving to, like where was

13  your girlfriend located?

14       A.   In Canada.

15       Q.   I'm sorry, where?

16       A.   In Canada.

17       Q.   In Canada?

18       A.   In Canada.

19       Q.   And at this time you lived where?

20       A.   In Orlando.

21       Q.   Okay.  So how long did it take to drive from

22  Orlando to Canada?

23       A.   Actually I did not drive from Orlando to

24  Canada.

25       Q.   Okay.  Explain that to me.



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                    185

1      A.   I flew to, I want to say, Minot, North Dakota.

2      Q.   And then drove to Canada?

3      A.   I believe, if I recall correctly.

4      Q.   When was your flight?

5      A.   I do not recall.

6      Q.   Was it the same day as this call or the day

7   before?

8      A.   I do not recall.

9      Q.   But at this time you're driving from North

10  Dakota to Canada?

11     A.   Correct.

12     Q.   Okay.  And so how long does that take?

13     A.   Roughly about two and a half, three hours,

14  roughly.

15     Q.   And so you pulled over to the side of the road

16  and go on video?

17     A.   Correct.

18     Q.   Okay.  And at that time is Dan also on the

19  call?

20     A.   I did not notice Dan until I turned on my

21  camera.

22     Q.   Okay.

23     A.   If I recall correctly.

24     Q.   And then what happens?

25     A.   Unbeknownst to me, I did not, at the time,



1  realize at the time that Sherri Miller was reading

2  from -- exactly from this termination letter because I

3  did not have it in front of me, nor I did not know what

4  the call was about.

5       Q.   Okay.  So she reads the summary of the

6  incident portion of the termination letter?

7       A.   That is correct.

8       Q.   Okay.  Is that all she says or does she say

9  anything else?

10      A.   She reads the summary of incident on Bates

11 010176.  After she finished reading, she said that now

12 I'll leave the call and turn the discussion over to Dan.

13      Q.   Did she leave the call?

14      A.   I believe so.

15      Q.   Okay.  And then what happens next?

16      A.   Dan asked me if my personal e-mail, my

17 personal phone number and my personal address were

18 correct, slash, updated within the system.  And I told

19 him, yes, they were, all three.

20      Q.   What happens after that?

21      A.   He ended the call.

22      Q.   So after you were separated from Signature,

23 did you contact any of their employees?

24      A.   I contacted Jan Chalk.

25      Q.   That same day?



FREDERICK SAUNDERS                                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                    187

1          A.    Within an hour.

2          Q.    What did you tell Jan?

3          A.    Her compa-ratio.  And what I was fighting for.

4    Because before she had no idea as I stated previously.

5    And so I wanted her to know it wasn't just because or,

6    you know, egregious.  It was truly low and unfair.

7          Q.    Anything else you talked to Jan about?

8          A.    Well, the lies on the term letter.

9          Q.    What are the lies on the term letter?

10         A.    The main one that hurts the most is the, we

11   noticed -- we've noticed a remarkable lack of engagement

12   from you.

13         Q.    But you'd agree that we reviewed the Employee

14   Engagement Gallup Survey, right?

15         A.    That survey is not indicative of my engagement

16   with my team.

17         Q.    That's your opinion, right?

18         A.    Especially from 2020, that's a fact.

19         Q.    But you don't know who responded to that

20   engagement survey, right?

21         A.    But I do know, if you were to ask them, they

22   would say my engagement was stellar.

23         Q.    But it's true that your team responded to that

24   and that you had one of the lowest scores, right?

25               MR. MANN:  Objection.



 1          THE WITNESS:  It's not a fair assessment of my

 2      engagement.

 3  BY MS. SIMPSON:

 4      Q.    I understand you believe that.

 5      A.    It's true.

 6      Q.    But you don't know sitting here today what

 7  your team would have said when your team, part of your

 8  team at least, responded to that employee engagement

 9  saying that you weren't engaged?

10          MR. MANN:  Objection.

11          THE WITNESS:  I do know what they'd say.

12      They'd say I was a great engagement person and

13      manager.

14  BY MS. SIMPSON:

15      Q.    How do you know that?

16      A.    Because they told me that constantly during my

17  four years of being at Signature as a RAM.

18      Q.    Every single person that ever reported to you?

19      A.    Absolutely.  Best manager I ever had.  Best

20  RAM I ever had.  You've developed me so much.  I

21  appreciate your efforts, everything.  So again, that

22  Gallup survey is not indicative of my engagement with my

23  people.

24      Q.    I understand you disagree with it.

25      A.    It's not just disagree.  It's not a true



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                        189

1  assessment of my engagement, Amanda.

2      Q.   I understand you believe that.  And I know

3  it's difficult to understand, but --

4      A.   It's not difficult.  It's not.

5           MR. MANN:  Let her finish.

6  BY MS. SIMPSON:

7      Q.   But some your team responded to the Gallup

8  survey generating those results.

9           MR. MANN:  Objection.

10           THE WITNESS:  Have you seen the questions on

11      that survey?

12  BY MS. SIMPSON:

13      Q.   I understand you disagree with those

14  questions.  But you understand that that's made from the

15  Gallup survey, right?

16           MR. MANN:  Objection.

17           THE WITNESS:  One question is, do you have a

18      best friend at work?  How is that a true assessment

19      of my engagement to the people, do I have a best

20      friend at work?

21  BY MS. SIMPSON:

22      Q.   I'm not going to go line by line with you in

23  the questions.

24           Do you have anything else to support that you

25  contend that in the termination notice that the lack of



 1  engagement was not true?

 2      A.   Absolutely.  The three pages of my manifesto

 3  that showed what I did in that year alone.

 4      Q.   What is your manifesto?

 5      A.   It is three pages -- actually six pages.  It

 6  was three pages of all my accomplishments, my duties,

 7  everything that I did for Signature, at Signature within

 8  that year.

 9      Q.   This is written by you?

10      A.   Absolutely.

11      Q.   Anything else?

12      A.   As far as?

13      Q.   Evidence that that's not true, a lack of

14  engagement?

15      A.   Yes, because in that same year, Sherri Miller

16  gave me an additional three percent merit increase for

17  being the best RAM she had at that time, which I would

18  think corresponds to my engagement, my performance.

19      Q.   Anything else?

20      A.   I can recite the list of my accomplishments in

21  my manifesto.

22      Q.   I'm okay with that.

23           Anything else in the notice of term that you

24  disagree with?

25      A.   You had an incident -- Bates 010176, you had



1  an incident with another team member where you did not

2  speak professionally.

3          I do not recall that incident whatsoever.

4      Q.   Did you ask Sherri during the call what that

5  was referring to?

6      A.   I did not.  Because honestly, I did not hear

7  most of the conversation because I was -- I would not

8  say in shock.  I was hurt by her terminating me when she

9  proclaimed not only that year, but the previous year

10  being the best RAM.  And now she turns around and says

11  that we've noticed a remarkable lack of engagement from

12  you, with no basis of a performance improvement plan or

13  a bad evaluation or a poor review or even an e-mail

14  saying that I lacked engagement.  And on the contrary,

15  opposite of that, when AAMs from my former team come to

16  me about their current RAM and how he was not responding

17  to their e-mails and their phone calls, they would come

18  to me for either support and to tell Sherri that that

19  RAM was not doing his job, but yet I got fired with

20  lies.

21      Q.   Okay.  Let's look at the second paragraph.  It

22  says, "Since May you've sought to have a team member's

23  pay raised despite multiple requests and repeated

24  denials for the request.  Most recently, on 9/14/21,

25  there was a call with Chris de Jongh, Jan Chalk and you



1  discussing a salary increase for her with discussion

2  about other AAMs.  The meeting concluded that there

3  would not be an off-cycle increase to her compensation."

4          That's correct, right?

5      A.   That's what they said.

6      Q.   What do you mean?

7      A.   That's what they stated.

8      Q.   Right.  So that's a true summary of what they

9  stated, correct?

10     A.   That's what they said.

11     Q.   Okay.  Next paragraph.

12          "On 10/4/21, you invited your direct reports

13 to a call to discuss how you were going to try to get

14 them pay increases despite having just been told that

15 would not occur."

16          That's true, right?

17     A.   That is not true because I did not --

18     Q.   What about that is not true?

19     A.   Because I did not say get them pay increases.

20 What I said is that whomever is not at the 80 or 90

21 percent compa-ratio, the goal is to get you there.

22     Q.   Isn't that saying I'm going to get you a pay

23 increase?

24          MR. MANN:  Objection.

25          THE WITNESS:  Not for everyone.



1  BY MS. SIMPSON:

2      Q.   You were saying you were going to get people

3  who were below the 80 percent compa-ratio a pay

4  increase, right?

5      A.   She's saying everyone on that call.

6      Q.   But you called everyone together to talk about

7  your concerns, right?

8      A.   Yes, but not to say that everyone gets a

9  raise.

10     Q.   Then why did you call them altogether?  Why

11 didn't you just call the ones that you thought were

12 below the compa-ratio?

13     A.   I don't know who else was below the

14 compa-ratio besides Jan.

15     Q.   Then why would you call former and current

16 AAMs altogether to discuss their concerns, if you had no

17 idea what their compa-ratio was?

18     A.   Because I knew eight or nine were below the

19 compa-ratio.

20     Q.   So you did know?

21     A.   No, I didn't know which ones.  I knew eight or

22 nine were low.

23     Q.   So you call them altogether not knowing who's

24 below the compa-ratio to talk to them about --

25     A.   That's why I said the goal was not for



FREDERICK SAUNDERS                           November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                        194

1  everyone to get a pay increase, but those who were below

2  80 percent to get a pay increase.  It's only fair.

3      Q.   How is it fair?  You don't know what is

4  comprised of the compa-ratio.

5           MR. MANN:  Objection.

6           THE WITNESS:  I know the differences are not

7      fair.

8  BY MS. SIMPSON:

9      Q.   You know there's differences in compa-ratio,

10 right?

11     A.   And below the 80 percent.

12     Q.   And we've seen e-mail after e-mail where

13 you're saying you don't know why it's different, right?

14     A.   No, just one e-mail.

15     Q.   Okay.  One e-mail, we've seen that, right?

16     A.   Because it was rhetorical in stating that,

17 help me understand why it's low, not because I don't

18 know why it's low.  The call -- everything was about why

19 is it low.

20     Q.   And multiple people told you there was no

21 issue, correct?

22     A.   But I saw the issue, clearly.

23     Q.   My question was, multiple people at Signature

24 told you there was no issue with the pay, correct?

25     A.   Repeat the question.



1        Q.    Multiple people at Signature told you there

2   was no issue with the pay, correct?

3        A.    They lied about being no issue with the pay.

4        Q.    That's your belief, right?

5        A.    Correct.

6        Q.    But multiple people at Signature told you

7   there was no issue with the pay, correct?

8        A.    They lied about no issue.

9        Q.    It's a yes-or-no question.

10       A.    Is it?

11       Q.    Yes, we can talk about you believing that it's

12   a lie next.

13             I'm asking you, multiple people at Signature

14   told you that there was no issue with the pay, correct?

15       A.    Correct.

16       Q.    So you believe it was a lie, correct?

17       A.    Correct.

18       Q.    What is your factual basis for contending that

19   it was a lie?

20       A.    Because Jan was below 80 percent compa-ratio.

21       Q.    Anything else?

22       A.    Sherri told us that eight or nine were in the

23   same position as being low.

24       Q.    Their compa-ratio was low, right?

25       A.    Correct.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                    196

1     Q.    Okay.  But again, you don't know if Sherri was

2   involved with setting compa-ratios or salaries, right?

3     A.    I do not know that, but I know she told us

4   that eight or nine were low.

5     Q.    But Chris de Jhong told you there was no

6   issue, correct?

7           MR. MANN:  Objection.

8           THE WITNESS:  He said that if we have to raise

9       it for one, we'd have to raise it for all.

10  BY MS. SIMPSON:

11    Q.    That wasn't my question.

12          He told you there was no issue with the pay,

13  right?

14    A.    He said that no one is leaving, so the pay

15  must be fair.

16    Q.    Christy Pavel told you she finished her

17  investigation, there was no issue with the pay, correct?

18          MR. MANN:  Objection.

19          MS. SIMPSON:  What's the objection?

20          MR. MANN:  You've asked the same questions

21      several number of times.

22          THE WITNESS:  Repeat the question.

23  BY MS. SIMPSON:

24    Q.    Christy Pavel told you she finished her

25  investigation and there was no issue with the pay,



 1  correct?

 2          MR. MANN:  Objection.

 3          THE WITNESS:  She said that.

 4  BY MS. SIMPSON:

 5      Q.   Who's Danielle Morales?

 6      A.   She was -- well, at the time she was an AAM

 7  for our MRO division.

 8      Q.   Did you contact her after your termination?

 9      A.   I did.

10      Q.   Why?

11      A.   I thought we had a good rapport, that I could

12  vent to her.

13      Q.   Were you later made aware that she reported

14  your call to Signature?

15      A.   I was not made aware of that.

16          (Defendant's Exhibit 30 was marked for

17          identification.)

18  BY MS. SIMPSON:

19      Q.   I'll show you what's been marked as

20  Exhibit 30.  This is a statement from Danielle Morales

21  dated October 28, 2021.  We produced this as part of

22  discovery, but have you reviewed it previously?

23          MR. MANN:  Previous to?

24          MS. SIMPSON:  Today.  I don't know if you saw

25          this part of discovery.  We have a lot of



 1      documents.

 2          THE WITNESS:  I have seen this part of

 3      discovery, yes.

 4   BY MS. SIMPSON:

 5      Q.   Okay.  So do you see that she says you called

 6   her at 10:09 a.m. and you spoke for an hour and 44

 7   minutes?

 8      A.   I do see that.

 9      Q.   And that she then sends this message to Sherri

10   Miller to discuss what transpired.  Do you see that?

11      A.   I do see that.

12      Q.   Is what she then summarizes with respect to

13   your conversation accurate?

14      A.   On Bates 010227, it's contradictory because

15   she says at one point, I wanted Chris de John's job.

16   But then she said I said that I'll never work for that

17   company again.

18      Q.   I'm just asking if you said that to her.

19      A.   I don't recall saying that about wanting his

20   job nor wanting it to be called Saunders Aviation.  I

21   don't recall saying that.

22      Q.   Did you tell her, in that same number four,

23   that you were talking to four or five lawyers to sue the

24   company and will refuse to settle?

25      A.   I believe so.



FREDERICK SAUNDERS                           November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                      199

1      Q.    And then the next line, that by the time he's

2   done with the company, it will be Saunders Aviation?

3      A.    I do not recall saying that at all.

4      Q.    And I think you said this already, but that he

5   will Chris de Jongh's job.  You couldn't recall saying

6   that?

7      A.    No.

8      Q.    That he wants the termination letter rescinded

9   and an apology from Sherri Miller for the lies she

10  signed her name to, but will absolutely never work for

11  the company again.

12     A.    Again, contradictory.

13     Q.    I'm just asking if you said that?

14     A.    I did want the letter rescinded.  I did at the

15  time want an apology, not anymore.  And I would never

16  work for the company again.

17     Q.    And then did you say that he will own

18  Signature in the end?

19     A.    I do not recall that.

20     Q.    The next line, did you say, he has all the

21  backup he needs for court as she downloaded all his

22  files from his RAM folder and it took her three hours to

23  do so.

24     A.    I see that.

25     Q.    Did you say that?



1    A.    I did say that.

2    Q.    Who is the "she" you're referring to?

3    A.    Jan Chalk, but she did not download the files.

4 She tried to, but it didn't work.

5    Q.    And how did you get the documents that were

6 ready for court?

7    A.    Which documents ready for court?

8    Q.    So he says he has all the backup he needs for

9 court.

10    A.    That's basically my manifesto.

11    Q.    But this is saying because she downloads all

12 the files from his RAM folder and it took her three

13 hours to do so.

14    A.    Again, she tried to, but it was unsuccessful,

15 the download.

16    Q.    So it's your contention under oath that you

17 took no confidential and proprietary documents from the

18 company following your termination?

19    A.    That is correct.

20    Q.    And the six-page manifesto you wrote?

21    A.    I wrote, yes.

22    Q.    Then why would you tell Danielle that you took

23 all the backup you needed?

24    A.    Not took, I have all the backup I need.  As a

25 support for my refutal, if that's a word, against the



 1 | term letter.
 2 |     Q.   But it's saying that someone has downloaded
 3 | all your files from your RAM folder?
 4 |     A.   Again, she tried to download it, but it didn't
 5 | work.
 6 |     Q.   Did you ask her to do this?
 7 |     A.   I believe so.
 8 |     Q.   Did you know that Jan was put on leave and
 9 | investigated for attempting to download confidential and
10 | proprietary information for you?
11 |     A.   I knew that she was put on paid administrative
12 | leave for 45 days, but I wasn't sure why.  Actually I
13 | didn't know why.  I had no idea why.
14 |     Q.   You knew that you had an obligation to return
15 | all company property upon being terminated, right?
16 |     A.   Which I did.
17 |     Q.   But then you had another current employee go
18 | and try to download your files, right?
19 |     A.   Not proprietary, just my -- the projects and
20 | tasks that I worked on.  Nothing confidential or
21 | proprietary, just my own records.
22 |     Q.   Records of what?
23 |     A.   My accomplishments.
24 |     Q.   Okay.  But that's company property, right?
25 |     A.   Is it?  I'm unsure.  If I wrote it, it's not



 1  like it's a policy of theirs.

 2      Q.   You wrote it?

 3      A.   I wrote -- or will say I did calculations on

 4  Excel sheets.  I did PowerPoint presentations like, for

 5  example, when I had to draft a -- it's called a PA,

 6  project approval, to have a fuel farm obtain an

 7  electronic meter.  It's all my thoughts into why they

 8  should get an electronic meter based on my experiences

 9  from being an auditor and then now an accounting manager

10  and visiting the site.  But nothing proprietary as far

11  as like customer information, costing, pricing,

12  competitors, lists, nothing of that sort.  So it wasn't

13  proprietary or confidential.

14      Q.   That's your belief, right?

15      A.   That's my belief.

16      Q.   So what took three hours if Jan was not

17  successful in downloading the files?

18      A.   Because I did a lot work --

19           MR. MANN:  Objection.

20           THE WITNESS:  I did a lot of work, Amanda, in

21      that year time frame.  In all the years I was a

22      RAM, I worked a lot.  I worked on my vacation.

23      Actually, September 2021 that I was let go, I was

24      in Washington State on vacation in an RV on my

25      hotspot answering e-mails and phone calls from a



1      base, that wasn't even under my region, for another

2      RAM that didn't do his job.

3  BY MS. SIMPSON:

4      Q.   Did you reach out to any other employees

5  besides Danielle and Jan after you were terminated from

6  Signature?

7      A.   Yes.

8      Q.   Who?

9      A.   Sharon Hartmann, Lori Golda, David Jordan.

10  Greg Gunter, Sherry Battle.

11     Q.   Anyone else?

12     A.   I'm thinking.

13          I believe that's it.

14     Q.   Okay.  What role did Sharon hold?

15     A.   Sharon Hartmann?

16     Q.   Yes.

17     A.   Was an AAM.

18     Q.   And did you actually speak to her?

19     A.   Yes.

20     Q.   What was discussed?

21     A.   Basically similar to what I discussed with

22  Danielle.

23     Q.   Did you ask her to download anything from the

24  computer?

25     A.   Absolutely not, no.



FREDERICK SAUNDERS                                      November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                204

```
 1        Q.    Who's Lori?

 2        A.    Another AAM.

 3        Q.    Did you actually speak with her?

 4        A.    I did.

 5        Q.    And what was discussed?

 6        A.    Similar to Sharon and Danielle.

 7        Q.    David, we've already talked about today,

 8   right, and he's another AAM?

 9        A.    Correct.

10        Q.    Did you have the same conversation with him?

11        A.    Correct.

12        Q.    And Greg?

13        A.    Same.

14        Q.    And he's an AAM?

15        A.    AAM.

16        Q.    Did you contact anyone who didn't pick up the

17   phone and you otherwise couldn't get ahold of?  I'm

18   sorry, you also said Sherry Battle.

19        A.    I called her, same similar conversation.

20        Q.    Okay.  And she's an AAM?

21        A.    AAM.

22        Q.    Anyone else you contacted that you couldn't

23   get ahold of or they didn't respond?

24        A.    Not that I can recall.

25        Q.    And why were you calling all of them?
```



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                           205

1      A.    Frustration, just explaining what happened.

2      Q.    Did you tell them their compa-ratio?

3      A.    I did not.  Just Jan.  Because I didn't know

4  to be -- I did not know the compa-ratios for Brian,

5  Lori, Sherry Battle, Sharon Hartmann or Sandy Montalbano

6  because they were from my first team, so I had no idea

7  of their compa-ratios.  And of my current team, Jan, of

8  course, I told her.  I did not tell Greg his.  I did not

9  tell David his.  I did not speak to Lisa or Renee.

10     Q.    Did you try to?

11     A.    No.

12     Q.    Did you ask anyone, other than Jan, to

13  download materials for you?

14     A.    I do not recall.  I don't think so.

15     Q.    And I know that said a RAM folder, what is

16  that?

17     A.    That's my personal RAM folder.  All the work

18  that I did for Signature was in that RAM folder.

19     Q.    Was that on your computer or on some sort of

20  company drive?

21     A.    Like a network drive, more than likely.

22     Q.    So was there information in that folder about

23  your AAM reports?

24     A.    What do you mean AAM reports?  What do you

25  mean?



FREDERICK SAUNDERS                                November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                          206

1       Q.   You said that all your work that was done was

2   in that RAM folder.  So would that have included your

3   work with your direct reports?

4       A.   Work as far as reviewing or -- not reviewing.

5   Analyzing their -- the activity of their bases.  That's

6   a fair statement, I think.

7       Q.   Anything else in there about them?

8       A.   Would you clarify the question?

9       Q.   Yeah, I'm just trying to understand what's in

10  this RAM folder.

11      A.   I mean, thousands of documents.  It's just

12  mainly my work, my accomplishments, my analysis of

13  monthly -- like, for example, I would review fuel

14  variance reports every month to make sure that the fuel

15  variances were within .25, plus or minus, because once

16  you guys have that variance there's possible issues with

17  your fuel, either issuing or receiving fuel.  So every

18  month I reviewed that and talked to my AAMs if they were

19  outside that tolerance of the variance.

20      Q.   It sounds like all of your work was in that

21  folder.  Maybe I should ask, was there any work that you

22  did that wasn't in that RAM folder?

23      A.   I do not recall.  I do not think so.

24  Everything was there, I believe.

25           MR. MANN:  Can I ask what the relevance is?



1        This happened after his termination.

2                MS. SIMPSON:  Yes.

3                MR. MANN:  So you're spending a lot of time on

4        it.

5                MS. SIMPSON:  All right.  I'm going to move on

6        in a second.

7    BY MS. SIMPSON:

8        Q.    How did Jan have access to the RAM folder?

9        A.    Like I said, it was a shared network.

10       Q.    So direct reports would have access to

11   manager's files?

12       A.    It wasn't anything, again, confidential.  It

13   was just all work that we all did.  They were called

14   shared drives, so everyone has almost everything.

15       Q.    So it didn't require a password or anything?

16       A.    Exactly.  That's why I said nothing in there

17   was proprietary or confidential.  It was all open.

18       Q.    I know you keep using that word, but it's all

19   the work that you did at Signature, right?

20       A.    For the most part, yes.

21               MS. SIMPSON:  Do you want me to keep going or

22       do you want to stop for your hearing?

23               MR. MANN:  No, stop.  I appreciate it.

24               MS. SIMPSON:  Of course.

25               (Brief recess.)



1  BY MS. SIMPSON:

2      Q.   So briefly, Mr. Saunders, before the break we

3  were talking about your RAM folder?

4      A.   And you were describing the documents inside

5  of them.

6      Q.   Were there any documents that contained

7  customer names?

8      A.   I do not believe so.

9      Q.   Were there any documents that contained any

10  information about financials for the company?

11      A.   I do not believe so.

12      Q.   So I'm a little confused on that only because

13  if you were an accountant and it was your work, how

14  would it not include financial numbers?

15      A.   Because our accounting was more operational

16  based than financial based.  The financial accounting is

17  done at the corporate level and we were at the field

18  level, so it's more about fuel.

19      Q.   But it would include financial numbers about

20  operations, right?

21      A.   Not necessarily, no.  It's about fuel mainly,

22  like making sure we have enough fuel in the storage

23  tanks and the trucks.  That was -- that's mainly the

24  accounting.

25      Q.   What were you going to do with the documents



1  if you got them?

2      A.    Support my case against the lies in the

3  termination letter.

4      Q.    And what part of those documents did you want

5  to support your case?

6      A.    All that I had done within that year to refute

7  the lack of engagement comment or lie.

8      Q.    And I know we walked through some individuals

9  who you talked to after your separation, but I just

10 wanted to make sure that as you sit here today under

11 oath, did anyone from Signature give you any company

12 documents following your separation of employment?

13     A.    Explain company documents when you say company

14 documents.

15     Q.    Documents from the company.

16     A.    For example?

17     Q.    Any documents from the company.

18     A.    I'm unsure the --

19     Q.    So is that a yes?

20     A.    I'm not saying yes.  I don't understand.

21     Q.    But you're not saying no and you're asking

22 what company documents are.

23     A.    Right.

24     Q.    Did anyone from Signature give you documents

25 from the company following your separation from the



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                    210

1  company?

2       A.   Like what company documents?

3       Q.   Why are you asking me that if nobody gave you

4  company documents?

5       A.   I don't know what that would constitute,

6  company documents.

7       Q.   Documents from the company, your work.

8       A.   My work, stuff that I did, my reviews, yes, I

9  have those.

10      Q.   So how did you get them?

11      A.   I take that back, I don't have those.  Sorry,

12  I apologize.  I misspoke.  I do not have those.

13      Q.   So I've got to ask my question again.

14           Did anyone from Signature give you company

15  documents after your separation of employment?

16      A.   I do not recall.

17      Q.   How do you not recall that?  It's either yes

18  or no.

19      A.   Because I'm not sure --

20           MR. MANN:  Objection.

21           THE WITNESS:  -- what you're asking.

22  BY MS. SIMPSON:

23      Q.   What don't you understand about company

24  documents?

25      A.   Company documents -- give me an example of



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                             211

1   company documents.

2        Q.    Did someone from Signature give you documents

3   after your separation?

4        A.    I do not recall.

5        Q.    So it's possible that somebody gave you

6   documents from Signature after your separation?

7             MR. MANN:  Objection.

8             THE WITNESS:  I do not recall.

9   BY MS. SIMPSON:

10       Q.    The question is, is it possible?

11       A.    Anything is possible.

12       Q.    And if you don't recall whether or not

13  somebody did, it's possible that someone gave you

14  company documents, correct?

15            MR. MANN:  Objection.

16            THE WITNESS:  I don't know how to answer that.

17  BY MS. SIMPSON:

18       Q.    Well, you asked a current Signature employ to

19  take company documents, right?

20            MR. MANN:  Objection.

21            THE WITNESS:  Download my work, which she did

22       not do.

23  BY MS. SIMPSON:

24       Q.    You said she wasn't successful in doing it?

25       A.    Correct, so she did not do it.



1     Q.   But she did something for three hours, right?

2     A.   She tried.  You know how a download goes, but

3  it doesn't actually happen.

4     Q.   Okay.  So besides Jan, did anyone else attempt

5  to get company documents for you?

6          MR. MANN:  Objection.

7          THE WITNESS:  I do not believe so.

8  BY MS. SIMPSON:

9     Q.   Did you ask anyone, besides Jan, to get

10  company documents for you?

11     A.   I do not believe so.

12     Q.   So you had mentioned before that you wanted to

13  talk about your claim of discrimination.  Do you recall

14  that?

15     A.   I do recall that.

16     Q.   Okay.  And so what is your basis for your

17  claim of discrimination?

18     A.   How I was treated differently than Jan.

19     Q.   What do you mean by that?

20     A.   That we both filed a hotline claim.  And after

21  that hotline claim, I was fired.  Whereas, Jan was not

22  fired and put on -- instead put on paid administrative

23  leave.  And besides gender, the difference between Jan

24  and I is she's white and I'm black, so we were treated

25  differently in that regard.  Because why wasn't I put on



FREDERICK SAUNDERS                              November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                         213

1  paid leave to be investigated, why wasn't I offered a

2  severance after the fact.  But Jan was offered five

3  months' severance.  This is after her being on paid

4  leave.  Actually she was offered her job back or a

5  paid -- or four months of severance -- I'm sorry, five

6  months of severance or her job back they offered her.

7      Q.    Are you aware that Jan was put on paid

8  administrative leave as a result of the investigation

9  into taking company files for you?

10      A.    Did not.  I was not aware of that.

11      Q.    Are you aware that Jan was offered a severance

12  agreement after that investigation closed with respect

13  to taking company files for you?

14      A.    I did not know why it was closed or the status

15  of that investigation.  But I do know they offered her

16  job back or she could take five months' severance.

17      Q.    Okay.  And that was with respect to the

18  investigation into you asking her to take company files?

19           MR. MANN:  Objection.

20           THE WITNESS:  I don't recall that.  I wasn't

21      aware of the reason for the investigation.

22  BY MS. SIMPSON:

23      Q.    What is your basis for contending that --

24  well, let me take a step back.

25           You said both gender and race.  What is your



 1 | discrimination claim based on, one or both?

 2 |        MR. MANN:  You said other than gender?

 3 | BY MS. SIMPSON:

 4 |     Q.   One or both.

 5 |     A.   Other than gender or age, no difference is

 6 | race.

 7 |     Q.   Okay.  I'm trying to understand what protected

 8 | categories your discrimination claim is based on.

 9 |     A.   What are the options for a protected class?

10 |     Q.   I'm asking you what your claim is based on.

11 | You're saying you feel like she was treated differently.

12 |     A.   Because she was white and I was black.

13 |     Q.   Okay.  So it's race?

14 |     A.   Yes.

15 |     Q.   Okay.  What is your basis for contending that

16 | race played any role in how Signature treated either of

17 | you?

18 |     A.   To repeat myself, we both filed a hotline

19 | claim and after those claims were filed, I was

20 | terminated, she was not.  She was later investigated,

21 | put on paid leave.  After her paid leave, she was

22 | offered either her job back or a severance.  When I was

23 | fired, I was offered no severance.  Difference in

24 | treatment.

25 |     Q.   I understand.  I'm asking how race played a



1  role in that?

2      A.   Because I believe she was white and got

3  special treatment or better treatment than I got because

4  I was black.

5      Q.   Okay.  So it's your opinion that because you

6  two are different races, that was somehow tied to these

7  decisions?

8      A.   Absolutely.

9      Q.   And do you have any other facts besides the

10 fact that you two are different races to support that?

11     A.   The only fact that I'm aware of that I'm black

12 and she's white.

13     Q.   Okay.  Anything else in support of your

14 discrimination claim?

15     A.   Not at this time.

16     Q.   And then you had mentioned retaliation.  Do

17 you recall that?

18     A.   I do, yes.

19     Q.   What's the basis for your retaliation claim?

20     A.   Because when I mentioned EEOC liability

21 exposure to Christy Pavel on October 12, 2021, I was

22 fired nine days later without any explanation between

23 the 12th and 21st from anyone why I was getting fired.

24 Because normally what should happen, from my opinion and

25 from my experience at Signature, is that you're put on a



1  performance improvement plan -- even before that, you're

2  talked to by your manager.  You maybe will get an e-mail

3  saying that, you know, here's the issues why you're

4  susceptible to being fired.  Here's a performance

5  improvement plan.  You have three to six months to

6  rectify these deficiencies.  If not, it's ground for

7  termination.  So none of that happened for me in those

8  nine days from October 12, 2021 to October 21, 2021.

9  And because of that, I think -- I feel -- I opine that

10  they terminated me for retaliation, for mentioning an

11  EEOC liability concern for exposure.

12       Q.   Why do you think that had anything to do with

13  your termination?  Just because they're close in time?

14       A.   Close in time and there was no other reason to

15  fire me.

16       Q.   Because you disagree with what's in the notice

17  of termination?

18       A.   Absolutely.  I disagree with everything in

19  that letter.  It's all lies.

20       Q.   In your opinion, right?

21       A.   In my opinion and the truth.

22       Q.   And you had mentioned whistleblowing, right?

23       A.   Yes.

24       Q.   What is the basis for your whistleblowing

25  claim?



1      A.   Because I filed a hotline claim which is

2    supposed to be anonymous.  But yet in the term letter,

3    they said that I had to tell my manager I was filing a

4    hotline claim.  I did not tell her I was filing a

5    hotline claim, so therefore, that's against the

6    whistleblower, in my opinion.  Because if it was

7    anonymous, it shouldn't be stated or said, hey, you

8    didn't tell me you had filed a hotline claim.

9      Q.   You didn't file your claim anonymously,

10   though, right?

11     A.   They didn't know who it was from.  Well, they

12   did not -- how do I say that?  I didn't have to tell my

13   manager I was filing before I filed it.

14     Q.   My question is with respect to the ethics

15   hotline claim.  You told them your name when you called,

16   right?

17     A.   Or sent -- I filled in the box for my name,

18   yes, I believe so.

19     Q.   Okay.  And so why do you -- why do you believe

20   that the ethics hotline complaint is somehow connected

21   to some adverse employment action?

22     A.   Because in the term letter, Sherri said that I

23   didn't tell her I was filing a claim.  I didn't have to

24   tell her I was filing a claim.

25     Q.   So explain that to me.



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                    218

1      A.    I don't have to tell Sherri Miller that I was

2   going to file a hotline claim.  I don't have to tell

3   her.

4      Q.    Any other basis for your whistleblower claim?

5      A.    I reported what I believe was an unfair act,

6   behavior, whatever you want to call it, and then nine

7   days later I was fired.

8      Q.    Let's talk about what you're seeking from this

9   lawsuit.  Let's go back to the answers to

10  interrogatories, which I believe is Exhibit 1.  And flip

11  to Interrogatory 13, please.

12          Do you see that this asks to itemize and

13  identify all damages.

14     A.    When you say "all damages" -- oh, sorry.

15     Q.    It's Interrogatory 13, page 18.

16     A.    Itemize and identify all damages.

17     Q.    Do you see that that's the question asked?

18     A.    Yes.

19     Q.    Okay.  And then your attorney sets forth some

20  objections and the actual answer starts on the next

21  page.

22          And do you see that you're seeking

23  approximately $15,311 for lost wages in 2021?

24     A.    I do see that.

25     Q.    And what's that based off of?



1      A.    Prorated amount based on the time frame from

2  when I was terminated to the end of the year.

3      Q.    Any other lost wages besides that?

4      A.    I don't believe so.

5      Q.    Okay.  And then you see in the next bullet

6  point it says, approximately $2,230,768 for front pay

7  and compensatory damages.

8      A.    I do see that.

9      Q.    And what is that based off of?

10      A.    If I had stayed with Signature Aviation for

11  the next 17 years.

12      Q.    Okay.  So that's the front pay portion?

13      A.    Yes.

14      Q.    And so what are you using times 17 years?

15      A.    My annual salary at that time, plus the

16  standard three percent merit increase year over year.

17      Q.    And then this also includes compensatory

18  damages.  Do you know what part of this amount is for

19  compensatory damages?

20      A.    I'm unsure what.

21      Q.    They're also sometimes called emotional

22  distress damages.

23      A.    I'm unsure how to quantify that number.

24      Q.    Okay.  So you don't know how that amount is

25  broken down between front pay and compensatory?



1       A.   This is all front pay.  The $2.2 million is

2  all just front pay, what I would have received if I

3  stayed on with Signature.

4       Q.   Okay.  So how much are you allocating for

5  compensatory?

6       A.   I'm unsure how -- what's the maximum to do

7  that.

8            MR. MANN:  Can we take a break?

9            MS. SIMPSON:  Yeah.

10           MR. MANN:  Can I talk to you?

11           MS. SIMPSON:  Yes.

12           MR. MANN:  I can do it in front of him or I

13      can do it between you -- it would influence his

14      testimony though.

15           MS. SIMPSON:  Okay.  Let's talk.

16           (Brief recess.)

17  BY MS. SIMPSON:

18      Q.   Do you understand that you're seeking

19  emotional distress damages in this case?

20      A.   I do understand that, yes.

21      Q.   Okay.  Can you explain what emotional distress

22  you claim to have suffered?

23      A.   Anxiety, depression, sleepless nights,

24  emotional breakdowns consists of crying, physical pits

25  in my stomach.  Insomnia, that's part of sleepless



FREDERICK SAUNDERS                                  November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              221

1  nights, right?  Fear, I guess at one point when this

2  first happened I thought that -- I thought that

3  Signature would have someone kill me instead of paying

4  the settlement out because it was cheaper to hire

5  someone to pay me than to pay the settlement.

6        Q.   Why would you ever think that?

7        A.   Because people do evil things.

8        Q.   Okay.

9        A.   And I don't put anything past anyone.  If they

10  can lie on a term letter, if they can via a statement

11  position, I don't see anyone above hiring someone to do

12  that to me.

13        Q.   Sir, do you understand what you're saying

14  right now?  You disagree with the basis for your

15  termination, but you're taking a leap to say that you

16  think a former employer would pay someone to kill you?

17            MR. MANN:  Objection.  He's talking about your

18       feelings.

19            THE WITNESS:  That was my fear.  That's how I

20       felt.  That's why I had sleepless nights.

21  BY MS. SIMPSON:

22        Q.   Nobody ever threatened you at Signature,

23  right?

24        A.   No.

25        Q.   Has anybody ever threatened to kill you



1  before?

2        A.    No.

3        Q.    So when did your alleged emotional distress

4  begin?

5        A.    Immediately upon termination.

6        Q.    Did it change at some point?

7        A.    Explain when you say, did it change.

8        Q.    Did any of the symptoms you just described

9  change at some point?

10        A.    Well, obviously not the emotional stress two

11  years later.

12        Q.    You've had the same emotional distress this

13  whole time since you've been terminated?

14        A.    This entire time.

15        Q.    Even after you got a higher-paying job?

16        A.    That has nothing to do with my emotional

17  state, how much I got paid.  If it was the same, I would

18  still feel the way I feel.

19        Q.    Do you have emotional distress because of this

20  lawsuit?

21        A.    Absolutely, solely because of the lawsuit.

22  And so with that, not much has changed.  Not much has

23  changed.  I still wake up 3:00, 4:00 in the morning.  I

24  still cry.  I still am angry.  I'm still -- I don't

25  understand how companies do this to people and how



1  people do this to people and they don't -- sometimes

2  don't face the consequences and that's what the

3  anxiety -- it drives me crazy because you -- I always

4  try to do the right thing and I hold integrity high and

5  for that to be called out, to be lied upon.  And two

6  years later after being questioned by it, I don't know

7  if it will ever go away.

8      Q.   You're being questioned by it because you're

9  suing the company for millions of dollars, right?

10     A.   Yes.  Which they wrongfully terminated me and

11 I believe they knew they were wrong or are wrong in this

12 regard.

13     Q.   What do you mean by that?

14     A.   They had no just basis, based on that term

15 letter mainly, to fire me.

16     Q.   I understand that's your opinion.

17          Speaking of the emotional distress, has it

18 stopped you from maintaining your employment?

19     A.   I fear that it may threaten my employment.

20     Q.   What do you mean by that?

21     A.   Because I'm a very open person and my current

22 manager, slash, director -- I shared the situation with

23 him when I first got hired on because I cannot fake,

24 most of the time, when someone asks you how you're doing

25 and I had a breakdown the night before or I couldn't



1  sleep the night before, I cannot say I'm okay.

2          So at one point, maybe within three months of

3  being hired, I told him why I was distraught or feeling

4  the way I was feeling.  At the time he said he

5  understood.  And he even said that, if you need to take

6  a mental break, you know, a day to compose yourself,

7  then by all means do that.  At the same time, the fear

8  sets in because no one knows what someone will do.  And

9  will he react in a way that feels like I'm a liability

10 to the company and let me go so as not to have the same

11 thing happen to -- what Signature did to me, that

12 happened and what they may do to me.  But at the same

13 time, my performance is excellent where I know

14 performance-wise I shouldn't get fired.

15          But concern or fear of that liability, what

16 I'm currently going through now for the past two years,

17 he may -- or someone may -- the company may decide to

18 cut ties.  Because even today, he knows that I submitted

19 a sick day, but he knows that it was for this, slash,

20 mental health, we'll call it -- or he called it.  So to

21 him, it was entitled to be a sick day and not a PTO day.

22     Q.   Did you tell him you were in deposition today?

23     A.   I believe so.

24     Q.   And you voluntarily told him that you sued a

25 former employer, right?



FREDERICK SAUNDERS                           November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                        225

1      A.   I believe so, yes.  I think I said litigation

2    or -- I believe so.

3          (Defendant's Exhibit 31 was marked for

4       identification.)

5    BY MS. SIMPSON:

6      Q.   So, Mr. Saunders, I'm showing you what's been

7    marked --

8      A.   I'm sorry, Amanda --

9      Q.   It's going to help, if I direct you to certain

10   pages.

11         MR. MANN:  Yeah, we talked about it.  It's

12      fine.

13   BY MS. SIMPSON:

14     Q.   So I'm showing you what's been marked as

15   Exhibit 31.  These are records that were produced to us

16   pursuant to a subpoena to the Department of Veterans

17   Affairs with respect to you.  We're going to be jumping

18   around a little bit because they're not in chronological

19   order, but you have the Bates labels down, so I think

20   we'll be able to move efficiently through this.

21         So let's flip to 030195, which is this many

22   pages in (indicating) and it says 9 of 13 at the bottom.

23         MR. MANN:  So 195?

24         MS. SIMPSON:  Yes.

25



1            MR. MANN:  What page does it go to?

2            MS. SIMPSON:  197.

3    BY MS. SIMPSON:

4        Q.   So, Mr. Saunders, do you see on 195 that this

5    is an entry date of May 13, 2022?

6        A.   Yes.

7        Q.   So this is about seven months after your

8    separation, right?

9        A.   Yes.

10        Q.   Okay.  And so it appears that this is the

11    first time that you're referred to primary care, mental

12    health screening, because you had indicated you wanted

13    to talk to someone.  Do you recall that?

14        A.   I do recall that.

15        Q.   Okay.  And so this is the month after you

16    filed the charge of discrimination, right?

17        A.   Seven or eight months roughly, yes.

18        Q.   The charge of discrimination with the EEOC?

19        A.   I'm sorry?

20        Q.   This is a month after you filed a charge of

21    discrimination with the EEOC, right?

22        A.   Oh, I'm unsure of the timeline.

23            (Defendant's Exhibit 32 was marked for

24        identification.)

25



 1  BY MS. SIMPSON:

 2      Q.    So I'm showing you what's been marked as

 3  Exhibit 32.  Do you recognize this?

 4      A.    I believe so.

 5      Q.    Is this your charge of discrimination?

 6      A.    I believe so.

 7      Q.    Do you see the bottom left-hand corner that

 8  you digitally signed it?

 9      A.    I do see that.

10      Q.    And do you see that that signature is dated

11  April 21, 2022?

12      A.    Yes.

13      Q.    Okay.  So let's flip back to the VA records

14  now and we're looking at the entry date of May 13, 2022.

15           So this is the next month after your charge of

16  discrimination, right?

17      A.    Based on the dates, yes.

18      Q.    Okay.  And so did you seek mental health

19  treatment prior to requesting to talk to someone on

20  May 13, 2022?

21      A.    I do not believe so.

22      Q.    I told you we're going to flip around.  Bear

23  with me.  We're going to go to 030424.

24      A.    030324?

25      Q.    030424.  And it also says, page 97 of 178 on



 1  the same one.
 2          A.    Yes.
 3          Q.    Take a second to read the second block.  These
 4  are the nursing notes from that say day, May 13, 2022.
 5                MR. MANN:  For the record, it goes to Bates
 6          030429.
 7                MS. SIMPSON:  Thank you.
 8                And it actually starts on 423 as well.
 9                MR. MANN:  So 423 to 429?
10                MS. SIMPSON:  Yes.
11                MR. MANN:  Okay.
12  BY MS. SIMPSON:
13          Q.    So stay on 424, do you see next to chief
14  complaint it says, veteran states that he was wrongfully
15  terminated from his job of 14 years last year and he is
16  angry about it.  Had to battle for justice and he is
17  wishing ill on the people who lied on him.
18          A.    I do see that.
19          Q.    And do you recall saying that?
20          A.    I do recall.
21          Q.    And the page right before it, which is 423, do
22  you see that the diagnosis -- the diagnosis is
23  adjustment disorder with other symptoms?
24          A.    I do see that statement.
25          Q.    Okay.  And then under the case formulation

 1  right below that it's explaining, he seems to have

 2  adjustment disorder.  The main issue relates to being

 3  wrongfully terminated last year in October 2021 and not

 4  being able to let go of his situation.  We will sign him

 5  up for psychotherapy with PCMHI.

 6          Do you see that?

 7      A.  I do see that.

 8      Q.  And it ends by saying, he denies need for

 9  medications to help with anxiety and there are no acute

10  safety concerns.

11          Do you see that?

12      A.  I do see that.

13      Q.  And is that accurate, that you denied the need

14  for any sort of medications?

15      A.  That is correct.

16      Q.  Okay.

17      A.  May I add because fear of addiction.

18      Q.  Do you have addiction in your family?

19      A.  My father used cocaine and had to go to rehab.

20          MR. MANN:  I don't think any of that is going

21      to be relevant.

22  BY MS. SIMPSON:

23      Q.  What was your fear of addiction based on?

24      A.  I like to feel good and I want to do it

25  naturally.



1      Q.   Did you tell him you needed medication, but

2   you just feared you were going to get addicted?

3      A.   I did not say -- no, I never said I needed

4   medication.  They asked me and I denied the need for

5   medication.

6      Q.   Okay.  So let's flip to 030190, and it says

7   May 16, 2022 at the top.  Do you see that?

8      A.   Yes.

9      Q.   Okay.

10          MR. MANN:  Does this one go to 194 or is it 13

11      pages?

12          MS. SIMPSON:  Thirteen pages, the way that

13      they have it.  But it's all different dates.

14   BY MS. SIMPSON:

15      Q.   So on that page under visit summary treatment

16   plan, second paragraph, do you see that it says,

17   "Veteran is agreeable to an appointment with the team

18   psychologist"?

19      A.   I do see that sentence.

20      Q.   Okay.  Do you recall when you had your first

21   appointment with the psychologist?

22      A.   I do not recall.

23      Q.   At this point it sounds like you haven't had

24   one, right?

25      A.   I do not recall.



1      Q.   Okay.  Let's go to 030410.

2      A.   03?

3      Q.   04- --

4           MR. MANN:  410.

5           THE WITNESS:  Okay.

6   BY MS. SIMPSON:

7      Q.   Second box on that page, do you see the date

8   November 4, 2022?

9      A.   Yes.

10      Q.   So in the documents, this appears to be your

11  next appointment with mental health counseling.  Do you

12  recall any appointment between May 2022 and

13  November 2022?

14      A.   I do not recall.

15      Q.   And under the schedule MH appointment, do you

16  see the second paragraph, "Veteran has returned to

17  clinic.  Order, updated order for rescheduling mental

18  health appointment in the Deltona clinic"?

19      A.   I do see that sentence or statement.

20      Q.   Did you ever end up scheduling some mental

21  health appointment in the Deltona clinic?

22      A.   I did not schedule any -- I've never been to

23  Deltona clinic, no.

24      Q.   Did you ever end up getting scheduled for

25  another mental health appointment in a different clinic?



 1      A.   I'm unsure.

 2      Q.   Okay.  We'll keep walking through the records.

 3 The next one, 030396.  So the second box, do you see

 4 that that says February 21, 2023?

 5      A.   Yes.

 6      Q.   And do you know who Ortiz Gonzalez is?

 7      A.   I have no idea.

 8      Q.   Okay.  And under chief complaint -- actually,

 9 it's HPI, right below that, do you see that it says,

10 "Mr. Saunders is a 50-year-old male.  Patient with

11 history of chronic conditions who came for establishment

12 of care.  His main concerns is screening colonoscopy

13 since he is 50 and also a referral to MH, mental health,

14 for anger-related issues"?

15      A.   I do see that.

16      Q.   So at this point had you seen a psychologist?

17      A.   I do not recall.

18      Q.   What chronic conditions do you suffer from

19 that it's referring to?

20      A.   I'm unsure what they mean by chronic

21 conditions myself.  I don't understand what that means.

22      Q.   Okay.  Next number, 030382.  Second box, do

23 you see that says the date of February 24, 2023?

24      A.   Yes.

25      Q.   And the standard title says, "Mental Health



 1  Initial Evaluation Note."

 2      A.   I do see that.

 3      Q.   And I'm sorry, right above that it also says,

 4  "MH, mental health, PC Initial Assessment."

 5           Do you see that?

 6      A.   No, on -- we're talking -- yes.

 7      Q.   And then the author is Rodriguez-Jimenez.  Do

 8  you know who that is?

 9      A.   I do not know who that is.

10           MR. MANN:  If you're wondering who the treater

11       was for the VA's medical records, they put the

12       treater and then the RN.  And the treater would be

13       in like three pages, 030384.

14  BY MS. SIMPSON:

15      Q.   Mr. Saunders, can you flip to that for a

16  second because it's actually very informative because it

17  says a full name.  At the bottom do you see it says,

18  Natalia Rodriguez-Jimenez, and it says, psychologist?

19      A.   I do see that.

20      Q.   Do you recall meeting with a woman

21  psychologist?

22      A.   I do recall that.

23      Q.   And does that refresh your recollection on her

24  name at all?

25      A.   Not at all.



1    Q.   Okay.  Let's flip back to 382.  And right

2  above screening is administered there's a paragraph, do

3  you see that it says, "Veteran reported on October 2021

4  who was terminated from his job.  He has felt frustrated

5  because the company lied on the documentation in regard

6  to the reason for termination.  He had to hire a lawyer

7  to fight the legal case.  As a result of the situation,

8  he has felt anxious and angry."

9    A.   I do see that paragraph.

10   Q.   And is that accurate what you explained to the

11  psychologist?

12   A.   Partly, yes.

13   Q.   What do you mean partly?

14   A.   The frustration, the thoughts of wanting to

15  harm others.

16   Q.   Which was noted before that period?

17   A.   But I know I said every visit that I had at

18  the VA.

19   Q.   And when you say "harm others," who were you

20  referring to?

21   A.   Those that lied on me.

22   Q.   Who do you believe lied on you?

23   A.   Christy Pavel, Chris de Jhong, Sharon Miller,

24  Dan Cunico.

25   Q.   Did you ever act on those feelings?

1      A.   I have not.

2      Q.   Below that paragraph in screenings

3  administered, do you see that it says, depression, nine?

4      A.   I do see that.

5      Q.   And then under that two lines are the ranges,

6  do you see it says five to nine, mild?

7      A.   I do see that.

8      Q.   Let's go to 030378.  So this is three months

9  later.  Do you see the date -- I'm sorry, one month

10  later, March 24, 2023.  Do you see that?

11      A.   I do see that.

12      Q.   And it looks like the same screenings are

13  administered.  Do you see that the depression now says

14  two?

15      A.   I do see that.

16      Q.   And it says that PHQ9, the screening was

17  administered and score indicates minimal depression?

18      A.   I do see that.

19      Q.   And under that, it says, GAD7, Anxiety, six?

20      A.   I do see that.

21      Q.   And then it says, GAD7 was administered and

22  score indicates mild anxiety.

23      A.   I do see that; however, from my understanding

24  and my mental state, PTSD is based on triggering.  So

25  one can be fine during the periods of triggers, but when



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              236

1  those triggers happen, these go from a zero to a 21.

2      Q.    What do you mean PTSD?

3      A.    Trauma.

4      Q.    Are you saying you have PTSD?

5      A.    Yes.

6      Q.    From what?

7      A.    From being fired from Signature Aviation

8  wrongfully.

9      Q.    Were you given a PTSD diagnosis?

10     A.    I'm unsure if I was or not.  I think I saw it

11 stated here somewhere PTSD.  I literally saw it here in

12 one of these pages.

13     Q.    Okay.  So are you contending that these scores

14 are not accurate?

15     A.    They're accurate, but again, triggers will

16 cause these ranges to spike.

17     Q.    Okay.

18     A.    So we should not downplay the reduction.

19     Q.    Do you have any medical training?

20     A.    No.

21     Q.    Okay.  Let's flip to the next page.  At the

22 top, under review prior action plan, second paragraph,

23 do you see that it says, "Veteran was seen for a

24 followup today and he reported feeling much better since

25 last visit"?



1        A.   I do see that.

2        Q.   All right.  And then two sentences after, do

3   you see that it says, "Veteran also shares that he's

4   applying for other positions and is hopeful to get a

5   better job"?

6        A.   I do see that.

7        Q.   So at this time of March 2023, you were

8   employed with GAF, right?

9        A.   Yes.

10       Q.   Okay.  So were you unhappy with GAF at this

11  time?

12       A.   Not at all.  The reason I was looking for a

13  better job is because after I was wrongfully terminated

14  from Signature Aviation, I realized I was underpaid and

15  undervalued.  And so I wanted, as anyone should, to

16  improve their career status and seek better employment.

17       Q.   What do you mean you realized you were

18  underpaid after leaving Signature?

19       A.   Because I was being paid roughly $90,000 at

20  Signature Aviation when I was terminated, wrongfully

21  terminated.  And then I received a job at GAF, say, nine

22  months later with no additional training, no additional

23  degree, no additional certification, no additional

24  license, yet received a $50,000 increase, which is about

25  60 percent roughly.  And so my opinion, based on those



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              238

1  two facts, I felt -- I believe I was underpaid at

2  Signature.

3      Q.   Just because you made more at a different

4  company?

5      A.   And basically the same -- similar title,

6  similar role and significantly more money.

7      Q.   Were your job duties exactly the same?

8      A.   Similar.

9      Q.   You'd agree that companies pay roles

10 differently depending on who you work for, right?

11     A.   I know that wholeheartedly.

12     Q.   Okay.  Just so I'm clear, your only evidence

13 you're claiming you were underpaid at Signature is

14 because you went and got another job where you were

15 making more, right?

16     A.   Correct.  I believe -- sorry, repeat the

17 question.

18     Q.   Your only evidence for claiming that you were

19 underpaid at Signature is that you went and got another

20 job and were paid more, correct?

21     A.   I had no other evidence while at Signature

22 because I did not know my compa-ratio during my tenure

23 at Signature to be able to understand how I was paid,

24 nor did I know any other RAM's compa-ratio to compare

25 myself to whether I was under- or overpaid.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              239

1      Q.   Does GAF use compa-ratio?

2      A.   I have no idea.

3      Q.   Any other facts to support your claim that you

4  were underpaid at Signature?

5      A.   Not at this time.

6      Q.   Okay.  So going back to the PTSD.  I

7  understand that you served.  During your time of

8  serving, did you ever witness someone getting killed?

9      A.   No.

10     Q.   Have you ever had a near death experience?

11     A.   No.

12     Q.   Ever witness any sexual abuse?

13     A.   No.

14     Q.   Ever been sexually abused yourself?

15     A.   When you -- I was -- I'm unsure if this

16  counts.

17          MR. MANN:  You want to take a break?

18          MS. SIMPSON:  The question is pending.

19          MR. MANN:  I don't know if it's relevant.

20          MS. SIMPSON:  It's relevant.

21          MR. MANN:  Okay.

22          MS. SIMPSON:  He's seeking emotional distress

23     damages.

24          MR. MANN:  Go ahead.

25          THE WITNESS:  One night at -- some friends and



1        I were -- I want to say we were in Atlanta and we

2        were barhopping and we ended up at a gay bar.  And

3        I'm unsure if any of my friends were gay at the

4        time, not that it matters by any means.  And

5        walking through that club, someone grabbed my butt.

6        So again, I'm unsure if that constitutes sexual

7        abuse, but I recall that.

8   BY MS. SIMPSON:

9        Q.   How did that make you feel?

10       A.   Violated.

11       Q.   When did this occur?

12       A.   I was in the military, so between, I'll say,

13  January of '91 to March '97.

14       Q.   Is that the only instance that you were

15  thinking of?

16       A.   That's the only thing I can recall.

17       Q.   Let's go back to the exhibit.  We're on

18  030379, fourth paragraph down.  Do you see that it ends

19  by saying, "due to improvement of symptoms, veteran

20  declined additional PCMHI services at this time."

21       A.   I do see that sentence.

22       Q.   Were you ever treated for any additional

23  mental health counseling at the VA?

24       A.   I don't believe so.

25       Q.   Were you ever treated for any additional



1  mental health counseling with any other counselor or

2  physician?

3       A.   No.

4       Q.   Let's go back to the answers to

5  interrogatories, Exhibit 1, we're going to flip to

6  Interrogatory 11.

7            Do you see that this asks you to list each and

8  every person that you contend or believe witnessed the

9  events or have knowledge of the facts of your claims?

10      A.   I do see that.

11      Q.   Besides the individuals listed here in

12  response to interrogatory, are there any other witnesses

13  that you contend would have knowledge of or support your

14  claims?

15      A.   To clarify, my claims against the company?

16      Q.   Yes.

17      A.   And are we saying that would support my case?

18      Q.   Yes.  Or contradict your case.

19           MR. MANN:  Good or bad.

20           THE WITNESS:  I mean, I initially want to say

21      everyone at Signature that I knew and interacted

22      with at some point in 14 years.  So how do I narrow

23      that down?  What's the basis or the criteria for

24      the names?  Besides the true immediate direct

25      people involved with the case, which I believe you



FREDERICK SAUNDERS                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                    242

1        have all listed here.

2   BY MS. SIMPSON:

3        Q.   And I guess it would also be the former and

4   current AAMs that you had at that meeting, right?

5        A.   Okay.  So I think you have all the names, but

6   I'll repeat them.

7        Q.   I don't need you to repeat them.

8        A.   Okay.

9        Q.   I'm just thinking about anyone else besides

10  who we've covered today during your testimony?

11       A.   I'm struggling to think of anyone that was

12  directly involved or fully aware of the case.

13       Q.   Did your former girlfriend have any knowledge

14  regarding the claims?

15       A.   I would think so because I talked to her about

16  the wrongful termination.  I mean, obviously she was

17  there at the time when it happened, immediately how I --

18  I will say damaged, if you will.

19       Q.   Where does she live now?

20       A.   Honestly, I have no idea.  I haven't talked to

21  her since roughly around that same time frame.

22       Q.   Any other family members or friends who would

23  have knowledge as to your claims?

24       A.   I mean, my friends and family knew what

25  happened to me, but I'm not sure how -- how valuable or



1   involved they would need to be or could be in the case.

2   I'm unsure.

3           MR. MANN:  So No. 11 asks him if they have

4       knowledge of any of the facts.  If you're asking

5       him anybody he's talked to about the case, I think

6       that would be a separate question than No. 11,

7       right?

8           MS. SIMPSON:  I'm just asking him right now

9       separate and apart from Interrogatory 11 --

10          MR. MANN:  Okay.  All right.

11          MS. SIMPSON:  -- whether there's any other

12      individuals.

13          MR. MANN:  Okay.  So just ignore No. 11 and

14      address the question like as if it's anybody.

15          THE WITNESS:  Who else that knows about this

16      lawsuit?

17          MR. MANN:  Uh-huh.

18          THE WITNESS:  I have four best friends and,

19      three -- actually all four know about the case.

20      I'm unsure -- well, they know what happened to me.

21      I'm unsure if I told them that I filed a lawsuit.

22      Well, I know my closest best friend that's locally,

23      I told him that I filed a claim, a lawsuit.  But

24      then my other best friend in Phoenix, I'm unsure if

25      I told -- he knows I was trying to pursue a

 1        lawsuit, but I'm not sure if I told him -- yeah,

 2        they'd have to.  Honestly, I'll just say my four

 3        best friends know about the lawsuit.

 4   BY MS. SIMPSON:

 5        Q.    Okay.

 6        A.    And my family, of course.

 7        Q.    And your former girlfriend?

 8        A.    Yes.  Well, no, no, because when we -- we

 9   broke up in April of 2022, so she's unaware of this

10   lawsuit.

11        Q.    Was she aware of the charge of discrimination

12   that was filed around that time?

13        A.    I shared with her that this all happened

14   because I was black and more so the -- the lack of

15   consideration that I would do nothing after I was

16   wrongfully terminated, that I would be -- that I was

17   disregarded.  Because I think, again, my opinion only,

18   that Jan being white and a female, they feared her

19   retaliation -- or her response to retaliation more than

20   they feared my response to the retaliation and being

21   fired wrongfully.  Because, again, my opinion, I felt

22   like we can fire him and he would just go away and would

23   not contest the wrongful termination.  Versus Jan, who,

24   again, is white and female, those fragile tears, they

25   feared that more and was more accepting of her position,



1  which allowed them, I believe -- again, my opinion -- to

2  have her stay on or offer her five months' severance

3  with the hope that she would take the severance, which

4  she did not, she stayed on, and so, therefore, I believe

5  that treatment was discriminated and unjust.

6       Q.   Why do you believe that?

7       A.   Because why would she not be treated the same

8  way I was and be fired as well for filing the hotline

9  claim as I did.

10      Q.   But what leads you to believe that the company

11  thought that you would just go away and Jan wouldn't?

12      A.   Because they dismiss me for being black.

13      Q.   You have no factual basis to contend that,

14  except that you are black and she is white, correct?

15      A.   That's why I said my opinion and I believe.

16      Q.   You mentioned that Jan's female.  Are you

17  contending that your discrimination claim is also based

18  on gender?

19      A.   My claim is on that she is white and I am

20  black.  The additional part, her being a white female, I

21  think Corporate America is more afraid of that gender

22  and race than a black male.

23      Q.   You said Corporate America.

24      A.   Well, Signature Aviation in this case.

25      Q.   But you're talking broadly about your



1  political views about Corporate America?

2      A.   Well, I'll stick with Signature Aviation.

3  They were more afraid of Jan being a white female than

4  me being a black male.

5      Q.   What proof do you have that Signature Aviation

6  believed that?

7      A.   Again, my opinion and my belief.

8      Q.   Is it just because they're a corporation in

9  America?

10     A.   No, because they treated me differently than

11  they treated Jan.

12     Q.   But how is that linked to her gender?

13     A.   Because she's a female.

14     Q.   And because you're a male?

15     A.   I'm a male.

16     Q.   What's the race of your former girlfriend?

17     A.   White.

18     Q.   What is that her name again?

19     A.   Alison Hugo, H-U-G-O.

20     Q.   Do you still have her phone number?

21     A.   I'm unsure.  Possibly.  I think so.  Then

22  again, I have a pattern of if I'm breaking up with

23  someone I just delete everything to not have any ties.

24     Q.   If you still have it in your phone, can you

25  agree to supplement your answer to Interrogatory 11 with



1  her last known information that you have, please?

2          MR. MANN:  Yeah, we'll do that.  What about

3      the other -- the family and his four friends?  We

4      can put them on here.

5          MS. SIMPSON:  Yeah, if you could, that would

6      be great.

7          THE WITNESS:  Do you need the names now?

8          MS. SIMPSON:  Let's do it --

9          MR. MANN:  We'll do it in a -- it would just

10     be quicker if we did it in a --

11         MS. SIMPSON:  And just for the record, I'll

12     also leave the deposition open with respect to any

13     additional witnesses that are supplemented in

14     response to Interrogatory 11.

15         MR. MANN:  We don't have any objection to

16     leaving the deposition open.  We will take a cross,

17     but if there is another depo, we'll do another

18     cross.

19         MS. SIMPSON:  Absolutely.

20         MR. MANN:  And then you-all can redirect

21     there, too.

22         MS. SIMPSON:  Understood.

23         MR. MANN:  And that relates to the text

24     messages as well, not just the witnesses.

25         MS. SIMPSON:  Yes.



1          MR. MANN:  We'll give you that.

2          MS. SIMPSON:  And any supplementation with

3     respect to --

4          MR. MANN:  Damages.

5          MS. SIMPSON:  -- damages.

6  BY MS. SIMPSON:

7     Q.   Okay.  Mr. Saunders, other than the witness

8  information that you're going to supplement and the text

9  messages, do you have any other documents, e-mails or

10  recordings in your possession that you have not already

11  produced to support your claims?

12     A.   I do not believe so.

13          MS. SIMPSON:  I need five minutes, quick.

14          MR. MANN:  Uh-huh.

15          MS. SIMPSON:  Thank you.

16          (Brief recess.)

17          MS. SIMPSON:  So subject to what we've already

18     put on the record as to additional followup and

19     keeping the deposition open, I have no further

20     questions.

21          MR. MANN:  I will ask some questions.

22                    CROSS-EXAMINATION

23  BY MR. MANN:

24     Q.   So all the documents that we went over, some

25  of them you had seen for the first time, correct?



1       A.    Correct.

2       Q.    Some of them you had seen during discovery.

3  So in other words, you didn't see them until they

4  produced them?

5       A.    Correct.

6       Q.    And Exhibit 1, we talked about this, this is

7  the interrogatory answers that you provided to them?

8       A.    Correct.

9       Q.    You're in the process -- or you have

10  supplemented them with documents, correct?

11       A.    Correct.

12       Q.    And we're in the process of updating the

13  answers, correct?

14       A.    Correct.

15       Q.    Exhibit 2, Florida Commerce document, I think

16  this is your unemployment stuff?

17       A.    Correct.

18       Q.    Do you remember going over -- I'm not sure I

19  circled the page.  Is that okay?  All right.  So we went

20  over some of the documents in here, do you recall that?

21       A.    Correct.

22       Q.    And you recall going over the ones that said

23  discharge, slash, terminated?

24       A.    Correct.

25       Q.    And then some of the records that didn't



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                           250

1  appear to be your handwriting?

2      A.   Correct.

3      Q.   It's true that you filed for unemployment?

4      A.   Correct.

5      Q.   And you were either given unemployment or not?

6      A.   Correct.

7      Q.   Did you fill out all the documents in here

8  personally?

9      A.   I have no idea.  I have no idea.

10     Q.   Well, did you go through every page during the

11 deposition?

12     A.   No.  Not through every page, no.

13     Q.   The ones that we did go over, did you fill

14 those out personally?

15     A.   No, that was not my handwriting.

16     Q.   What about the ones that were typed?

17     A.   I'm unsure.  I'd have to go back and look at

18 them ad see if I typed them or not.

19     Q.   And -- nevermind.  Scratch that question.

20          Okay.  Conexus, this is Exhibit 3.  Do you see

21 it right there, if you want to pull it?

22     A.   Yes.

23     Q.   Conexus, do you remember going over this

24 document?

25     A.   I do.



1      Q.    Do you remember Conexus?

2      A.    Yes.

3      Q.    And then there's the invoices here?

4      A.    Yes.

5      Q.    And it says rate $110.

6      A.    Yes.

7      Q.    Can you explain that for me?

8      A.    From my understanding, how recruiting firms

9   work, especially in the accounting industry, they bill

10  the employer -- in this case, Ungaro Consulting -- a

11  higher rate than what's actually paid to the employee.

12  Basically that difference is the recruiting company

13  payment for finding the candidate and thus the employee.

14     Q.    When you get paid by Conexus, you get it in a

15  full amount paycheck, right?

16     A.    I believe so, yes.

17     Q.    You don't get the breakdown of how much you

18  got per hour or what rate?

19     A.    No, it was -- I think it was --

20     Q.    You don't recall?

21     A.    Don't recall.

22     Q.    And you don't recall the 65?

23     A.    Do not recall 65.

24     Q.    You thought it was 55?

25     A.    I thought it was 55.



1    Q.   Honest mistake?

2    A.   Yes.

3    Q.   And you don't have any problem updating the

4  interrogatories?

5    A.   Not at all.  Absolutely not.

6    Q.   Exhibit 4, no questions for it.  I just wanted

7  you to look at it again.

8    A.   Fair enough, Mike.  Fair enough.

9    Q.   All right.  Number 7, this is the Gallup

10  exhibit.  So the Gallup document, you didn't like this

11  one, did you?

12    A.   Its not a true assessment of my engagement

13  with my team.  Did not like it, no.

14    Q.   Specifically, you don't know who's answering

15  these questions, obviously?

16    A.   Correct.

17    Q.   It doesn't say who is answering these

18  questions?

19    A.   Correct.

20    Q.   It also doesn't say that -- the questions

21  don't ask, for example, Frederick Saunders tells me what

22  to expect at work.  It doesn't say your name in any of

23  these questions?

24    A.   Correct.

25    Q.   It also ask questions like I have a best



1  friend at work.  How could you be anyone's best friend

2  when your direct reports are in Alabama, other states?

3       A.    Correct.  They cannot be best friends.

4       Q.    So obviously you're not going to get a high

5  rating on something like that, right?

6            MS. SIMPSON:  Objection.

7            THE WITNESS:  Correct.

8  BY MR. MANN:

9       Q.    I mean, were there any other questions that

10  you find a problem with as to being an evaluation of you

11  personally as an employee at the company?

12       A.    Question 2, I have the materials and the

13  equipment I need to do my work right.  I had no controls

14  over the systems at Signature Aviation.  They were

15  antiquated at best.  They had multiple systems, instead

16  of true RP which would make everyone's jobs ten times

17  easier because you'd have one system doing everything

18  instead of like 40 different systems that have to be

19  integrated and/or managed reconciled manually each day,

20  each week, each month.  So again, not a true assessment

21  of my engagement based on, again, what materials and

22  equipment they have to do their work right.

23            If I keep going, No. 3, at work I have the

24  opportunity to do what I do best every day.  How does

25  that reflect assessment of my engagement with them?



1   Opportunity to do what you do best every day.  That does

2   not affect me.  How does that refer to me?  So issue

3   with that question.

4           Number eight, the mission or purpose of my

5   company makes me feel my job is important.  Again, how

6   is that a direct -- that is not a direct assessment of

7   my engagement with my team.

8       Q.   I won't make you go through all of them.  It

9   will be -- so my next question is:  I mean, in your

10  opinion --

11      A.   Yes.

12      Q.   -- based on having seen this today --

13      A.   Today, for the first time.

14      Q.   -- does this score reflect more about you or

15  more about the company?

16      A.   About the company, completely.

17      Q.   Jan Chalk told you she thought she was being

18  paid less based on discrimination?

19      A.   Correct.

20           MS. SIMPSON:  Object to form.

21  BY MR. MANN:

22      Q.   Whether or not that is true, whether it was

23  based on discrimination, what kind of discrimination,

24  whether or not it was warranted, that is not something

25  you're claiming.  You're claiming that she told you that



FREDERICK SAUNDERS                              November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              255

1  she was discriminated against in her pay?

2       A.   Yes.

3            MS. SIMPSON:  Object to form.

4  BY MR. MANN:

5       Q.   And you reported that up the chain?

6       A.   Yes.

7       Q.   And you were fought about it, they fought

8  back?

9       A.   Yes.

10      Q.   And eventually, a week or two later, you were

11 terminated?

12           MS. SIMPSON:  Object to form.

13           THE WITNESS:  Yes.

14 BY MR. MANN:

15      Q.   Let me say a week or two after your hotline

16 claim you were terminated?

17      A.   Yes.

18      Q.   And that's a pretty close proximity to when

19 you put your hotline report in, right?

20      A.   Yes.

21      Q.   And you understood that it was an anonymous

22 hotline?

23      A.   Yes.

24      Q.   Regardless of you putting your name in the

25 hotline, which was supposed to be anonymous to you, you



1  thought that only the hotline would know your name,

2  right?

3       A.   Yes.

4            MS. SIMPSON:  Object to form.  Leading.

5            MR. MANN:  On cross?

6  BY MR. MANN:

7       Q.   So how did Sherri learn about you filing the

8  hotline claim?

9       A.   I have no idea.

10           MS. SIMPSON:  Objection.

11  BY MR. MANN:

12      Q.   You have no idea?

13      A.   No idea.

14      Q.   Did you tell anyone, other than Jan, that you

15  were going to do that before you did it?

16      A.   No.

17      Q.   Did you tell other employees before Sherri

18  found out?

19      A.   I do not recall.  I'm unsure when Sherri found

20  out, so I don't know.

21      Q.   You even offered to give your money to Jan,

22  right?

23      A.   Yes.

24      Q.   Was that eventually what they did?

25      A.   I'm unsure how they reallocated the pay



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              257

1  because, again, I never looked at my paycheck then or
2  now.  So I don't know if they took it from me or someone
3  else, I have no idea.
4      Q.   And you don't look at your paycheck?  People
5  would think that's crazy, but is your claim based on
6  your paycheck?
7      A.   No, because I never cared about money from the
8  time I was born until now.  Money was never an issue
9  with me.
10     Q.   As long as you can feed your family?
11     A.   Yeah.  Myself and I was comfortable, yes.
12     Q.   Do you know if Jan still works at the company?
13     A.   She does not work for the company anymore.
14     Q.   Did she resign?
15     A.   She resigned, I want to say if not this past
16  Friday, the Friday before that.
17     Q.   Did she tell you that she resigned?
18     A.   She told me leading up to her resignation that
19  she was going to resign because not only was she still
20  suffering from the discrimination we'll call it --
21     Q.   What she would call it?
22     A.   What she would call it.  And in addition, when
23  her AA who reports to Jan resigned, Jan took on that
24  AA's responsibility which gave her more work and still
25  the same -- and stayed the same pay.



1      Q.   Do you know if she was six bases and then took

2  on a seventh?

3      A.   No, it wasn't a seventh.  It was just more

4  work.

5      Q.   Was it more complexity or was it more -- how

6  would you say it?

7      A.   Actually in this case it was complexity

8  because BFM, the Mobile Executive Airport, they managed

9  the fuel operation for Airbus, who makes airplanes for

10 the different airlines and there's a particular process

11 of gauging and regauging that they do at that base for

12 that airline -- or for that company that makes airbuses

13 for the airlines and it's very complex.  And at the time

14 Lynn did that work and then when Lynn left, the AA,

15 resigned, Jan took on that work.  And she told me that

16 she was working 70, 80 hours a week doing her job and

17 Lynn's job and that's why she resigned.

18     Q.   Let's go to Exhibit 13.  It's the text

19 messages.

20     A.   Yes, sir.

21     Q.   Go to page 2 of it.  At the bottom, do you see

22 the text message -- and this is from?

23     A.   Sherri Miller.

24     Q.   Sherri Miller texts you, after you say all of

25 this on June 1st at about 3:12 p.m, she says, "Let HR



FREDERICK SAUNDERS                        November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                    259

 1  get settled down."

 2          Do you know what she was referring to?

 3      A.   I have no idea.

 4      Q.   There were a couple different drafts of Jan's

 5  e-mail or whatever she was sending -- whatever you want

 6  to call it.  You can call it a complaint.  You can call

 7  it an e-mail.  You can call it a letter.

 8          But without labeling it, how many drafts were?

 9      A.   No more than one to two drafts.

10      Q.   Do you know whether -- based on the documents

11  that we've looked at today, do you know whether your

12  edits were the final edits?

13      A.   I have no idea.

14      Q.   Isn't it true that Signature ended up giving

15  her one percent increase?

16      A.   From my understanding from that e-mail, yes.

17      Q.   And it's what you suggested?

18          MS. SIMPSON:  Object to form.

19  BY MR. MANN:

20      Q.   Do you recall suggesting, you know, take my

21  one percent?

22      A.   Yes, I do recall that.

23      Q.   They ended up giving her one percent, right?

24      A.   Yes.

25      Q.   Was that the right thing to do?



1            MS. SIMPSON:  Object to form.

2            THE WITNESS:  Yes.

3   BY MR. MANN:

4        Q.   Exhibit 18.

5        A.   Okay.

6        Q.   On the first page of Exhibit 18, there's a

7   from Jen Hudak to Dan Cunico and Frederick Saunders?

8        A.   Yes.

9        Q.   There's also no date.  Can you confirm right

10  now today whether or not this was actually sent or

11  received by you?

12       A.   I cannot confirm that.

13       Q.   It says, "Good morning, Frederick.  Forwarded

14  the situation to Dan Cunico for discussion and follow up

15  as he supports your organization."

16            You don't recall receiving that?

17       A.   That e-mail, no.

18       Q.   Exhibit 20, I want to be very clear about this

19  one.  You did not ask Jan to record anything?

20       A.   Correct.  I did not ask her to record

21  anything.

22       Q.   You did not ask her to send you anything?

23       A.   Correct.

24       Q.   She volunteered?

25       A.   Correct.  Yes.



1    Q.   Did you ever record anything?

2    A.   No, I have not ever recorded anything.

3    Q.   Do you recall your termination letter?

4    A.   Yes.

5    Q.   Okay.  Do you know what the proper reporting

6  structure is?

7    A.   Yes.

8    Q.   Can you tell me about it?

9    A.   From my understanding, it would be to Sherri

10  Miller, then to Chris de Jongh.

11    Q.   And you did that, right?

12    A.   I did that.

13    Q.   You did that and that wasn't working?

14    A.   Yes, correct.

15    Q.   Then you went to anonymously report it to who?

16    A.   The hotline.

17    Q.   Is it your understanding that that is outside

18  of the reporting structure?

19    A.   At that time that was my understanding, yes.

20    Q.   It was outside of it?

21    A.   Yes.

22    Q.   It wasn't part of the -- did you understand my

23  question?  So are you okay to go to the anonymous

24  hotline?

25    A.   Oh, yes, after not getting action on the



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                               262

```
 1  previous two people.
 2      Q.   So it was outside of the reporting structure
 3  of like the first option?
 4          MS. SIMPSON:  Objection.
 5  BY MR. MANN:
 6      Q.   Is that what you were saying?
 7      A.   I'm saying they're not -- I think when you say
 8  reporting structure, like people.  And after Sherri
 9  Miller, Chris de Jongh then the hotline.
10      Q.   Did any investigation into your behavior that
11  you -- apparently you had a remarkable lack of
12  engagement.  Did they ever investigate you?
13      A.   Never.
14          MS. SIMPSON:  Objection.
15  BY MR. MANN:
16      Q.   Did you ever get a call from HR about this
17  before they made this termination?
18      A.   Never.
19          MS. SIMPSON:  Objection.
20  BY MR. MANN:
21      Q.   Did you ever get from anybody, an e-mail,
22  phone call, rumor, anything, that they were
23  investigating you for a lack of remarkable engagement?
24          MS. SIMPSON:  Objection.
25          THE WITNESS:  Never.
```



1  BY MR. MANN:

2      Q.   Is it your understanding that they terminated

3  you without investigating you?

4      A.   That is correct.

5           MS. SIMPSON:  Objection.

6  BY MR. MANN:

7      Q.   They investigated Jan Chalk though, right?

8      A.   For 45 days.  Yes, sir, they did.

9      Q.   Was she on paid leave?

10     A.   Paid leave.

11     Q.   She was offered some kind of package?

12     A.   Offered her job back or five months'

13  severance.

14     Q.   Were you offered a job back?

15     A.   Never.

16     Q.   Were you offered a severance?

17     A.   No, sir.

18     Q.   Were you investigated?

19     A.   No, sir.

20          MS. SIMPSON:  Objection.

21  BY MR. MANN:

22     Q.   If you could look at No. 30, this is what's

23  been told to us is Danielle Morales' call notes.

24     A.   (Nods head.)

25     Q.   You didn't write these?



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              264

1      A.   Did not write these.

2      Q.   But it's apparently an unsigned document that

3 she wrote?

4      A.   Apparently.

5      Q.   And she is saying things that happened during

6 a phone call with you?

7      A.   Yes.

8      Q.   Do you agree with everything that she said in

9 here?

10     A.   Not everything, no.

11     Q.   Some of it, though?

12     A.   Some of it, yes.

13     Q.   Exhibit 31, all right, the good ol' VA medical

14 records.

15     A.   The beast of it all.

16     Q.   I don't know how they sort these, but we're

17 going to work with it, okay?

18          MS. SIMPSON:  I need one second, Mike.  Sorry.

19          MR. MANN:  All right.

20          MS. SIMPSON:  Okay.

21 BY MR. MANN:

22     Q.   So I guess I won't -- strike that.

23          So your first meeting at the VA was because

24 you needed to talk to someone?

25          MS. SIMPSON:  Objection.



 1          THE WITNESS:  Yeah.

 2    BY MR. MANN:

 3      Q.   Among other things.  That's the chief

 4    complaint, right?

 5      A.   Yes.

 6      Q.   And, in fact, you were angry at the time?

 7      A.   Yes.

 8      Q.   Tell me about it.

 9      A.   If I recall correctly, this was around the

10    time of the EEOC, either mediation, before, during,

11    after, I'm unsure.  But I think it was around that time

12    where everything -- all the pain and anguish and anger

13    came back.

14      Q.   It took a lot for you to file the EEOC claim?

15      A.   When you say it took a lot?

16      Q.   I mean, it wasn't something that you like to

17    do.

18      A.   No, I've never -- that's the first time I've

19    ever done that in my entire life.

20      Q.   And it's not something you look forward to

21    doing?

22      A.   Never, no.

23      Q.   So your emotions came to a peak at that point?

24          MS. SIMPSON:  Objection.

25          THE WITNESS:  Absolutely.  Peaked again.  A

FREDERICK SAUNDERS                                  November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              266

1        repeated peak, yes.

2    BY MR. MANN:

3        Q.    Your anger was directed towards someone?

4        A.    Directed towards someone?

5        Q.    Let me put it this way, your anger was caused

6    by a specific person or persons?

7        A.    Yes --

8              MS. SIMPSON:  Objection.

9              THE WITNESS:  -- it was.  What they did made

10       me angry, yes.

11   BY MR. MANN:

12       Q.    Would it be what I call fighting words?

13       A.    More than that, Mike, yes.

14       Q.    It made you pretty angry, huh?

15       A.    (Nods head.)

16       Q.    And that anger, while it derived some kind of

17   feeling towards those people, didn't actually manifest

18   into anything?

19       A.    Correct.  Did not manifest into anything, no.

20       Q.    And your treatment that you did do at the VA,

21   it was -- it was brief?

22       A.    Yes.

23       Q.    But what was -- what was your -- what did they

24   tell you is the best course of action?

25       A.    To not shut down, to stay engaged with my



1  friends and do -- continue to do fun activities, such as

2  trivia, Bingo, go to concerts, because the moment I stop

3  doing those things, I would dwell on what happened to me

4  and it would be harder and it would take longer to heal

5  and not even heal completely.  Because my therapist

6  would say, you would never -- not that you won't ever

7  get over this, but it would take time to lessen the

8  pain.  And so I had to -- I have to continue to work

9  through that because obviously the pain is still here.

10         And not to be dramatic, but I'm not sure it

11  would ever go away because whatever happened to me,

12  happened to me.  It can never be undone, right?  I can

13  go to all the concerts.  I can do all the trivia.  I can

14  go to all the Bingo.  But in a day, it doesn't take away

15  what Signature Aviation wrongfully and unjustly did to

16  me.  And I don't -- again, not to be dramatic about it,

17  but I'm not sure it will ever go away.

18       Q.   You're holding a pin today, right?

19       A.   Right.

20       Q.   It says "love" on it.

21       A.   I've been holding it all day.

22       Q.   Why are you holding that pin?

23       A.   One, to try to talk slower, to remain calm

24  because -- actually this pin is -- to know me, I go to a

25  lot of Dave Matthews Band concerts -- 185 to be roughly




1  around that amount -- and to know the music and the

2  lyrics is based on love and kindness and peace.  So I

3  embody that.  I live that.  And to have that disrupted

4  by something that I did not do and they lied and claimed

5  I did unjustly and wrongfully, I have this just to try

6  to stay calm.

7         And that's why I go to concerts because --

8  even this year, when all this started to come back up as

9  far as the request for the deposition, request for

10 mediation again, this year I was like, go to as many

11 concerts as you can just to stay away from the thought

12 of dealing with this.  And I literally went to about 20

13 concerts this year, DMB alone.  I went to others, like

14 Avery Brothers and Eagles and other artists that I love

15 and enjoy.  But DMB, which to me is my soul because --

16 not only the music, but the people that I surround

17 myself with, they're the same caliber of people of love

18 and peace and integrity and honor and respect.  And I

19 surround myself with that and I keep my circle very

20 small because of that.  I don't bother anyone and no one

21 should ever bother me because I don't bother anyone.

22 But in the situation that happened at Signature, they

23 bothered me and they lied on me.  And they continue to

24 lie on me to this day.

25     Q.   Let me ask you this:  The litigation is not



1 | what caused you to have this.  It's the actions of the
2 | company, isn't it?
3 |     A.   Absolutely, yes.
4 |     MS. SIMPSON:  Objection.
5 |     THE WITNESS:  The termination letter and the
6 |     treatment afterwards.
7 | BY MR. MANN:
8 |     Q.   You mentioned earlier that Sherri Miller
9 | appeared to be crying when she called you?
10 |     A.   Not appeared, she was crying on the phone.
11 |     Q.   Do you know why she was crying?
12 |     A.   She even said that I can't believe I'm doing
13 | this.  I remember that to this day.  And in my head I'm
14 | thinking, then why are you doing it?  If you know what
15 | you're saying is a lie then why are you doing this.  And
16 | I didn't say it on the phone because I was --
17 |     Q.   Yeah, you thought it --
18 |     A.   I thought it.
19 |     Q.   -- but you didn't say it.
20 |     A.   I didn't say it.
21 |     Q.   And you said you were shocked at the time?
22 |     A.   Absolutely shocked.
23 |     Q.   So you didn't say anything?
24 |     A.   No, because I did not want to -- I wasn't sure
25 | if the call was being recorded and I wanted to not



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                    270

1  appear --

2      Q.   Did they tell you it was being recorded?

3      A.   I don't think -- I don't recall them saying

4  that.  But just my fear of it was I didn't want them to

5  further use that to retaliate against me any further

6  than they had already had at that point in time.  So I

7  did not say anything except for towards the end when I

8  confirmed with Dan Cunico that, yes, he had my personal

9  e-mail, my personal phone number and my physical mailing

10  address correct.  And so other than that, I just

11  listened to Sherri talk.  But again, as I mentioned

12  earlier, I didn't realize until afterwards that what she

13  was reading was the termination letter.  And when I got

14  it in person and physically, that was the first day I

15  cried because I could not believe she put her name to

16  those lies.

17          I know Dan did not know me, but I will speak

18  to that because as an HR person you would think if you

19  say in a term letter that there's someone you know to

20  have unremarkable engagement, you have the personnel

21  file to back that up and they do not.  He knew they did

22  not, yet he signed his name to that anyways.

23      Q.   The only document we went over today that has

24  anything to do with your performance is one that --

25      A.   The term letter.



 1            MS. SIMPSON:  Objection.

 2   BY MR. MANN:

 3       Q.   The Gallup, right?

 4       A.   Yeah, but that's not a true assessment of my

 5   performance or my engagement.

 6       Q.   Exactly.

 7       A.   There's no -- they never produced a

 8   performance improvement plan.  They never produced a

 9   poor review.  They never produced a bad evaluation.

10   They never produced any e-mails saying that I was

11   showing a lack of engagement, even trending toward --

12       Q.   If you had been told those things, what would

13   you have done?

14       A.   Correct it immediately.

15            MR. MANN:  Okay.  That's it.  She may have

16       some questions.

17            THE WITNESS:  Okay.

18                    REDIRECT EXAMINATION

19   BY MS. SIMPSON:

20       Q.   I just want to understand.  You don't care

21   about money?

22       A.   It doesn't control my actions.

23       Q.   You're seeking over $2 million in this case,

24   right?

25       A.   Because of the front pay calculation.



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                                  272

1      Q.   But you've been making more in your current

2  employer than you did at Signature, right?

3      A.   That is correct.

4      Q.   So you care about money?

5      A.   No, I don't care about money.  Because I

6  didn't tell them to pay 145.  They paid me that based on

7  my experience and what they need from me.  I didn't say,

8  hey, pay 145 because Signature paid me less than that.

9      Q.   But this litigation is bringing up hard

10  feelings for you, right?

11      A.   Oh, absolutely, yes.

12      Q.   And the purpose of the litigation is to get

13  money, right?  You don't want your job back with

14  Signature, correct?

15           MR. MANN:  Objection.

16           THE WITNESS:  This litigation is not about

17      money.  I'm not doing this for the money.  I'm

18      doing this because they lied on me.

19  BY MS. SIMPSON:

20      Q.   That's your opinion, right?

21      A.   That's my opinion, yes, which I can back it up

22  with facts.

23           MS. SIMPSON:  I have no further questions.

24           MR. MANN:  That's it.

25           THE COURT REPORTER:  All right.  Read or



1   waive?

2        MR. MANN:  And this is adjourned, but it is

3   open.

4        THE COURT REPORTER:  Okay.

5        MS. SIMPSON:  Are you going to read?

6        MR. MANN:  Yes.

7        THE COURT REPORTER:  Do you want this typed

8   up?

9        MS. SIMPSON:  Not right now.

10        THE COURT REPORTER:  If she orders, I will let

11   you know.

12        MR. MANN:  Okay.

13        (The deposition adjourned at 6:36 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25



FREDERICK SAUNDERS                                    November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              274

1                        CERTIFICATE OF OATH

2

   STATE OF FLORIDA
3
   COUNTY OF ORANGE
4

5       I, DAYNA JONES, FPR, Shorthand Reporter and Notary

6   Public, State of Florida, certify that FREDERICK

7   SAUNDERS personally appeared before me and was duly

8   sworn/affirmed.

9       WITNESS my hand and official seal this 30th day of

10  November, 2023.

11

12

13

14

15

16

17

18  *Dayna Jones*
    _____
19      Dayna Jones, FPR, Notary Public
        State of Florida, My Commission:
20      HH094883, Expires:  March 15, 2025

21

22
    **Personally Known _____ OR Produced Identification X
23  Type of Identification Produced:  Florida Driver's
    License
24

25



1                        CERTIFICATE OF REPORTER

2

     STATE OF FLORIDA
3
     COUNTY OF ORANGE
4

5          I, DAYNA JONES, FPR, Shorthand Reporter and Notary

6     Public, State of Florida, HEREBY CERTIFY that I was

7     authorized to and did stenographically report the

8     deposition of FREDERICK SAUNDERS; that a review of the

9     transcript was requested; and the foregoing transcript,

10    pages 1 through 273, is a true and accurate record of my

11    stenographic notes.

12         I FURTHER CERTIFY that I am not a relative,

13    employee, attorney or counsel of any of the parties, nor

14    am I a relative or employee of any of the parties'

15    attorneys or counsel connected with the action, nor am I

16    financially interested in the action.

17         Dated this 22nd day of December, 2023.

18

19

20

21

22

23                      *Dayna Jones*
                       _____
24                     DAYNA JONES, FPR, Notary Public
                       State of Florida at Large
25

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

FREDERICK SAUNDERS                                          November 30, 2023
SAUNDERS V. SIGNATURE FLIGHT SUPPORT                              276

```
1                    DEPOSITION ERRATA SHEET

2   Our Assignment No.:  J10698486

3   Case No.:  6:23-CV-0230-RBD-LHP

4

5            DECLARATION UNDER PENALTY OF PERJURY

6            I declare under penalty of perjury that I have

7   read the entire transcript of my Deposition taken in the

8   captioned matter or the same has been read to me, and

9   the same is true and accurate, save and except for

10  changes and/or corrections, if any, as indicated by me

11  on the DEPOSITION ERRATA SHEET hereof, with the

12  understanding that I offer these changes as if still

13  under oath.

14           Signed on the _____ day of_____,

15  20____.

16

17                    _____

18                    FREDERICK SAUNDERS

19

20

21

22

23

24

25
```



```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE:_____

25
```

