1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
2                          ORLANDO DIVISION

3

4    FREDERICK SAUNDERS,

5             Plaintiff,

6    vs.                         Case No. 6:23-cv-0230-RBD-LHP

7

     SIGNATURE FLIGHT
8    SUPPORT, LLC, a Delaware
     limited company,
9
              Defendant.
10   _____/

11

12

13   DEPOSITION OF:       FREDERICK SAUNDERS - VOLUME 2

14   DATE:                WEDNESDAY, FEBRUARY 21, 2024

15   TIME:                9:40 A.M. - 12:00 P.M.

16   PLACE:               390 NORTH ORANGE AVE, SUITE 1285
                          ORLANDO, FLORIDA 32801
17
     STENOGRAPHICALLY
18   REPORTED BY:         ANEESHA WILLIAMS, CSR, NOTARY PUBLIC

19

20

21

22

23

24

25



1    A P P E A R A N C E S:

2    MICHAEL G. MANN, ESQUIRE
     OF:   THE COCHRAN FIRM ORLANDO, LLC
3          605 East Robinson Street
           Suite 140
4          Orlando, Florida 32801
           (407) 271-8590
5          mmann@cochranfirm.com

6          APPEARING ON BEHALF OF THE PLAINTIFF

7

     AMANDA A. SIMPSON, ESQUIRE
8    LIN J. WAGNER, ESQUIRE
     OF:   JACKSON LEWIS, P.C.
9          390 North Orange Avenue
           Suite 1285
10         Orlando, Florida 32801
           (407) 246-8440
11         amanda.simpson@jacksonlewis.com

12         APPEARING ON BEHALF OF THE DEFENDANT

13

     ALSO PRESENT:

14
           MATTHEW KLEIN, Signature Flight Support

15
           Corporate Representative

16

17

18

19

20

21

22

23

24

25



```
 1                        I N D E X

 2

 3    TESTIMONY OF FREDERICK SAUNDERS

 4    DIRECT EXAMINATION BY MS. SIMPSON ................... 5

 5    CROSS-EXAMINATION BY MR. MANN ...................... 82

 6    REDIRECT EXAMINATION BY MS. SIMPSON ............... 84

 7    CERTIFICATE OF OATH ............................... 86

 8    CERTIFICATE OF DEPOSITION TRANSCRIPT ............... 87

 9    ERRATA SHEET ..................................... 88

10

11

12                    INDEX OF EXHIBITS

13    DEFENSE EXHIBITS

14    EXHIBIT 1       Text Message Correspondence      17

15    EXHIBIT 2       Text Message Correspondence      20

16    EXHIBIT 3       July 25, 2022 E-Mail            21

17    EXHIBIT 4       Text Message Correspondence      28

18    EXHIBIT 5       Text Message Correspondence      32

19    EXHIBIT 6       Text Message Correspondence      38

20    EXHIBIT 7       Text Message Correspondence      43

21    EXHIBIT 8       Text Message Correspondence      45

22    EXHIBIT 9       Text Message Correspondence      48

23    EXHIBIT 10      Text Message Correspondence      49

24    EXHIBIT 11      Text Message Correspondence      50

25    EXHIBIT 12      Text Message Correspondence      52
```



1   EXHIBIT 13          Text Message Correspondence          56

2   EXHIBIT 14          Text Message Correspondence          59

3   EXHIBIT 15          Text Message Correspondence          61

4   EXHIBIT 16          Text Message Correspondence          62

5   EXHIBIT 17          Text Message Correspondence          66

6   EXHIBIT 18          Text Message Correspondence          68

7   EXHIBIT 19          Text Message Correspondence          71

8   EXHIBIT 20          Text Message Correspondence          72

9   EXHIBIT 21          Text Message Correspondence          75

10

11   ** Note:  Exhibits were retained by Amanda Simpson,
     Esquire, and were not required to be attached to the
     deposition transcript

12

13

14

15

16                        ------

17              S T I P U L A T I O N S

18        It is hereby stipulated and agreed by and

19   between the counsel for the respective parties and the

20   deponent that the reading and signing of the deposition

21   transcript be read.

22                        ------

23

24

25



1                    P R O C E E D I N G S

2                         *********

3                   (Witness sworn.)

4              FREDERICK SAUNDERS (continued),

5    was called as a witness and, having first been duly

6    sworn, testified as follows:

7                    DIRECT EXAMINATION

8    BY MS. SIMPSON:

9       Q.   Good morning, Mr. Saunders.  As you know, I'm

10   Amanda Simpson.  I'm an attorney with Jackson Lewis, and

11   I represent Signature in connection with the claims

12   brought against us.  We're here for purposes of your

13   continued deposition.

14            Do you understand that?

15      A.   Yes.

16      Q.   And you understand that you're still under

17   oath?

18      A.   Yes.

19      Q.   And you understand that you have sworn to tell

20   the truth?

21      A.   Yes.

22      Q.   Okay.  And so as we discussed, you're here in

23   person, your attorney is observing via video stream, and

24   he is also on the telephone.

25            Do you understand that?



1       A.   Yes.

2       Q.   Okay.  Just a couple of reminders from the

3  first day.  If you don't hear or understand a question,

4  say so, and I'll repeat it or rephrase it.

5            Do you understand that?

6       A.   Yes.

7       Q.   If you answer the question, I will assume

8  you've heard it, understood it, and have given it your

9  best answer.

10           Is that fair?

11      A.   Yes.

12      Q.   You're doing great this morning, but just make

13  sure that you have an audible answer, not a head nod, so

14  the court reporter can take down your answers.  Okay?

15      A.   Yes.

16      Q.   All right.  Are you taking any drugs or other

17  medication or are you under the effects of alcohol or any

18  or substance which might affect your ability to recall

19  past events or answer my questions today?

20      A.   No.

21      Q.   Did you do anything to prepare for today's

22  deposition?

23      A.   No.

24      Q.   You did not speak to anyone?

25      A.   No.



1      Q.   Did you review any documents?

2      A.   No.

3      Q.   How did you know that today's deposition was

4   happening?

5      A.   From my lawyer yesterday.

6      Q.   Okay.  So were you aware that the continued

7   deposition was previously set and that we had to reset it

8   for today?

9      A.   No.

10      Q.   And since your last deposition, which was back

11   on November 30th, have you communicated with anyone

12   besides your attorney regarding your claims?

13      A.   Yes.

14      Q.   And who have you communicated with?

15      A.   My mother, my girlfriend.

16      Q.   Is that the same girlfriend that we talked

17   about previously who lived in Canada?

18      A.   No.  That girlfriend does not live in Canada.

19      Q.   Okay.  Which girlfriend is this?

20      A.   The one that's in Middleburg, Florida.

21      Q.   What's her name?

22      A.   Rebecca Warner.

23      Q.   Okay.  Anyone else?

24      A.   Not that I can think of right now.  Those

25   three.  Actually, my sister.



1      Q.    What's your sister's name?

2      A.    Alice Saunders.

3      Q.    And I'm sorry.  I should have asked.  What's

4  your mother's name?

5      A.    Gwendolyn Saunders.

6      Q.    Thank you.

7            So since your deposition, have you spoke with

8  Jan Chalk about your claims?

9      A.    No.

10     Q.    Since your deposition, have you spoke with

11  David Jordan about your claims?

12     A.    No.

13     Q.    So today we're going to review some text

14  messages that you provided.

15            When I'm asking about communication, you

16  understand that I'm talking about either oral, texting,

17  or e-mailing?

18     A.    Yes.

19     Q.    Okay.  So just so I'm clear, besides the family

20  members and your girlfriend that you've listed, you have

21  not spoke, texted, e-mailed, messaged or in any other way

22  communicated with anyone else besides your attorney about

23  your claims?

24     MR. MANN:  Objection.

25     THE WITNESS:  I do not recall.



 1  BY MS. SIMPSON:

 2      Q.   Do you think you could have texted with

 3  somebody about your claims since your November 30th

 4  deposition?

 5      A.   I do not recall.

 6      Q.   Do you think you could have e-mailed with

 7  somebody since your November 30th deposition about your

 8  claims?

 9      A.   I do not recall.

10      Q.   Let's talk about when you worked at Signature.

11           How would you communicate with other Signature

12  employees?  Did you communicate via company e-mail?

13      A.   Yes.

14      Q.   Did you have a company phone?

15      A.   Yes.

16      Q.   Did you communicate with them via text on your

17  company phone?

18      A.   Rarely.

19      Q.   Did you communicate with them via your personal

20  phone?

21      A.   Rarely.

22      Q.   Who at Signature would you communicate with via

23  your personal phone?

24      A.   That could be, if anyone, Sherri Miller.

25      Q.   And I'm not trying to trick you.  You produced



1  some text messages from September when you were still

2  employed with the company, and those were with Jan Chalk.

3          So did you also text with Jan Chalk via your

4  personal phone?

5      A.   Yes, I believe so.  Yes.

6      Q.   Okay.  Any other AAMs that you would text with

7  via your personal phone?

8      A.   I would think -- not at all of them, but the

9  first -- my first team and second team at some point or

10 another in those four years.

11     Q.   Okay.  Did you ever have, like, group chats

12 with your team, like a text message with multiple AAMs?

13     A.   I do not recall that.

14     Q.   But you recall individual text messages with

15 your AAMs?

16     A.   I believe so, yes.

17     Q.   During your employment with Signature, did you

18 ever utilize, like, a messaging system to communicate

19 with your team?

20     A.   Like Teams chat, I think.

21     Q.   Something like that.

22     A.   Yes, the company's chat service.

23     Q.   Okay.  Got it.

24          Any personal messaging service?

25     A.   I do not believe so, no.



1        Q.    And so we're going to talk about it today.

2   We've received some text messages from you.

3            But who do you recall texting with from

4   Signature after your termination?

5        A.    I do not recall.  I mean, besides Jan, I can't

6   think of anyone else that I've ever texted.

7        Q.    Do you recall texting David Jordan?

8        A.    Possibly, like almost three years ago.

9        Q.    Did you e-mail with any Signature employees

10  after your termination?

11       A.    I do not recall.

12       Q.    What is your personal e-mail address?

13       A.    fsankh@yahoo.com.

14       Q.    Just to make sure I have that right,

15  f-s-a-n-k-h?

16       A.    Yes.

17       Q.    Thank you.

18            Do you have any other e-mail addresses besides

19  that after your termination from Signature?

20       A.    The same username, but at Google or Gmail.com.

21  I rarely use that account.

22       Q.    Did you use any personal messaging service to

23  communicate with Signature employees after your

24  termination?

25       A.    Personally or personal...



1     Q.   So you had indicated that during the time you
2   worked for Signature there was a company messaging
3   service like Teams or something.
4          After your separation, did you ever use any
5   sort of messaging service or WhatsApp or something else
6   to communicate with individuals from Signature?
7     A.   I do not believe so.  I don't think so.
8     Q.   Okay.  Thanks.
9          So I know we're going back to November 30th,
10  but do you remember during your first day of the
11  deposition that you testified that you had some text
12  messages that you were going to review and supplement
13  your production with?
14    A.   No.
15    Q.   You do not recall that?
16    A.   No.
17    Q.   Do you recall indicating that you had some
18  witness information that you were going to supplement
19  your discovery responses with?
20    A.   No.
21    Q.   Do you recall indicating that you were going to
22  review to determine whether there were any other
23  documents, including e-mails, that you had not produced
24  relevant to your claims?
25    A.   No.



1      Q.   Do you recall taking a video of scrolling
2  through your text messages?
3      A.   I did not do that.  The law firm did that.
4      Q.   Okay.  So you're aware of someone videoing your
5  text messages?
6      A.   Yes, the law firm.
7      Q.   So did you turn your phone over to the law
8  firm?
9      A.   Yes.
10     Q.   Okay.  Do you know the individual who took a
11 video?
12     A.   I have no idea who that was.
13     Q.   Approximately when did you turn your phone over
14 to the law firm?
15     A.   I do not recall.
16     Q.   Was it more or less than a month after your
17 deposition on November 30th?
18     A.   I do not recall.
19     Q.   Was it in the past month?
20     A.   I do not recall.
21     Q.   Do you know what text messages of videos were
22 produced to us?
23     A.   I have no idea.
24     Q.   So you did not have an opportunity to review
25 the video of text messages that were provided to us?



1      A.   No.

2      Q.   Okay.  Did you, following your deposition, ever

3   look through your text messages to determine what you had

4   that was relevant to this case?

5      A.   No.

6      Q.   Do you know sitting here today whether you

7   still have text messages with Jan Chalk?

8      A.   Yes.

9      Q.   And do you know how long those text messages go

10   back for?

11      A.   I would say since I was her regional accounting

12   manager.  So that would be October of '20.  I believe a

13   year.  Yes, a year.  So what was that, almost four years

14   now?

15      Q.   Okay.  Do you know sitting here today whether

16   you have text messages on your phone with David Jordan?

17      A.   Probably in the same time period if I do have

18   them.

19      Q.   Same question for Sherri Miller.

20      A.   Longer.  I think 2017 when I was a RAM, first

21   became a RAM.

22      Q.   Did you ever text with Chris DeJong?

23      A.   Actually, not.  No.

24      Q.   And to the extent -- because I know you don't

25   remember -- but that you have texts with other AAMs,



 1  would those also go back to when you first initiated

 2  contact with them?

 3      A.   October 2017, yes.

 4      Q.   And why that date?

 5      A.   That's when I became a RAM.

 6      Q.   Got it, okay.  That makes sense.  Thank you.

 7           So just because you haven't seen the video,

 8  I'll represent to you that the video of scrolling through

 9  the text messages with Jan Chalk started in about

10  September 2021.

11           Do you know why the text messages only start at

12  September 2021?

13      A.   No idea.

14      MR. MANN:  Objection.

15  BY MS. SIMPSON:

16      Q.   Are you aware of the Court issuing an order

17  compelling you to produce text messages for the relevant

18  time period of April through September 2021?

19      A.   No.

20      Q.   So I'm assuming because you're not aware, that

21  you didn't look to see whether you had any text messages

22  from April to September 20th, '21?

23      A.   No.

24      MR. MANN:  Objection.

25



 1   BY MS. SIMPSON:

 2        Q.   But you think that your phone has text messages

 3   back with Jan from 2020?

 4        A.   I would say 2017.

 5        Q.   Okay.  At any point did you try to produce text

 6   messages in a text-based format?

 7        A.   Explain the question.

 8        Q.   At any time did you try to take snapshots of

 9   the text messages to produce them in this case?

10        A.   I do not recall.

11        Q.   You can tell from my questioning we're trying

12   to obviously just get the complete set of text messages.

13             Would you be open to a third-party vendor

14   downloading your text messages from the relevant

15   custodian for the relevant time period?

16        THE WITNESS:  Mike?

17        MR. MANN:  Yeah, we're open to it.  I was going to

18   suggest that anyway.  That would be the easiest way.

19   We were under a time constraint, so I didn't think we

20   could get it done in time, but I'm open to it if you all

21   want to do it.

22        MS. SIMPSON:  Okay.  I appreciate it, and I'll

23   confer with my client on that.  Thank you.

24   BY MS. SIMPSON:

25        Q.   So have you reviewed any text messages in



1  preparation for the deposition today?

2       A.   No.

3       Q.   Did you know that the deposition was going to

4  be covering text messages?

5       A.   No.

6       Q.   So similar to the first deposition, I'm going

7  to show you some exhibits.  My paralegal actually went

8  through the video to try to screen shot them so that we

9  have examples.

10           Take your time, review them, and then we can

11  proceed with the questions, okay?

12       A.   Yes.

13       MS. WAGNER:  Amanda, to confirm, is that Tab No. 1?

14       MS. SIMPSON:  So, Mike, Lin is going to be sharing

15  the exhibits for you on Zoom.  Please let me know if you

16  can see it or if you have any issues.

17       MR. MANN:  I can see it just fine.  Thank you.

18       MS. SIMPSON:  And, Lin, my apologies.  I'll let you

19  know what tab number I'm doing.

20           So this was Tab No. 1.  It's going to be marked

21  as Defendant's Exhibit No. 1.

22           (Deposition Exhibit No. 1 was

23            marked for identification.)

24  BY MS. SIMPSON:

25       Q.   So Mr. Saunders, I'm showing you a text message



1    that was on the recording produced between you and Jan.

2            Do you see on the first page that it's

3    July 21st, 2022?

4        A.   Yes.

5        Q.   Okay.  And you understand that the blue text

6    messages are yours and the gray on the left are Jan's?

7        A.   Yes.

8        Q.   And at the bottom of that first set of text

9    messages, do you say that you say, "Absolutely.  Starting

10   the recording now"?

11       A.   Yes.

12       Q.   What were you recording?

13       A.   The EEOC mediation.

14       Q.   Okay.  Do you still have a copy of that

15   recording?

16       A.   On my phone, yes.

17       Q.   Have you provided it to your attorney?

18       A.   No.  I tried to.

19       Q.   What do you mean you "tried to"?

20       A.   I tried to send him the file.

21       Q.   Is that the video file that you recently tried

22   to send last week, and it was too large and didn't go

23   through?

24       A.   Correct.

25       Q.   Got it.



1           Was anyone aware that you were going to be

2    recording the EEOC mediation?

3       A.   Just Jan Chalk.

4       Q.   And why did you record the EEOC mediation?

5       A.   Because she wanted to hear the lies that

6    Signature continued to tell, and we have a trauma bond.

7       Q.   Did you send Ms. Chalk the EEOC mediation

8    recording?

9       A.   No.

10      Q.   Did you try to?

11      A.   Yes.

12      Q.   How did you try?

13      A.   The same way I tried to send it to Mike,

14   through text.

15      MS. SIMPSON:  Tab 3.

16      MR. MANN:  Can you give me the Bates numbers for

17   these?

18      MS. SIMPSON:  Absolutely.  FS -- well, these are

19   internal Bates numbers because we took them off the

20   video.

21      MS. WAGNER:  Yes.

22      MS. SIMPSON:  So we --

23      MR. MANN:  Okay.

24      MS. SIMPSON:  Yeah, it's just --

25      MR. MANN:  You want to adopt these or...



1      MS. SIMPSON:  Sure.  We can do that for purposes of

2  the record to make it clear.  And then we'll send you

3  copies after the deposition.

4          So Mike, Exhibit No. 1 is FS020087.

5      MR. MANN:  Through 90?

6      MS. SIMPSON:  Yes, 020090.  And then Exhibit No. 2

7  is 91.

8      MR. MANN:  Okay.

9          (Deposition Exhibit No. 2 was

10          marked for identification.)

11  BY MS. SIMPSON:

12     Q.   So Mr. Saunders, I'm showing you what's been

13  marked as Exhibit No. 2.

14          Do you see that this is a text from you to

15  Jan on July 22nd, 2022?

16     A.   Yes.

17     Q.   And do you see that it indicates at the top

18  right, "Good morning.  I sent the video to your personal

19  e-mail"?

20     A.   Yes.

21     Q.   Is this referring to the EEOC mediation video?

22     A.   Yes, but the e-mail did not go through.

23     Q.   How do you know the e-mail didn't go through?

24     A.   Because she told me it did not go through.

25     Q.   Okay.  Did you send the EEOC mediation video or



1  attempt to to anyone besides Ms. Chalk?

2      A.    No.

3      Q.    Did you play the EEOC video for anyone?

4      A.    Yes.

5      Q.    Who did you play it for?

6      A.    Jan Chalk.

7      Q.    How did you play it for her?

8      A.    Through my phone.

9      Q.    And you played it for her because it wasn't

10  able to be sent?

11     A.    Yes.

12     Q.    Got it.

13     MS. SIMPSON:  Tab 33.

14          (Deposition Exhibit No. 3 was

15           marked for identification.)

16  BY MS. SIMPSON:

17     Q.    I'm showing you what's been marked as

18  Exhibit No. 3.

19          Do you recognize this, Mr. Saunders?

20     A.    Yes.

21     Q.    So is this an e-mail from you dated July 25th,

22  2022 with the subject line, "Takeaways from the

23  Mediation"?

24     A.    Yes.

25     Q.    Is that also referring to the EEOC mediation?



1      A.   Yes.

2      Q.   And then what are the second and third pages

3   titled "Key Takeaways from Mediation"?

4      A.   The first page are three lies from Signature,

5   and the fourth one is the misunderstanding.

6      Q.   And it looks like it was notes from my opening

7   statement at mediation?

8      A.   I believe so.

9      Q.   And your rebuttal to that?

10      A.   Correct.

11      Q.   And the second page is with respect to the

12   termination letter that we discussed as part of

13   mediation?

14      A.   Additional lies from Signature, yes.

15      Q.   Flipping to the first page, I just want to go

16   through and understand who these individuals are.  Sorry.

17   I think you said Alice earlier today.

18           Is that your sister?

19      A.   Sister, yes.

20      Q.   Okay.  Who is Abdul?

21      A.   One of my best -- I'd say closest friends.

22      Q.   I know who Jan Chalk is.

23           Who is Deidra Adams?

24      A.   My HR consultant for this case.

25      Q.   What do you mean "HR consultant"?



1        A.    To understand how this works from an HR

2    perspective.

3        Q.    Did she used to work at Signature?

4        A.    Yes.

5        Q.    Who is Tracy Edouard, E-d-o-u-a-r-d?

6        A.    Former colleague when I was at Signature.

7        Q.    Dustin Dosvais, D-o-s-v-a-i-s?

8        A.    Former colleague of mine when I worked at

9    Signature.

10       Q.    Mary Mitchell?

11       A.    That was an ex-girlfriend at the time.

12       Q.    I'm sorry.  Is that the one that was in Canada?

13       A.    No.

14       Q.    Okay.  Ronald Senter?

15       A.    My best friend.

16       Q.    I'm just helping her with spellings.  I

17   apologize.  S-e-n-t-e-r.

18             And you were explaining --

19       A.    Best friend who lives in Phoenix.

20       Q.    Willie Saunders?

21       A.    My brother.

22       Q.    Nicole Ungaro, U-n-g-a-r-o?

23       A.    Former employer.

24       Q.    Was Ungaro Consulting that we talked about

25   during the first depo?



1    A.   Correct.

2    Q.   So at this time you were no longer working with

3  her?

4    A.   Correct, but she cared about the case and me.

5    Q.   Got it.

6         Angela Rogers?

7    A.   One of my closest friends.  They also cared

8  about me and the case, what was being done to me --

9  wrongfully done to me.

10   Q.   So I'm seeing some of these names for the first

11  time.

12        Why didn't you raise them as potential

13  witnesses with relevant information as to claims in this

14  case?

15   A.   Because there's so many I forgot.  Forgive me.

16   Q.   And you had hadn't found this document yet, as

17  of the November 30th deposition?

18   A.   I forgot about it.

19   Q.   When did you find this document?

20   A.   When you all asked me to cease and desist.

21   Q.   When you got our cease and desist letter with

22  respect to the recording of the EEOC mediation?

23   A.   Correct.

24   Q.   Okay.  So you went and looked for information

25  regarding the recording in response to that?



1        A.    Correct.

2        Q.    I appreciate that.  Thank you.

3              Did you look for text messages regarding the

4   EEOC mediation?

5        A.    No, I don't think so.

6        Q.    Okay.  Besides Jan Chalk, do you recall if you

7   texted with anyone about the EEOC mediation?

8        A.    I do not recall.

9        Q.    Did you have any oral conversations with Tracy

10  about the EEOC mediation?

11       A.    I do not recall.

12       Q.    Do you recall having any oral conversations

13  with Dustin about the EEOC mediation?

14       A.    I do not recall.

15       Q.    Okay.  And so you send this e-mail.

16             Do you get any response?

17       A.    I don't recall.

18       Q.    You don't recall if you got a response from any

19  one of the 11 people that you sent that e-mail to?

20       A.    I do not recall.

21       Q.    Did you look in your e-mail to see if anyone

22  responded?

23       A.    I do not recall.

24       Q.    Would you look in your e-mail to see if anyone

25  responded?



1      A.   I do not recall.

2      Q.   That's not responsive, sir.  I know you're

3   getting in the habit of saying "I don't recall," but --

4      A.   I don't recall.  The truth.

5      Q.   My question is would you look?

6      A.   Why would I look?  I have no reason to look.

7      Q.   Because I'm asking you to, and you have an

8   obligation to produce all relevant documents in

9   discovery.

10      A.   Okay.  I don't recall.

11      Q.   Let's take a pause for a second.  I understand

12   that you do not recall if you looked for responses to

13   your e-mail sending the key takeaways from the EEOC

14   mediation.

15           I'm asking you if you would look to see if you

16   got any responses from any of the 11 people to that

17   e-mail.

18      A.   No.

19      Q.   No, you won't?

20      A.   There's no need to look for -- it's more

21   therapeutic for me -- as my therapist said, write my

22   thoughts down on paper and to share it so I don't keep it

23   bottled up.

24      Q.   I want to be clear.  You're refusing to go and

25   look for responses to this e-mail.



1        A.   Why would I even need to go and look, I guess?

2   I don't understand the question.  There's no need --

3   e-mails come to when people respond.

4        MR. MANN:  Frederick?

5        THE WITNESS:  Yes.

6        MR. MANN:  Frederick, we'll take a double check and

7   look for it.

8        THE WITNESS:  What am I looking for, Mike?  What am

9   I looking for?  Responses?  Replies?  If that's the case,

10  why would I look for it?  Because they would be in my

11  e-mail box.  I wouldn't have to look for it.  That's why

12  I'm confused about the question.  There's no need to look

13  for it.  If there's a reply to the e-mail that I sent

14  almost two years ago, I would see the reply.

15       MS. SIMPSON:  Mike, for purposes of the record, will

16  you agree to work with your client on how to search his

17  inbox and deleted items for possible responses from the

18  11 individuals this e-mail was sent to?

19       MR. MANN:  Yeah, sure.

20            And I think what he's trying to say is that he

21  looked, and he doesn't think he needs to look again, but

22  we'll definitely -- I'll work with him.

23  BY MS. SIMPSON:

24       Q.   Is that what you're saying, Mr. Saunders?

25       A.   No, I'm not.  No, I'm not.  I didn't look.  I



1  don't have -- there's no need to look.  E-mails come in.

2  When someone replies to an e-mail, and I don't have to

3  look.  There's no looking.

4       MR. MANN:  I think we can move on.  You've got

5  our -- you've got my answer to your question and, you

6  know, you've got his.  So we can move on.

7       MS. SIMPSON:  And I'm sorry.  Just because there was

8  a lot of back and forth, is your answer, Mike, yes that

9  you will work with your client to look for responses?

10      MR. MANN:  Yes.

11      MS. SIMPSON:  Thank you.

12      MR. MANN:  Yes.

13      MS. SIMPSON:  Tab No. 4.

14           Mike, the internal Bates label is FS 020022.

15           (Deposition Exhibit No. 4 was

16            marked for identification.)

17  BY MS. SIMPSON:

18      Q.   So Mr. Saunders, I'm showing you what's been

19  marked as Exhibit No. 4, which is a text message exchange

20  between you and David Jordan.

21           Do you recognize this?

22      A.   Yes.

23      Q.   And the first page, do you see that the e-mail

24  chain on the bottom is dated July 26th, 2022?

25      A.   Text chain, yes.

1        Q.   And then on the second page --

2        A.   Which I cannot read, but continue.

3        Q.   I know it's really hard to read based on the

4   video format they gave you, but I can help you with it.

5        A.   No one gave me a video format.

6        Q.   So at the bottom of the text, it says, "Plus we

7   just had the mediation with Signature, Cochran Law Group.

8   Yes" -- and it continues on the next page -- "of Johnny

9   Cochran, laugh out loud, the new law firm who is

10  representing me on the EEOC.  I will send you a short

11  document in a few of the key takeaways, and if I may call

12  you here in about an hour to add some color to it all,"

13  and two emoji smiling, laughing, crying faces.

14           Do you see that?

15       A.   No.

16       Q.   Can you look at the exhibit?

17       A.   I looked at it.  I can't read it.

18       Q.   Can you look at it as I read it aloud so we can

19  try?

20       A.   What am I looking at?

21       Q.   Second page.

22       A.   I cannot read that.

23       Q.   Can you just listen to what I'm reading aloud

24  and directing you where it is and try to read along with

25  it.



1        MS. SIMPSON:  Mike, are you having trouble reading

2   it?

3        MR. MANN:  Well, I can only read what's on the

4   screen.

5        MS. SIMPSON:  Okay.

6        MS. WAGNER:  I've been scrolling with you reading

7   it.

8   BY MS. SIMPSON:

9        Q.   Okay.  So let's try this again.

10           At the bottom of page 2 -- Mr. Saunders, I need

11  you to look at the document so that we can do this

12  together.

13       A.   I cannot read this.

14       Q.   Do you want to take out your phone and find

15  this text message from David Jordan instead, or do you

16  want to try to read with me?

17       A.   I'll take out my phone.

18       Q.   It's from July 26th, 2022.

19       A.   Okay.

20       Q.   So you see the July 26th, 2022, and he goes,

21  "Hey, Mr. Saunders."  And then you respond, "Ahhh,

22  Mr. Jordan"?

23       A.   Yes.

24       Q.   So in the middle of that long text, I'm going

25  to read aloud, "Plus we just had in the mediation with

1  Signature.  Cochran Law Group, yes, of Johnny Cochran,

2  laugh out loud, the new firm who is representing me in

3  the EEOC.  I will send you a short document in a few of

4  the key takeaways.  And if I may call you here in about

5  an hour to add some color to it all."  Smiley emoji and

6  laughing crying emoji.

7            Do you see that?

8       A.   Yes.

9       Q.   Okay.  Is this talking about the same key

10  takeaways document that we just reviewed?

11      A.   Yes.

12      Q.   And so David Jordan wasn't identified in that

13  e-mail.

14            Did you send it to him in a different e-mail?

15      A.   Yes.

16      Q.   I don't have a copy of that e-mail.

17            Would you agree to look for and produce that?

18      A.   Yes.

19      Q.   Thank you.

20            Did you have a call with Mr. Jordan after you

21  sent him the key takeaways document?

22      A.   I do not recall.

23      Q.   Do you recall providing that key takeaways

24  document to anyone else?

25      A.   I do not recall.  It's been almost two years



```
 1  ago.
 2      Q.   Was anyone aware that you were making this key
 3  takeaways document?
 4      A.   No.  I do it for myself.
 5      Q.   Okay.  Jan Chalk wasn't aware of that?
 6      A.   No.
 7      Q.   She was just aware of the recording of the
 8  EEOC?
 9      A.   That she asked me to record, yes.
10      Q.   Got it.  Okay.
11      MS. SIMPSON:  Tab 5, Internal Bates label FS 020217
12  to 223.
13           (Deposition Exhibit No. 5 was
14            marked for identification.)
15  BY MS. SIMPSON:
16      Q.   So Mr. Saunders, I know there's a lot here.
17  I'm just going to ask you about the first one.  I can
18  represent to you -- I mentioned it earlier -- but this is
19  the earliest text that we have between you and Jan Chalk.
20           Do you see at the top that it's dated
21  September 23rd, 2021?
22      A.   Yes.
23      Q.   Could you do me a favor since you pulled out
24  your phone and just see if you have text messages with
25  Jan prior to this time?
```



1       A.   I have September 23rd, 2021.

2       Q.   And the question was do you have texts before

3   that?

4       A.   That's the first one that I have.

5       Q.   You don't have any texts before that?

6       A.   No.

7       Q.   Do you know why?

8       A.   No.

9       Q.   Do you have an auto deletion on your phone?

10      A.   No.

11      Q.   Does that surprise you, that there's no texts

12  before that time?

13      A.   No, I don't think it surprises me.

14      Q.   I thought you had indicated you probably have

15  texts since 2017.

16      A.   Probably doesn't mean I did.

17      Q.   Okay.

18      A.   Plus, again, this is my personal phone, not my

19  work phone.

20      Q.   What do you mean by that?

21      A.   Not my work phone.

22      Q.   Are you telling me that you texted Ms. Chalk

23  about the relevant events of this case with respect to

24  her letter raising concerns about her pay that you edited

25  via your company phone?



1        A.   Say that again.

2        Q.   So I'm looking for text messages from

3   April 2021 through September 2021, and so I'm trying to

4   understand where they would be.

5        A.   On my work phone more likely.

6        Q.   I thought you testified that you regularly used

7   your work phone to communicate.

8        A.   That's true.

9        Q.   So do you recall texting Jan at all when the

10   two of you were going back and forth revising her

11   correspondence to HR and management about her pay?

12        A.   No.  It was all e-mails, I believe.  All

13   e-mails.

14        Q.   You never texted her at all during that time?

15        A.   I don't recall.  No.

16        Q.   Let's do the same for David Jordan.

17             Can you go to his texts in your phone and let

18   me know when the first date is.

19        A.   March 3rd, 2021.

20        Q.   So you have texts with David during the

21   relevant time but not Jan?

22        A.   And to make it make sense, they were texting

23   because he was using his personal phone because the work

24   phone would not, I guess, transmit a lost connection.

25   That's why.  But other than that, it was rare that we



 1   used personal phones for work besides -- it was rare for

 2   me to use personal phones during work or for work.  I

 3   used my work phone for --

 4        Q.   Why did you use your personal phone in

 5   September 2021 when you were still employed with

 6   Signature to text Jan?

 7        A.   I do not recall what the reason was for.

 8        Q.   Did you delete any text messages with Jan prior

 9   to September 2021?

10        A.   I don't think so, no.

11        Q.   I'm going to go through a couple names.  If you

12   could look in your phone to see if you have text

13   messages, it would help us for determining a possible

14   custodian for our third-party vendor if that's the route

15   we take.

16             Do you have any text messages with AAM Lisa

17   Hay?

18        A.   No.

19        Q.   You're positive you don't even need to look?

20        A.   I do not believe -- I'll double check, but I

21   rarely talked to her at all.

22        Q.   And just because -- it'll help you if you run

23   across another one, you can imagine I'm going to ask

24   about all the AAMs.

25        A.   Sorry.  Yeah, December 17th, 2020.



1        Q.   With Lisa Hay?

2        A.   Yes.  I didn't recall that.  It was, like, four

3   in total.  One from me and three from her, so...

4        Q.   I apologize.  Were you done?

5        A.   Like I said, again, there was four.  One from

6   me and three from her.

7        Q.   Okay.  And what's the date?

8        A.   The first one from me is December 17th, 2020.

9        Q.   Got it.

10       A.   And then she responds, so the same time frame.

11  The third one is from April -- from her, April 8th

12  remember giving me the name of either her general manager

13  or director at the time, Izza (phonetic) Lee.  And then

14  also April 8, 2021, she sent me a text about -- it looks

15  like we tried to get a temp person to backfill a spot for

16  the time being.  She needed approval on that, so that's

17  pretty much it.  That is it, so...

18       Q.   What about Sherri Battle?

19       A.   Actually, nothing.

20       Q.   Vanessa Franklin?  I think she goes by Tracy

21  Franklin.

22       A.   Renee.

23       Q.   Renee.  Sorry.

24       A.   I've got nothing from her either.

25       Q.   Okay.  Brian Furman (phonetic)?



1      A.    Two.   One from August 5th, 2019 saying, "I'll

2  call you back around 4:15."   And then one October 19th,

3  2020, "Can I call you later?"   Those two.

4      Q.    Okay.   Laurie Golda?

5      MR. MANN:   Who was that?

6      MS. SIMPSON:   Laurie Golda, G-o-l-d-a.

7      THE WITNESS:   None.

8  BY MS. SIMPSON:

9      Q.    Okay.   Gregory Gunter?

10     A.    August 23rd, 2018.

11     Q.    That's it?

12     A.    As far as the earliest it goes back.

13     Q.    Okay.   Sharon Hartman?

14     A.    None.

15     Q.    Sandra Montalbano, M-o-n-t-a-l-b-a-n-o?

16     A.    October 26, 2021.

17     Q.    Daniel Morales?

18     A.    December 10th, 2019.   Wait.   Hold on.

19     Q.    They start December 2019?

20     A.    Yes.

21     Q.    Robert Benziger?

22     A.    May 16th, 2022.

23     Q.    Dustin.   Do you know who I'm talking about?

24  His last name is Dosvais.

25     A.    November 22nd, 2019.



1        Q.   Tracy Edouard?

2        A.   April 26, 2017.

3        Q.   Sherri Miller?

4        A.   April 24, 2019.

5        Q.   And if we can go back to January for a second,

6    can you tell me the last date of a text with her?  I

7    apologize.  I should ask have asked that before.

8        A.   December 26th.  That was last year.

9        Q.   Thank you.

10            (Deposition Exhibit No. 6 was

11             marked for identification.)

12   BY MS. SIMPSON:

13       Q.   I'm showing you what's been marked as

14   Defendant's No. 6.

15            And, Mike, the Bates label is going to be

16   FS 020225 to 230.

17            So Mr. Saunders, on the first page at the

18   bottom, if you can put the exhibit in front of you so we

19   can go through it to together.

20            Do you see that that text chain at the bottom

21   starts September 29th, 2021?

22       A.   Yes.

23       Q.   And do you see that it's a text from you to Jan

24   talking about your Ethics hotline complaint?

25       A.   Yes.



1    Q.   And then if you flip to the second page, do you

2    see that text continues and you say, "I'm going to ask

3    Sandy and Greg to do the same"?

4    A.   Yes.

5    Q.   And did you, in fact, talk to Sandy or Greg

6    about also filing an Ethics hotline complaint?

7    A.   No.

8    Q.   Why not?

9    A.   I changed my mind.  I did not.

10    Q.   Do you know if they ever submitted an Ethics

11    hotline complaint?

12    A.   I have no idea.

13    Q.   Do you know if Jan talked to them about filing

14    an Ethics hotline complaint?

15    A.   I have no idea.

16    Q.   And just so I'm clear, is Sandy and Greg

17    referring to the AAMs Sandy and Greg?

18    A.   I believe so.

19    Q.   It's your text, so I just want to make sure

20    that that's who it's referring to.

21    A.   I believe so.

22    Q.   Okay.  You weren't asking any other Sandy and

23    Greg to potentially file an Ethics hotline complaint,

24    right?

25    A.   What other Sandys and Gregs would be interested



1    in that?

2         Q.   I'm sorry?

3         A.   No.

4              (Reporter clarification.)

5         THE WITNESS:   I don't know any other Sandys and

6    Gregs.  I have no idea of other Sandys and Gregs.

7    BY MS. SIMPSON:

8         Q.   I just wanted to make sure.

9              Had either Sandy or Greg come to you about

10   their pay?

11        A.   Yes.

12        Q.   Who?

13        A.   Both.

14        Q.   When?

15        A.   I do not recall.

16        Q.   And what did Sandy discuss with you about her

17   pay?

18        A.   Underpaid, undervalued.

19        Q.   Was this oral or in writing?

20        A.   Oral.

21        Q.   Do you recall what year?

22        A.   No.

23        Q.   Were there any witnesses?

24        A.   No.

25        Q.   When did Greg come to you with respect to his



1    pay?

2         A.    Underpaid, undervalued, the running joke that

3    when someone leaves Signature and get rehired, they come

4    back with a higher pay; and how it wasn't fair that

5    operations were getting increases in pay and accounting,

6    thus, AAMs were not getting the same increases in pay.

7         Q.    And was that oral or in writing?

8         A.    Oral.

9         Q.    Any witnesses?

10        A.    No, I do not believe so.

11        Q.    And continuing on that second page, do you see

12   that Jan responds, "Sounds good.  Is there any other AAMs

13   that would possibly get onboard?"

14        A.    Yes.

15        Q.    And you respond, "Maybe Sherri, I will ask her

16   to."

17        A.    I do see that, yes.

18        Q.    And which Sherri is that referring to?

19        A.    Sherri Battle.

20        Q.    Did you speak with Sherri Battle about

21   submitting an Ethics hotline complaint?

22        A.    No.

23        Q.    Had Sherri come to you about her pay?

24        A.    I do not recall.

25        Q.    Do you see Jan's response is, "Okay.  I don't



 1  really know her that well.  I wondered about Susan Barr."

 2  And it continues on the next page, "I have no idea what

 3  she's makes.  Scottsdale was acquired right after MOB and

 4  BFM, but she is under Angie, so I don't know?"

 5      A.   I see that, yes.

 6      Q.   Did you ever speak with Susan Barr about filing

 7  an Ethics hotline complaint?

 8      A.   No.

 9      Q.   Do you know if Jan did?

10      A.   I have no idea.

11      Q.   On the next page, do you see that Jan says,

12  "I can talk to Susan, but like I said, she could be at

13  100 percent compa ratio.  I have no idea"?

14      A.   I do see that, yes.

15      Q.   Do you recall what Susan's compa ratio was?

16      A.   I have no idea what Susan Barr's compa ratio

17  is.

18      Q.   Did you know at the time of these text

19  messages?

20      A.   Actually not, no.

21      Q.   Why would you not know her compa ratio?

22      A.   Because she was not in my region.

23      Q.   Okay.  Did she ever directly report to you?

24      A.   No, never.

25      Q.   Who did she direct report to?



1      A.   Angie, as Jan mentioned.

2      Q.   And just so I understand how compa ratio works,

3  as a RAM you would only get compa ratio for your direct

4  reports?

5      A.   Correct.

6      Q.   Got it.

7           On the third page, I'm just going back to

8  your text on the third page, which is 227 at the bottom.

9      A.   Yes.

10     Q.   You see how you're mentioning "leading a

11  crusade of our own, and would you be okay sharing our

12  fight with her"?

13     A.   "LOL."  Yes, I do see that text.

14     Q.   Okay.  I'm just trying to understand.  You felt

15  like you were working against the company?

16     A.   No.  I was working for fair pay for the AAMs.

17     Q.   What's the crusade that you're taking on?

18     A.   It was a joke.  That's why I said "LOL."

19          (Deposition Exhibit No. 7 was

20           marked for identification.)

21  BY MS. SIMPSON:

22     Q.   Mike, the Bates label is going to be FS 020232

23  to 33.

24          Mr. Saunders, at the bottom of the first page,

25  do you see that this is a text from you to Jan on



1   October 4th, 2021?

2       A.   Yes, I do see that.

3       Q.   And you see that you indicate "I'm having the

4   group meeting today"?

5       A.   Yes, I do see that.

6       Q.   Is that referring to the meeting where you

7   called your current and former AAMs together in order to

8   talk about their pay?

9       A.   The same meeting where Chris DeJong clashed

10  through the company?  Yes, that meeting.

11      Q.   I'm sorry.  I think we're confusing meetings.

12           I understand there was a meeting that you and

13  Jan had with Mr. DeJong.  Is that the meeting you're

14  referring to, or is it when you pulled together your

15  current and former AAM to talk to them about the meeting

16  you had with Mr. DeJong?

17      A.   The latter, but --

18      MR. MANN:  Objection.  You can answer.

19      THE WITNESS:  Chris DeJong said that meeting screwed

20  the company.

21  BY MS. SIMPSON:

22      Q.   When did Chris say that?

23      A.   In a chat.

24      Q.   With who?

25      A.   With the CFO at the time.



1       Q.    Okay.  You weren't apart of that chat?

2       A.    No, I wasn't part of that chat.  No.

3             (Deposition Exhibit No. 8 was

4              marked for identification.)

5       THE WITNESS:  May I take a break?

6       MS. SIMPSON:  Absolutely.

7       THE WITNESS:  Thank you.

8             (A recess was taken.)

9   BY MS. SIMPSON:

10      Q.    I'm going to start with an exhibit.  The

11  internal Bates is going to be FS 020234.  And,

12  Mr. Saunders, I'm sorry I gave you that exhibit.  I

13  actually want to take a step back.

14            What we're reviewing is obviously texts to Jan

15  Chalk.  I understand why you're texting with her because

16  the e-mails that we reviewed during your first deposition

17  were with respect to her pay.

18            On the e-mail correspondence regarding the EEOC

19  mediation, there was Tracy and Dustin.  Why were you

20  communicating with them?

21      A.    Because they cared about me.  They wanted to

22  understand how I was doing.

23      Q.    Okay.  Is Tracy still with Signature?

24      A.    No.

25      Q.    Are you guys friends outside of work?



1     A.   Yes.

2     Q.   Okay.  Are you two still friends?

3     A.   Yes.

4     Q.   Have you talked to her about your claims?

5     A.   At some point to some extent, yes.

6     Q.   Recently?

7     A.   No.

8     Q.   Do you recall what you told her about your

9  claims?

10    A.   That Signature continues to lie or lied at that

11 time.

12    Q.   And what was Tracy's response?

13    A.   Just supportive.  "You'll get through this.

14 The truth is on your side."

15    Q.   And same questions for Dustin.

16         Is he a former employee of Signature?

17    A.   Yes.

18    Q.   And are you two friends outside of work?

19    A.   Yes.

20    Q.   Did you talk to him about your claims?

21    A.   I don't believe so.

22    Q.   Do you recall Dustin's reaction to the EEOC

23 information?

24    A.   There was no reaction, no reply, no response.

25    Q.   So as friends you never talked about the EEOC



1    mediation besides that e-mail?

2         A.   Correct.

3         Q.   Okay.  Let's go to what's been marked as

4    Exhibit No. 8.

5              Do you recognize this communication with Jan?

6         A.   This one, vaguely.

7         Q.   On the second page at the top, do you see it's

8    dated October 6th, 2021?

9         A.   Yes.

10        Q.   And do you see that Jan says, "When you said

11   her percentages were 7 to 10 percent higher than what you

12   have, you were saying by SFS compa ratio I would be at

13   68 percent or so regarding than the 68 percent that

14   salary.com shows, correct?"

15        A.   I do see that.

16        Q.   Okay.  So at this point had you indicated to

17   Ms. Chalk what her Signature Flight -- or SFS compa ratio

18   was?

19        A.   No.

20        Q.   Do you know who she's referring to when she

21   says when you said "her percentages"?  Is that her?

22        A.   Honestly, again, this is -- I vaguely remember

23   this, and I'm confused about the text, to be honest with

24   you.  I don't -- it's weird to me because, again, she

25   only had an understanding of her compa ratio based on

 1  salary.com.  So I'm not sure of the figures, and I

 2  honestly have no idea.

 3       MS. SIMPSON:  Tab 9, which will be marked

 4  Exhibit No. 9, the Bates label is going to be FS 020242.

 5            (Deposition Exhibit No. 9 was

 6             marked for identification.)

 7  BY MS. SIMPSON:

 8       Q.   Do you see on that first page that this is an

 9  exchange with Jan Chalk at the bottom starting

10  October 15th, 2021?

11       A.   Yes.

12       Q.   And if we flip to the third page, at the top do

13  you see that you say, "The longer no response from them,

14  I feel the decision may be in our favor especially with

15  the EEOC leverage"?

16       A.   Yes.

17       Q.   What did you mean by that?

18       A.   That Signature will do the right thing.

19       Q.   If the EEOC found cause?

20       A.   Prior to.

21       Q.   Oh, at this point you were saying you were

22  going to file with the EEOC?

23       A.   No, I'm not saying.

24       Q.   Okay.  Then what's the EEOC leverage?  I'm

25  confused about that.



1        A.    Yeah, I'm unsure what I meant by that at the

2   time.

3        MS. SIMPSON:   Tab 11, which will be marked as

4   Exhibit No. 10.  The Bates label is going to be 020263.

5             (Deposition Exhibit No. 10 was

6              marked for identification.)

7        THE WITNESS:  Yes, I see it.

8   BY MS. SIMPSON:

9        Q.    And do you see on the first page that this

10   chain starts October 31st, 2021?

11        A.    Yes.

12        Q.    And if you flip to the second page, do you see

13   your text says, "At least you are getting the e-mails,"

14   smiley emoji.  "I cannot lose my eyes and ears on the

15   inside," winking emoji?

16        A.    I do see that.

17        Q.    What did you mean about "eyes and ears on the

18   inside"?

19        A.    No idea.  It was a joke more likely because of

20   the winky face.

21        Q.    Was Ms. Chalk providing you with company

22   information?

23        A.    No.

24        Q.    Were you using Ms. Chalk to communicate with

25   other Signature employees?



1       A.    No.

2       MS. SIMPSON:  Tab 12, which will be marked

3  Defendant's Exhibit 11, Bates labeled 020285.

4            (Deposition Exhibit No. 11 was

5             marked for identification.)

6       THE WITNESS:  Yes.

7  BY MS. SIMPSON:

8       Q.    And on that first page, do you see midway

9  through the page the text chain starts November 3rd,

10  2021?

11      A.    Yes.

12      Q.    And do you see that Jan Chalk says, "I just

13  pray that if we both have a lawsuit against them, that

14  will make our case even stronger"?

15      A.    Yes.

16      Q.    Was Ms. Chalk claiming to join your litigation?

17      A.    Separate litigation.

18      Q.    What was that going to be for?

19      A.    Unfair pay.

20      MR. MANN:  Objection.

21  BY MS. SIMPSON:

22      Q.    Do you know why she did not proceed with filing

23  litigation?

24      A.    I have no idea.

25      MR. MANN:  Objection.



1   BY MS. SIMPSON:

2       Q.   If you flip to the second page, do you see your

3   response is, "That is one of my main hopes, and that they

4   do not find anything "illegal" on your work laptop or

5   work phone?

6       A.   I do see that.

7       Q.   What illegal information were you discussing

8   about being on Jan's computer?

9       A.   None.  I don't think there was anything illegal

10  because I put it in quotes just like a joke.

11      Q.   Okay.  What information did you think that --

12  I'm sorry -- to quote your text that you were hoping they

13  did not find on her work laptop or work phone?

14      A.   Nothing.  Everything is the truth.  Everything

15  has been the truth.

16      Q.   Why did you text her that one of your main

17  hopes was that they didn't find anything illegal on her

18  work laptop or work phone?

19      A.   Again, it's a joke.

20      Q.   It's a joke?

21      A.   Yes.  It's almost like counterintuitive.

22  There's nothing to find.  There's nothing to find except

23  for the truth.

24      Q.   I'm trying to get the truth today.

25           Do you see her response is, "The my RAM stuff



 1  folder is the only thing they could use"?

 2       A.    True.

 3       Q.    Okay.  I thought you testified during your

 4  deposition that she wasn't successful in downloading

 5  information?

 6       A.    I don't think she was.  I don't think so.

 7       Q.    Why would she say that the RAM stuff in that

 8  folder is what they could find on her work laptop?

 9       A.    It's just a statement.  I'm not saying she

10  actually sent it to me.

11       Q.    So she could have downloaded the information?

12       A.    I have no idea.

13       MR. MANN:  Objection.

14       MS. SIMPSON:  Tab 13, which is going to be marked as

15  Defendant's Exhibit 12.

16             (Deposition Exhibit No. 12 was

17              marked for identification.)

18  BY MS. SIMPSON:

19       Q.    Do you see on the first page that this text

20  chain starts November 4, 2021?

21       A.    Yes.

22       Q.    And if we flip three pages in to 292.

23       A.    Yes.

24       Q.    Do you see at the bottom how you're talking

25  about what your girlfriend said with respect to accessing

1    your RAM folder?

2           A.   Yes.

3           Q.   And if you flip to the next page, it seems like

4    you're concerned about Jan accessing your RAM folder, and

5    that you want to talk to an employment attorney.

6                Do you see that?

7           A.   Yes.

8           Q.   Did you, in fact, reach out to someone?

9           A.   I don't believe so.

10          Q.   You're mentioning your aunt here.  Who is that?

11          A.   Farnita Kay Saunders.

12               (Reporter clarification.)

13          THE WITNESS:  F-a-r-n-i t-a and then, K-a-y, and

14   last name same as mine, Saunders, S-a-u-n-d-e-r-s.

15   BY MS. SIMPSON:

16          Q.   Does she have legal training?

17          A.   She's a lawyer for Morgan & Morgan.

18          Q.   What office of Morgan & Morgan is she in?

19          A.   I think it's the one in Orlando, I believe.

20          Q.   Does she still work there?

21          A.   I'm unsure at this point.

22          Q.   Did you reach out to your aunt about Jan

23   accessing your RAM folder?

24          A.   I don't believe so.

25          Q.   Did you introduce your aunt to Jan Chalk?



1          A.    No.

2          Q.    If you'll flip to the next page, which is 294,

3    you see that you're talking what about Tracy is

4    mentioning?

5          A.    Yes.

6          Q.    And who is that?

7          A.    That's Edouard.

8          Q.    At that point, was she a former employee of

9    Signature?

10         A.    I do not recall.

11         Q.    Okay.  So she might have been current -- am I

12   right, she's the one that worked with Signature?

13         A.    At one point she did.  She's not there anymore

14   as of right now.  At this point I'm not sure during this

15   time period was she or not.

16         Q.    Got it.

17               And so you spoke with Tracy about having Jan

18   Chalk access the RAM folder?

19         A.    Yes.

20         Q.    And she indicated that Jan could say you were

21   accessing those files for information.

22         A.    I do see that, yes.

23         Q.    Okay.  But you indicated to Jan that you'd

24   rather lean towards the truth?

25         A.    Correct.



1      Q.   And what was the truth of why Jan was accessing

2   the RAM folder?

3      A.   The truth was to -- I guess the rebuttal of

4   Signature's comment or statement on their termination

5   letter to me that they noticed a lack of engagement, and

6   that was the ultimate lie.  And before I even talked to

7   Jan about any of this as to the file, I wrote down three

8   pages of all that I did that year to counter their lie of

9   lack of engagement.

10      Q.   And that was located in the RAM folder?

11      A.   No.  That's just all what I knew I did.

12      Q.   Okay.  So what in the RAM folder would have

13   supported this rebuttal?

14      A.   Honestly, I mean, talking about before.  It's

15   like reports, reports I reviewed, projects I was working

16   on, support I gave to my AAMs during those four years.

17   Yeah, all the engaging things I did that year that I was

18   terminated wrongfully for a lie of lack of engagement.

19   All lies, all lies, all lies, continued lies.

20          I mean, I reviewed reports every day, every

21   week, every month.  I'd meet with my teams every day,

22   every week, every month, and they lie and say lack of

23   engagement.  I'm so tired of the lies.

24      Q.   Me too.  Let's hope we can clear some up today.

25      A.   I doubt it.



 1              (Deposition Exhibit No. 13 was

 2              marked for identification.)

 3   BY MS. SIMPSON:

 4       Q.    I'm showing you what's been marked as Exhibit

 5   No. 13.  This is from Tab 14 Bates labeled 020302.

 6              On the first page, do you see that this text

 7   chain starts November 4, 2021?

 8       A.    Yes.

 9       Q.    And if you flip to the second page, you see at

10   the bottom that Jan says "Also picking up that copy

11   tomorrow"?

12       A.    I do see that.

13       Q.    What is that referring to?

14       A.    I do not recall.

15       Q.    If you'll flip to the next page, which is 304,

16   do you see that she continues, "Also have forensic

17   computer friend I may have told you about looking into my

18   copies"?

19       A.    I do see that.

20       Q.    What is she referring to here?

21       A.    I have no idea, but if Jan was successful in

22   delegating company documents or files, why wasn't she

23   fired?

24       Q.    You would agree that's a terminable offense,

25   right?



1       A.   It should have been.

2       Q.   And you asked Jan to --

3       A.   I didn't ask her to do anything.

4       Q.   You never asked Jan --

5       A.   No.

6       Q.   -- to download files for you?

7       A.   I did not, no.

8       Q.   So if you testified during your first

9   deposition that you asked her to and she was

10  unsuccessful, would that be a lie?

11      A.   I asked her to, or she volunteered to?

12      Q.   I'm just trying to get to the bottom of it

13  today.

14      A.   Okay.  I do not recall.  It's been three years.

15      Q.   So is your testimony from the first

16  deposition -- and I don't have the transcript in front of

17  me, but is that accurate?

18      A.   Neither do I.

19      Q.   Right.

20           You're not saying that you lied about it in

21  your first depo?  You just can't recall what you said,

22  right?

23      A.   Right.

24      Q.   Okay.

25      MR. MANN:  Objection.



1      THE WITNESS:  Why wasn't she fired?  She downloaded

2   these files.  You guys are claiming she did.  Why wasn't

3   she fired?  Why was she put on paid leave 45 days to be

4   investigated for this stuff and not fired?

5   BY MS. SIMPSON:

6      Q.   You see that you respond to her text saying,

7   "I know you have a techie friend who you have been

8   consulting with, and I hope you are right about Friday"?

9      A.   I do see that.

10      Q.   What are you referring to there?

11      A.   I have no idea, but, again, if she downloaded

12   files, why was she not fired?  For 45 days they looked at

13   her, and they did not fire her.  Why was she not fired in

14   those 45 days that she apparently allegedly downloaded

15   files?

16      Q.   Did her techie friend wipe her computer so

17   nobody could see what happened?  What was the techie

18   friend doing?

19      A.   I have no idea.  I'm not a techie friend.

20      MR. MANN:  Objection.  You can answer.

21      THE WITNESS:  I have no idea of her techie friend,

22   never met this person, don't know who this person is,

23   don't know the person's name, never talked to this

24   person.  All I know, if she did what you guys are saying

25   she did, why wasn't she fired?



1   BY MS. SIMPSON:

2        Q.   I'm not saying it.  It's in the text messages.

3        A.   Okay.  If that's what the text says and you're

4   trying to claim that she did this, then why wasn't she

5   fired?

6        Q.   If you flip to page 306, do you see in the

7   middle of the page, November 4, 2021, she says, "Got all

8   of the e-mails accessed and printed"?

9        A.   I do see that.

10       Q.   Do you know what e-mails she is talking about?

11       A.   I do not recall.  But, again, they're e-mails.

12   Why wasn't she fired for sending them to me?

13       Q.   Did she send them to you?

14       A.   I have no idea.

15       Q.   She might have?  You don't recall?

16       A.   I do not recall.  If she did, why wasn't she

17   fired?

18       MS. SIMPSON:  Tab 16, which will be marked as

19   Exhibit No. 14, which is Bates labeled 020398.

20            (Deposition Exhibit No. 14 was

21             marked for identification.)

22       THE WITNESS:  Yes.

23   BY MS. SIMPSON:

24       Q.   Do you see on that first page that this is a

25   text chain starting December 2nd, 2021?



1        A.   Yes.

2        Q.   And do you see in the first text messages

3    you're indicating "I've e-mailed three different lawyers

4    in Orlando who specialize more in employment law and

5    discrimination than Morgan & Morgan and a lawyer in

6    California who won against SA, and I have also e-mailed

7    Ben Crump, George Floyd's lawyer"?

8        A.   Yes.

9        Q.   Did any of those three law firms take your

10   case?

11       MR. MANN:  Objection.

12       THE WITNESS:  Do I answer, Mike?

13       MR. MANN:  Yes.

14       THE WITNESS:  No, no one took the case.

15   BY MS. SIMPSON:

16       Q.   Okay.  Did Ben Crump take the case?

17       A.   No.

18       Q.   Well, I'm sorry.  I'm not trying to trick you.

19            Did Morgan & Morgan take the case?

20       A.   They didn't.  Initially they took it on, but --

21   yeah, initially they took it on.

22       Q.   Okay.  But the other different law firms did

23   not, is what you're saying?

24       A.   Correct.

25       Q.   Got it.



1        MR. MANN:  Objection.

2        MS. SIMPSON:  Tab 18, which will be marked

3    Exhibit 15.

4              (Deposition Exhibit No. 15 was

5               marked for identification.)

6        THE WITNESS:  Yes.

7    BY MS. SIMPSON:

8        Q.   Do you see this text chain starts January 3rd,

9    2022?

10       A.   Yes.

11       Q.   And you see at the bottom you say, "For me,

12   unless Sherri and Chris get fired and/or contract a

13   terminal illness, I have to keep my peace, sanity, and

14   happiness by avoiding the drama and craziness of SA"?

15       A.   Yes, I do see that.

16       Q.   So you wish that Sherri or Chris were going to

17   get fired?

18       A.   For lying, yes.

19       Q.   Lying about what?

20       A.   Terminating me and saying that I lacked

21   engagement, I didn't have proof of my hotline claim, that

22   I did not follow the reporting structure, I did not

23   tell -- lied that I did not tell Sherri that I was filing

24   a hotline claim, the lie that I was causing dissension

25   amongst the AAM group, all the lies, continued lies.  I'm

1  so over the lies.

2       Q.   And you wished terminal illness upon them?

3       A.   I was angry at the time.  I'm angry now.  This

4  has been constant anger.

5       MS. SIMPSON:  Tab 20, which will be marked

6  Defendant's Exhibit 16.

7            (Deposition Exhibit No. 16 was

8             marked for identification.)

9       THE WITNESS:  Yes.

10 BY MS. SIMPSON:

11      Q.   And you're laughing.  What are you laughing

12 about?

13      A.   Because, as I continue to say, the truth is on

14 my side.

15      Q.   Okay.  Let's review that.

16           On the first page, do you see that it says

17 January 11, 2022, is when the text starts?

18      A.   Yes.

19      Q.   You see that Jan says at the bottom, "Had EEOC

20 interview.  She said because Lisa and Renee are paid more

21 than me and roughly the same age, it is not

22 discrimination by age or gender"?

23      A.   I do see that.

24      Q.   And do you see that your response is,

25 "Hopefully we can get them on whistle blower/retaliation



1   and lying in the termination letter"?

2       A.   I do see that.

3       Q.   And you see that Jan responds, "Think that's

4   the only option"?

5       A.   I do see that.

6       Q.   And you respond, "About Lisa and Renee, that

7   Morgan & Morgan said practically the same thing"?

8       A.   I do see that.

9       Q.   And sir, you're referring to her text saying,

10  "Lisa and Renee are paid more than me and roughly the

11  same age, it is not discrimination by age or gender"?

12      A.   I do see that.

13      Q.   And that's what your text is referring to, "the

14  same Lisa and Renee," that reference above?

15      A.   Yes.

16      Q.   And if you'll flip to page 439.

17      A.   Yes.

18      Q.   You see your second text says, "I was just

19  telling Dustin last night at dinner I may not have a case

20  either, and the best thing for me to do is move on after

21  my EEOC interview if it turns out the same way as yours.

22  Unfortunately, they may win.  Sad but true"?

23      A.   I do see that.

24      Q.   And which Dustin is this referring to?

25      A.   The same, D-o-s-v-a-i-s.



1          Q.    Thank you for spelling it.

2          A.    Are we done with this one?

3          Q.    Yes.

4          A.    Can I ask you a question?

5          Q.    I don't know if I can answer it, but you can

6    ask me.

7          A.    Well, I guess a statement because at this time

8    I do not recall I received the right to sue letter.  That

9    had changed everything.  At the same time I was focused

10   on the wrong thing.  I think was focusing on the pay

11   difference where -- the termination letter was not about

12   the pay difference.  The termination letter was about

13   them lying about -- again, lying about my lack of

14   engagement, lying about I didn't have merits on my

15   hotline claim, lying about I did not follow reporting

16   structure, lying about I caused dissension amongst the

17   AAM group, lying about --

18              (Reporter clarification.)

19         THE WITNESS:  Lying about the AAM group.  Dissension

20   amongst the AAM group, lying about that, and lying about

21   my lack of engagement, the main thing, which they have no

22   support to back that up, not even in that year, the whole

23   14 years, and then the lack of -- in addition, it was

24   produced that they used a Gallup poll survey from a year

25   ago to attest to my lack of engagement, which had nothing



1  to do with my engagement with my people, yet they did not

2  produce the review I had that same year where I had one

3  10, nine 9s, and five 8s to truly test my performance --

4  my high performance and engagement with my people, yet

5  they pull out a year-old Gallup poll survey to attest to

6  my lack of engagement, which, again, was a lie.  No

7  performance improvement plan, no bad review, no poor

8  evaluation, nothing.

9  BY MS. SIMPSON:

10      Q.    Okay.  So let me break that down.

11           At this time you don't think you had the

12  dismissal and notice of right to sue from the EEOC; is

13  that right?

14      A.    I do not recall.  I'm not sure if I had it or

15  not.  I don't know the timing.

16      Q.    And you indicated that this text exchange

17  between you and Jan, you both were focused on whether or

18  not Lisa and Renee's pay indicated discrimination based

19  on age or gender, right?

20      A.    That was the wrong focus.  The focus --

21      Q.    I'm just asking about this first, and then

22  we'll move on to your next point.

23           But this conversation, you two were focusing on

24  at that time --

25      A.    Yes, the wrong focus.



1        Q.    -- whether or not Lisa and Renee's pay meant
2    that there was not discrimination by age or gender,
3    right?

4        A.    Right.

5        Q.    But you after this at sometime shifted your
6    focus to the termination letter and your contention that
7    the information in it wasn't true, right?

8        A.    Before when they served it to me, my focus was
9    on that it was a lie.

10        Q.    Okay.

11        A.    And also, again, it wasn't about Lisa making
12    more money.  It was about Jan being below the 80 compa
13    ratio the company set.  That was the core issue.

14            (Reporter clarification.)

15        THE WITNESS:  80 percent compa ratio, and she was at
16    68 percent, 12 percent lower.  That was the issue.

17        MS. SIMPSON:  I'm going to Tab 21, which is going to
18    be Exhibit 17, and that's going to be Bates 020454.

19            (Deposition Exhibit No. 17 was

20             marked for identification.)

21        THE WITNESS:  Yes.

22    BY MS. SIMPSON:

23        Q.    Do you see on the first page it's dated
24    January 24, 2022, for this text chain?

25        A.    Yes.



1       Q.   And what is this that Jan is sending you?

2       A.   Basically, after I was wrongfully terminated,

3   the company decided to enact equity and pay based on

4   compa ratios to bring everyone up to whatever -- however

5   their managers deemed fit based on compa ratio tier.  And

6   it clearly --  I can't read this, but I just know 80

7   percent was for beginners of compa ratio, and Jan had

8   been there for nine years at 68 percent, and that's what

9   this issue -- one of the main focus is about this issue,

10  that she was below the compa ratio.

11      Q.   So Jan was sending you company documents

12  regarding pay?

13      A.   In this case, yes.

14      Q.   And besides these --

15      A.   But she was not fired.

16      Q.   And besides these text messages, which I mean,

17  I received after she retired, just for the record, did

18  you produce these documents separate from these text

19  screen shots?

20      A.   When you say "produced" --

21      Q.   Yeah.  Did you ever print out the documents she

22  sent you?

23      A.   I don't believe so.

24      MS. SIMPSON:  Tab 24, which is going to be marked as

25  Defendant's Exhibit 18, and it is Bates labeled 020484.



```
 1              (Deposition Exhibit No. 18 was

 2               marked for identification.)

 3        THE WITNESS:  Yes.

 4    BY MS. SIMPSON:

 5        Q.   Do you see on that first page that the text

 6    chain starts March 11th, 2022?

 7        A.   Yes.

 8        Q.   Do you see that your text on the bottom says,

 9    "So pissed again about the whole situation, and I want

10    them all near dead.  They/she/he have definitely and

11    significantly impeded my job search"?

12        A.   I do see that.

13        Q.   Who did you want dead?

14        A.   Again, I was angry.  All who lied, all who

15    lied, all who lied.

16        Q.   Did you attend an independent medical

17    examination?

18        A.   Yesterday, actually.

19        Q.   Yesterday?

20        A.   Yes.

21        Q.   About how long did that last?

22        A.   Three hours, which is, again impeding my

23    current employment.

24        Q.   When did you learn of an independent medical

25    examination?
```



1      THE WITNESS:  Mike?

2      MS. SIMPSON:  I'm asking you.  He can't answer.

3      MR. MANN:  You've got to answer.

4      THE WITNESS:  Yeah, I know.  Can I answer it?  So I

5  can answer it, Mike?

6      MR. MANN:  Yes.

7      THE WITNESS:  I would say Tuesday, Wednesday of

8  February 7th, 8th.  Wednesday, Thursday, somewhere in

9  that time frame, between Tuesday and Thursday of that

10  7th, 8th, and 9th of February.

11  BY MS. SIMPSON:

12      Q.  When you're talking about in this text chain

13  that "they significantly impeded my job search," what do

14  you mean by that?

15      A.  Because on the next page that I --

16      Q.  Can you give me the --

17      A.  FS 020486.

18      Q.  Thank you.

19      A.  They saw that it was a red flag to have me

20  terminated from Signature -- wrongfully terminated from

21  Signature based on lies after 14 years.

22      Q.  Did you tell them about your case against

23  Signature?

24      A.  Not at that time, I don't believe so.

25      Q.  Okay.  So what information was Nicole relying



1   on here that she saw on your departure from SA after

2   14 years as a red flag?

3       A.   I have no idea.  Maybe some HR search.  I have

4   no idea.

5       Q.   Would it be on your resume?

6       A.   Probably.  Well, but not -- no, not why I was

7   fired.  I mean, they thought I no longer worked there.

8   But if I got fired or left, they had no idea of that by

9   resume.  They have to do some type of search.

10      Q.   Okay.  Do you have any personal knowledge of

11  anyone at Signature contacting Ungaro about your

12  employment at Signature?

13      A.   No idea.

14      Q.   On the last page, 487, at the bottom, do you

15  see that Jan says, "Well, you were grossly underpaid, so

16  you could always use angle"?

17      A.   I do see that.

18      Q.   Jan knew how much you were paid?

19      A.   No, not -- well, not when I was at Signature,

20  after I left.

21      Q.   You told her how much you were paid after your

22  separation?

23      A.   Correct.

24      Q.   Okay.  And at any time during your employment

25  with Signature, did you raise concerns about being



1    underpaid?

2         A.   Never.  That's why it's a lie that it said I

3    did it for personal gain.  I had no idea what my pay was,

4    what my compa ratio was at the time.  It was never about

5    personal gain.  It was never about forcing Jan to

6    advocate for fair --

7              (Reporter clarification.)

8         THE WITNESS:  And it was never about coercing Jan to

9    advocate for her own fair pay.  So it was never about me

10   not acting timely to Jan's request for fair pay.

11   Continued lies.

12        MS. SIMPSON:  Tab 26, which is going to be marked

13   Exhibit 19.

14             (Deposition Exhibit No. 19 was

15              marked for identification.)

16   BY MS. SIMPSON:

17        Q.   On the first page, do you see that this text

18   chain starts March 22nd, 2022?

19        A.   Yes.

20        Q.   And you indicate, "I just called the

21   whistleblower law firm.  They did not want to take the

22   case, not a low-hanging fruit.  Wrongful termination

23   cases are difficult to win, so they referred me to

24   nela.org and the Florida local bar.  I will keep trying."

25        A.   Yes, I see that.



1      Q.    And under that you say, "She dropped me as a

2   client"?

3      A.    Yes.

4      Q.    Who are you referring to?

5      A.    Allison.

6      Q.    Did the whistleblower law firm take your case?

7      A.    No.

8      Q.    And I'm sorry.  Is that Allison at Morgan &

9   Morgan?

10      A.    Yes.  Look how far we've come.

11      Q.    So between the time of Allison at

12   Morgan & Morgan dropping you and you engaging Mike Mann

13   at the Cochran Law Firm, did you ever retain any other

14   lawyer?

15      A.    No.

16      Q.    Did you tell Jan why Allison dropped your case?

17      A.    I do not recall.

18      MS. SIMPSON:  Tab 31, which is -- and just for the

19   record, Mike, because I know you had asked about a stop

20   time, I'm going to be done shortly.

21      MR. MANN:  Okay.

22           (Deposition Exhibit No. 20 was

23            marked for identification.)

24   BY MS. SIMPSON:

25      Q.    So this is Exhibit 20, Bates labeled 020210?



1        A.    Yes.

2        Q.    And on the first page, do you see that this is

3   dated December 19th?

4        A.    Yes.

5        Q.    And do you see that Jan texted on that first

6   page, "Can I have notes in front of me?  I have a

7   timeline that I drafted two years ago with dates and

8   such."  And your is response, "I was told I couldn't

9   because they can confiscate the same document and

10  possibly use against the case."

11            And then continuing to the next page, "I would

12  say review that draft and remember the highlights.  Yet

13  the good thing about the truth, nothing to remember.  I

14  have another hour of driving until I get home from my

15  girlfriend's place, and I will write and forward you the

16  questions I think about."

17       A.    Yes.

18       Q.    Is that referring to Jan Chalk's upcoming

19  deposition?

20       A.    I believe so.

21       Q.    And did you, in fact, forward Ms. Chalk

22  questions?

23       A.    No.

24       Q.    Why not?

25       A.    Wait.  I did, actually.  Hold on.  On the last



1    page.

2        Q.    Take your time.  I'm sorry.  What number are

3    you referring to?

4        A.    2013.  "What did Sherri Miller say about the

5    AAMs pay?  What were you told by Sherri Miller as the

6    reason of not receiving fair pay?  What were you told by

7    Sherri Miller the reason for not receiving fair pay?  And

8    what were you told by Christy Pavel was the reason for

9    not receiving fair pay?"

10       Q.    So those are the questions that you sent her in

11   preparation for her deposition?

12       A.    Yes.  And also, I guess, "Why did you not

13   receive fair pay for taking on the work of two additional

14   locations?"  Yeah.

15       Q.    And you're reading the text at the bottom of

16   213 and 214?

17       A.    Yes.

18       Q.    Got it.

19             Okay.  And then under that, do you see you sent

20   Jan a screen shot of your text with Mike saying, "All

21   went well.  Amanda is doing questions now.  Your MUST

22   stop talking to witnesses about the lawsuit.  She just

23   spent about an hour examining her about your

24   communications with each other at about the litigation

25   and her deposition."



1    A.   Yes, basically telling Jan I can't talk to her
2  anymore.
3    Q.   So is that a text from Mike Mann to you about
4  Ms. Chalk's deposition that you sent to her?
5    A.   Yes.
6    Q.   Got it.
7         And so you're sending it to her because you
8  can't talk to her anymore?
9    A.   Right.
10    Q.   Did you let anyone else know that you couldn't
11  talk to them anymore?
12    A.   I do not recall.
13    MS. SIMPSON:  Tab 32, which will be marked
14  Defendant's Exhibit 21
15         (Deposition Exhibit No. 21 was
16          marked for identification.)
17    THE WITNESS:  Yes.
18  BY MS. SIMPSON:
19    Q.   Do you see on the first page that this text
20  chain at the bottom starts January 10, 2023?
21    A.   Yes.
22    Q.   And if you flip to the second page, 151 --
23    A.   Yes.
24    Q.   -- you see you have a long text that says, "FYI
25  for later, from me"?



1        A.    Yes.

2        Q.    And then do you see that it says, "Some of the

3  facts are off.  The main disconnect is that the situation

4  from April 2021 to October 2022 was never about black

5  employees or Jan Chalk's gender.  It was about me

6  advocating for her fair pay after her workload increased

7  by 50 percent"?

8        A.    I do see that, yes.

9        Q.    And then on page 153, do you see it says

10  "Lawyer response"?

11        A.    Yes.

12        Q.    What is that referring to?

13        A.    What I was advised by my lawyer.

14        Q.    And then do you see that that says, "We want to

15  stay away from terms like personal, and we want to keep

16  things as general and open ended as possible, like dates,

17  statements, numbers, et cetera because we don't" -- and

18  going over to the next page, 154 -- "because we don't

19  know everything yet, and the complaint will box us in

20  down the road when we are in discovery.  For example, if

21  we discover complaints of other employees about race

22  discrimination, we're going to want to be able to use

23  that as support in your case.  Also, people don't

24  suddenly start discriminating against black employees, so

25  I don't want to say they were never racist until



 1  October 21st.  We want to say they were racist during

 2  your employment and let them show us evidence otherwise."

 3       A.   Yes, I see that.

 4       Q.   And then do you see at the bottom of page 155

 5  that Jan says, "Agree.  And let him use the race issue

 6  wherever he wants"?

 7       A.   Yes.

 8       Q.   Was this text chain in response to you

 9  reviewing the complaint in this case?

10       MR. MANN:  Don't answer.  That's attorney-client

11  privilege.

12  BY MS. SIMPSON:

13       Q.   Around January 10th, 2023, did you review the

14  complaint before it was filed in this case?

15       A.   Ask that again.  Sorry.

16       Q.   Around January 20th, 2023, did you review the

17  complaint prior to it being filed in this case?

18       A.   Not at all of it.

19       Q.   What part of it did you review?

20       A.   The first few pages, the facts.

21       Q.   The facts?

22       A.   I honestly don't -- it was like 30 pages in

23  total, I think it was.

24       Q.   Okay.

25       A.   But they did discriminate against me now that I



1  think about it because I've been saying recently that

2  Bobby Benziger, who is a white male, received a

3  performance improvement plan for lack of engagement while

4  him and I were RAMs at the same time in those four years,

5  yet he was not fired.  Yet, I was fired for lack of

6  engagement and never received a performance improvement

7  plan of that notion.  Again, nor a bad evaluation, nor a

8  bad review, never even an e-mail saying "your engagement

9  is off, lacking, suffering, needs to be improved,

10  nothing."  Yet, Bobby, a white male, that received a

11  performance improvement plan was allowed to stay on, not

12  fired for lack of engagement, yet I was fired for lack of

13  engagement.

14       So in this case, discrimination was existing,

15  even to the point where Jan Chalk, white female, was not

16  fired for allegedly downloading documents, yet I was

17  fired wrongfully.

18       Q.   Okay.  So these are new claims that you didn't

19  raise during your first deposition.

20       So where did the information on Bobby Benziger

21  coming from?

22       A.   I was aware of that when I was with Signature,

23  that he received a performance improvement plan.

24       Q.   When I asked you during your first deposition

25  of all evidence you had in support of your discrimination



1  claim, why did you not raise this?

2       A.   I forgot.

3       MR. MANN:  Objection.

4  BY MS. SIMPSON:

5       Q.   What role did Bobby Benziger hold at the time

6  of your separation?

7       A.   He was a regional account manager just like

8  myself.

9       Q.   Okay.  Bobby Benziger ever pull together AAMs

10 to have a meeting with them about getting them more pay?

11      A.   I have no idea what he did in those four years.

12      Q.   And when you're saying Bobby Benziger, you're

13 referring to Robert Benziger?

14      A.   Correct.

15      Q.   Do you know if he's still employed with

16 Signature?

17      A.   He is not.

18      Q.   Do you know what the basis of his separation

19 from Signature was?

20      A.   From what I recall, better pay, more pay, more

21 money.

22      Q.   Did he voluntarily leave Signature?

23      A.   I want to say yes.

24      Q.   Were you aware that a mediation was scheduled

25 in this case for the afternoon of February 14th?



1      A.   Not until after I missed it.  I do not recall.

2      Q.   Were you notified of the mediation prior to

3  February 14th?

4      A.   After I missed it, I went back and realized

5  that I had received an e-mail on January 24th.  But,

6  again, to be clear, those e-mails did not appear on my

7  calendar at all, and I thought the mediation was on hold

8  because -- I thought it was on hold.

9      Q.   Do you know that we filed a motion for

10  sanctions with the Court as to not attending the

11  mediation?

12      A.   I believe that happened.

13      Q.   Are you aware that sanctions have been entered

14  against you for failing to produce all relevant

15  information in a timely manner?

16      MR. MANN:  Objection.

17      THE WITNESS:  Back to the first question.

18      MR. MANN:  You can answer.

19      THE WITNESS:  Okay.  Thank you, Mike.

20          It was an honest mistake missing the mediation,

21  honest mistake, and I -- I'm not reluctant to give you

22  guys anything.  I've given you guys everything I possibly

23  can.  And if I haven't given anything, it's just because

24  either I forgot or I didn't know it was asked of me to

25  provide it.  I'm not withholding anything.  I literally



1   brought my phone to Mike's law firm for you guys to get

2   all these text messages.

3   BY MS. SIMPSON:

4        Q.   I appreciate that, and that's a good point, for

5   purposes of the record.  I'm almost done, but I'm going

6   to keep this deposition open with respect to e-mails and

7   text messages relevant to this case that we've gone

8   through, not precluding the possibility of a possible

9   forensic examination of your phone for that information.

10        So are you aware that we have a hearing

11   tomorrow in federal court?

12        A.   I think 10 o'clock.  I'm aware of that one,

13   yes.

14        Q.   Are you planning to attend?

15        A.   Absolutely.  I missed my work week in Baltimore

16   because of that and yesterday's mental health expert

17   session.  That work trip was scheduled at least two

18   months in advance.  I had to cancel it last minute

19   because of all this, which puts my job further in

20   jeopardy.

21        MS. SIMPSON:  I will see you tomorrow.  And I have

22   no further questions subject to keeping the deposition

23   open.

24        MR. MANN:  All right.  I've got a few questions.

25



                    CROSS-EXAMINATION

1

2    BY MR. MANN:

3        Q.   All right.  Fredrick, just so we're clear, you

4    never actually sent the recording from the EEOC mediation

5    to anybody?

6        A.   That is clear, Mike, never sent it.  Too large

7    of a file.

8        Q.   You sent key takeaways to a number of people;

9    that's correct?

10       A.   That is correct, yes.

11       Q.   The key takeaways didn't have anything derived

12   from the mediation; isn't that correct?

13       MS. SIMPSON:  Object to form.

14       THE WITNESS:  When you say -- repeat the question.

15   Sorry, Mike.

16   BY MR. MANN:

17       Q.   So in the mediation, you didn't go over

18   rebuttals and statements and everything like that; isn't

19   that right?

20       A.   That is correct.

21       Q.   The actual key takeaways were your notes for

22   the mediation; is that right?

23       MS. SIMPSON:  Object to form.

24       THE WITNESS:  I believe so.

25   BY MR. MANN:



1       Q.   Did you prepare the key takeaways in

2   preparation for the mediation?

3       A.   I don't think so.

4       Q.   Did you prepare those takeaways in preparation

5   for trial?

6       A.   I'm not even sure there's a trial to be had

7   yet.  I don't know.  I mean --

8       Q.   Let me rephrase.

9            So did you prepare those key takeaways in

10  preparation for your ongoing litigation?

11      A.   I prepared the key takeaways document to

12  document the lies that Signature continues to tell, and

13  that was the first page.  The second page was just

14  reiterations of the lies from the termination letter.

15      Q.   And those were your mental impressions and

16  notes of your personal --

17      MS. SIMPSON:  Objection.

18  BY MR. MANN:

19      Q.   Your personal and mental impressions notes?

20      A.   Yes.  And to be clear, I never went back and

21  listened to the recording.  Those key takeaways were from

22  my memory of the mediation.

23      MR. MANN:  Nothing further.  Thank you, Fredrick.

24      MS. SIMPSON:  I have a couple follow-ups.

25



1                    REDIRECT EXAMINATION

2    BY MS. SIMPSON:

3        Q.   You just indicated that you never listened to

4    the recording of the EEOC mediation?

5        A.   Correct.

6        Q.   But I thought you testified previously that you

7    played that recording for Ms. Chalk?

8        A.   Yes, but I didn't listen to it.  I wasn't there

9    when it played.

10       Q.   What were the circumstances under which you

11   played the recording for her, but you didn't listen?

12       A.   Because my condo is two stories.  I played it

13   for her, and I went upstairs.

14       Q.   Oh, you did this in person?

15       A.   No, no.  I'm in Orlando.  She's in Mobile.

16       Q.   So you played the recording on your phone for

17   her, but you walked upstairs?

18       A.   Yeah, because she was on the phone.  She called

19   me; phone to phone.

20       Q.   Oh, because it was a long recording?

21       A.   Exactly.

22       Q.   You prepared the key takeaways following the

23   mediation because they included my opening statements,

24   right?

25       A.   Yes.



1        MS. SIMPSON:  No further questions.

2        MR. MANN:  We're good.

3        COURT REPORTER:  Do you need to order?

4        MS. SIMPSON:  Yeah.  Could I get that tonight?

5        MR. KLEIN:  We have a hearing in court tomorrow.

6        MS. SIMPSON:  Oh, yeah.

7             You want a copy, Mike?

8             I ordered the transcript.  Would you like a

9   copy?

10        MR. MANN:  Yes, please.

11        MS. SIMPSON:  Is your client, who has left, going to

12   read or waive?

13        MR. MANN:  He'll read.

14        COURT REPORTER:  Counsel, do you need yours on an

15   expedited basis as well?

16        MR. MANN:  No, I'm fine.

17             (Deposition proceedings were concluded.)

18

19

20

21

22

23

24

25



1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:

4    COUNTY OF ORANGE:

5

6        I, ANEESHA WILLIAMS, Notary Public, State of

7    Florida, do hereby certify that FREDERICK SAUNDERS

8    personally appeared before me on February 21, 2024 and

9    was duly sworn and produced a driver's license as

10   identification.

11       Signed this 22nd day of February, 2024.

12

13

14

15

16   _____

17   Aneesha Williams
     Notary Public, State of Florida
     My Commission No. HH321786
18   Expires: 08/29/2026

19

20

21

22

23

24

25



1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF ORANGE:

4

5        I, ANEESHA WILLIAMS, Notary Public, State of

6    Florida, certify that I was authorized to and did

7    stenographically report the deposition of FREDERICK

8    SAUNDERS; that a review of the transcript was requested;

9    and that the foregoing transcript is a true and accurate

10   record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16       Dated this 21st day of February, 2024.

17

18

19   _____

20       Aneesha Williams,
         Registered Professional Reporter

21

22

23

24

25



```
 1                    ERRATA SHEET

 2      DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES SHERRI

 3                 IN RE: SAUNDERS VS. SIGNATURE
                   CASE NO. 6:23-CV-0230-RBD-LHP
 4                 DATE: FEBRUARY 21, 2024
                   DEPONENT: FREDERICK SAUNDERS
 5

 6    PAGE NO. LINE NO.  CORRECTION & REASON

 7    _____    _____

 8    _____    _____

 9    _____    _____

10    _____    _____

11    _____    _____

12    _____    _____

13    _____    _____

14    _____    _____

15    _____    _____

16    _____    _____

17    _____    _____

18    _____    _____

19    _____    _____

20    _____    _____

21    _____    _____

22    Under penalties of perjury, I declare that I have read
      the foregoing document and that the facts stated in it
23    are true."

24

      _____
25    DATE                             FREDERICK SAUNDERS
```

